# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION


United States of America,    )
                             )
            vs.              ) 6:21cr00058-JDA-1
                             )
William Robert Norwood, III, )
                             )
            Defendant.       )
_____) March 2, 2021


TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING

BEFORE THE HONORABLE KEVIN F. MCDONALD
United States Magistrate Judge, presiding


A P P E A R A N C E S:

For Government:              Maxwell Cauthen, Esquire
                             US Attorneys Office
                             55 Beattie Place, Suite 700
                             Greenville, SC 29601


For Defendant:              Benjamin T. Stepp, Esquire
                            Federal Public Defender's Office
                            75 Beattie Place, Suite 950
                            Greenville, SC 29601




                 Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
                       U.S. District Court Reporter
                    300 E. Washington Street, Room 304
                          Greenville, S.C. 29601


Proceedings recorded by stenomask, transcript produced by
computer-aided transcription.

**P R O C E E D I N G S**

1

2       (Court is called to order on Tuesday, March 02, 2021, at

3    10:04 a.m.)

4            **THE COURT:**  If you're at counsel table and you wish

5    to remove your mask, I leave that up to you.

6            All right.

7            Recognize the US attorney.

8            **MR. CAUTHEN:**  May it please the Court, Your Honor.

9            **THE COURT:**  Yes, sir.

10           **MR. CAUTHEN:**  Judge, we're here on Case No. 1:21-266.

11   This is out of the District of Columbia. It's the United States

12   versus William Robert Norwood, III. He is presently represented

13   by local counsel, being Mr. Ben Stepp.

14           Your Honor, I do have one matter of housekeeping

15   before I go forward.

16           **THE COURT:**  Yes, sir.

17           **MR. CAUTHEN:**  And that is the Judge in the District

18   of Columbia issued an order sealing these materials. However,

19   once the arrest was executed, he included in his Order that the

20   affidavit in support of criminal complaint and related

21   materials are sealed until the arrest is executed. Therefore,

22   these are now unsealed as respect to the arrest, Your Honor.

23           **THE COURT:**  All right.

24           If that's in the form of a motion, then the motion is

25   granted, and those are unsealed.

1          **MR. CAUTHEN:**  Yes, sir.

2          And Your Honor, I have provided Mr. Stepp with a copy

3    of the materials that I have. And I think the Court has a color

4    copy, as well. And it is my understanding from speaking with

5    Mr. Stepp this morning after consultation with Mr. Norwood,

6    this was set for a preliminary/detention hearing. It is my

7    understanding that they are waiving the preliminary hearing

8    aspect and we would proceed forward today on the detention

9    hearing/bond request.

10          Is that correct, Mr. Stepp?

11          **MR. STEPP:**  Yes, sir.

12          That's right. I talked with my client about that

13    yesterday, and we waive the preliminary hearing.

14          **THE COURT:** Okay.

15          And Mr. Stepp, Mr. Norwood made an appearance the end

16    of last week, I take it, so he has already been advised about

17    the charges that were filed against him in the District of

18    Columbia, as well as the possible penalties. You've been

19    appointed, at least here locally. Is there anything more that

20    he needs by way of advice as to the charges that have been

21    filed?

22          **MR. STEPP:**  I don't think so. I talked to the other

23    lawyer in our office who appeared with him Friday. She had a

24    copy of the complaint with the factual statement and had an

25    opportunity to discuss that, at least partially, with him. He

1  had a chance to look over it. Because it was sealed, he could

2  not keep a copy.

3          But I went over it again yesterday in Spartanburg.

4  And I believe, based on what I've talked with him about, he

5  understands the charges, the potential penalties that are

6  listed in the complaint and, you know, why we're here ---

7          **THE COURT:**  Okay.

8          **MR. STEPP:**  --- and what went on last week.

9          I just have one question. So the unsealing of the

10 District of Columbia complaint and supporting factual basis,

11 that -- the Court did that today. Does that mean that I can

12 provide my client with a copy that he can keep if he wanted to?

13         **THE COURT:**  Yes, sir.

14         **MR. STEPP:**  Okay.

15         **THE COURT:**  Yes, sir.

16         **MR. STEPP:**  All right.

17         I'm going to let him -- he's seen it, but he hasn't

18 seen the color version. So while we're --

19         **THE COURT:**  Well, there -- and let me say this: I

20 mean, obviously, in our affidavit -- I have looked through the

21 affidavit. The affidavit does have personal identifiers which

22 may need to be redacted. Other than that, the substance of the

23 affidavit, I see no reason to -- for it to remain sealed. The

24 government has indicated that it -- that it believes it should

25 be unsealed.

1          **MR. STEPP:**  If I could add one thing.

2          **THE COURT:**  Yes, sir.

3          **MR. STEPP:**  My client's family is scattered back here

4    in the back. They came in this morning. And they provided me

5    with a copy that they printed off the Internet. They said it

6    was on -- anyway, they found it somehow.

7          **THE COURT:**  Of course, this is coming out of the

8    District of Columbia. I'm not sure if it was our court or their

9    court or what happened, or if it was a court at all.

10          **MR. STEPP:**  Well, it had the -- only -- the only ECF

11   number on this one that she gave me is 121-MJ-266, which may be

12   the District of Columbia --

13          **MR. CAUTHEN:**  It is.

14          **MR. STEPP:**  -- Information.

15          **MR. CAUTHEN:**  Judge, I might can shed a little light

16   on that.

17          **THE COURT:**  Yes, sir.

18          **MR. CAUTHEN:**  I spoke to the AUSA who is handling

19   this case, who is the actual case prosecutor for the District

20   of Columbia. When I spoke with her late yesterday afternoon,

21   that's when she informed me that it was unsealed based on the

22   Judge's order. So then I got a copy of it, which is what I just

23   read, the last part, in the court today upon the arrest.

24          **THE COURT:**  I see.

25          **MR. CAUTHEN:**  So they probably went ahead and posted

1    it. But of course, I couldn't do that until --

2            **THE COURT:**  But that was because Mr. Norwood made an

3    appearance last Friday.

4            **MR. CAUTHEN:**  Yes, sir.

5            **THE COURT:**  Even though Judge Austin apparently

6    didn't formally enter an order unsealing, they were operating

7    off of the District of Columbia, Judge Harvey's written order

8    that once he made an appearance that their court could unseal

9    it.

10           **MR. CAUTHEN:**  That is correct.

11           **THE COURT:** So that's why it's available.

12           **MR. STEPP:**  And if I could I add one thing, when I

13   got this thing --

14           **THE COURT:**  And -- and -- and I -- not to cut you

15   off, but I think we would still -- our court practice written

16   by local rules is redact personal identifiers from any

17   Information.

18           **MR. CAUTHEN:**  Yes, sir. It is my intention to let the

19   AUSA know that, Your Honor.

20           **THE COURT:**  Okay.

21           **MR. CAUTHEN:**  Because there's a couple of things in

22   here that, again, locally, we might want to redact, just to be

23   on the safe side to protect the individuals.

24           **THE COURT:**  That's just in compliance with our rules.

25           **MR. CAUTHEN:**  Yes, sir.

1          **THE COURT:**  It may not make a difference since it's

2    already out there, but we still observe our rules.

3          **MR. CAUTHEN:**  Yes, sir.

4          **THE COURT:**  And we want to protect Mr. Norwood's

5    rights to that -- in that respect.

6          Okay.

7          I'm sorry, Mr. Stepp.

8          **MR. STEPP:**  As a follow-up, when I was doing research

9    on this Friday, I did just general Internet Google search-type

10   research and found that the US Attorneys Office in the District

11   of Columbia has a webpage where they have listed all of these

12   Capitol riot people, on or about 8 or 10 pages, alphabetically,

13   of everyone who has been picked up. It's a very neat,

14   slick-looking thing. Norwood's name was not on there. I was

15   looking for him. But this was people who had already been

16   arrested.

17         **THE COURT:**  I see.

18         **MR. STEPP:**  They had their name, the case number,

19   they had what the status of the case was. Like if someone made

20   an appearance in January, they mention that, and appeared to

21   have a link to the court documents.

22         **THE COURT:**  Okay.

23         **MR. STEPP:**  So I would just point that out that this

24   stuff is out there.

25         **THE COURT:**  Okay. Well, I guess it's --

1         **MR. STEPP:**  I appreciate the Court's willing -- you

2  know, desire to protect personal information about people, but

3  unfortunately, I guess it's going to come out from other areas.

4         **THE COURT:**  Yes, sir.

5         Well, you know, for the -- Mr. Norwood's benefit, for

6  his family's benefit, you know, if the District of Columbia has

7  different local rules regarding personal identifiers and

8  sealing, then that's something they would need to take up with

9  that Court. But this Court will observe the redaction of

10  personal identifiers to protect Mr. Norwood and anyone else

11  from having that such information out publicly available.

12         So at the close of this hearing, I'd ask the

13  government to redact the affidavit. It shouldn't take very

14  long. Because I've read through it. I think there's a phone

15  number.

16         **MR. CAUTHEN:**  Yes, sir.

17         **THE COURT:**  There's a couple of other things. And

18  just to do that, to meet with the clerk so that redacted

19  version can be filed and made publicly available.

20         **MR. CAUTHEN:**  Yes, sir. Judge, I will tell the Court

21  that as soon as I finish here, I'm -- I have court in

22  Spartanburg.

23         **THE COURT:**  Okay.

24         **MR. CAUTHEN:**  But I will get to it as promptly as I

25  can to have -- to see that it's redacted and contact the clerk.

1       **THE COURT:** Okay.

2       All right.

3       Well, as I look through the -- the affidavit is not

4  very long. It is like a matter of a couple of phone numbers.

5       **MR. CAUTHEN:**  Yes, sir.

6       **THE COURT:** But anyway, all right.

7       Okay.

8       So Mr. Stepp and Mr. Norwood is here.

9       Mr. Norwood, you've heard what Mr. Stepp said -- has

10  said that you've been advised of what you're charged with in

11  the District of Columbia. You know what you're charged with.

12  Any question about that?

13       **THE DEFENDANT:**  No, sir.

14       **THE COURT:** Okay.

15       The only issue then -- as I understand it, the

16  preliminary hearing has been waived. In other words, there

17  is -- you can see there is probable cause to go -- for these

18  charges to go forward in the District of Columbia. And the only

19  question, then, is whether or not you should be detained, held

20  in custody until that hearing takes place. And so that's what

21  we're doing this morning.

22       The charges here, just to make clear, knowingly

23  entering or remaining in any restricted building or grounds

24  without lawful authority. That's under 18 U.S.C. 1752(a)(1) and

25  (2). There is also 40 U.S.C. 5104(e)(2)(D), violent entry and

1   disorderly conduct on Capitol grounds; 18 U.S.C. 1512(c)(2) and

2   (2), obstruction of justice/Congress; 18 U.S.C. 641, theft of

3   government property. So those are the charges. And the issue

4   then is whether or not you should be detained or be granted a

5   bond as those -- as you wait for a hearing or a trial on those

6   charges.

7          You do understand that this case would be handled in

8   the District of Columbia?

9          **THE DEFENDANT:**  Yes, Your Honor.

10         **THE COURT:**  Okay.

11         Very good. All right.

12         Mr. Stepp, can you think of anything we need to do

13  before we start the hearing?

14         **MR. STEPP:**  No, sir.

15         I think that covers the preliminary issues from our

16  side.

17         **THE COURT:**  Okay.

18         All right.

19         Anything more from the U.S. attorney before I ask you

20  to call your first witness?

21         **MR. CAUTHEN:**  No, sir.

22         **THE COURT:** Okay.

23         Please call your first witness.

24         **MR. CAUTHEN:**  Your Honor, at this time, the

25  government will call Special Agent Tanya Evanina of the FBI.

1          **THE COURT:**  All right.

2          **MR. CAUTHEN:**  If you'd step forward and be sworn,

3    please, ma'am.

4          **THE COURT:**  Ma'am, if you'd come forward. And you can

5    remove your mask so that everyone can see and hear you clearly.

6    And if you'd you state your name and spell it and then be sworn

7    by the clerk.

8          **THE WITNESS:**  My name is Tanya, T-a-n-y-a, Evanina,

9    E-v-a-n-i-n-a.

10         **THE CLERK:**  Thank you.

11         Could you please raise your right hand?

12                         **TANYA EVANINA**

13       having first being duly sworn, testified as follows:

14         **THE WITNESS:**  I do swear.

15         **THE CLERK:**  Thank you.

16         **THE COURT:**  If you would, please be seated there.

17    Speak into that microphone and keep your voice up so that

18    everyone can hear you.

19                      **DIRECT EXAMINATION**

20    BY MR. CAUTHEN:

21    **Q**    Agent Evanina, you're with the FBI?

22    **A**    Yes, sir.

23    **Q**    Are you familiar with the facts and circumstances

24    underlying this case?

25    **A**    Yes, sir.

1  **Q**   Have you spoken with affiant of the warrant?

2  **A**   I have.

3  **Q**   Okay.

4      Let's go to the affidavit -- I'm referring to Page 2 --

5  since what we're talking about is an issue of bond in this

6  matter. Were the agents provided information that Mr. Norwood

7  had communicated with others regarding his participation in the

8  Capitol riot?

9  **A**   Yes.

10 **Q**   And how was that communication done best on your

11 knowledge?

12 **A**   I was submitted electronically via an online tip to the

13 FBI.

14 **Q**   And with respect to Mr. Norwood's communication, do you

15 have a copy of those? Have you read through those in the

16 affidavit?

17 **A**   Yes, sir. I do.

18 **Q**   Okay.

19     Let's go first Page 2. I'm looking near the bottom of the

20 page below the photographs. Tell me when you're there. Below

21 the photographs of the screenshots. Are you there?

22 **A**   I have may have a different affidavit.

23         **THE COURT:**  Page 2 of the document that I have has a

24 criminal complaint as the cover page and then behind it, a

25 statement of facts with --

1       **MR. CAUTHEN:**  May I approach and hand her the

2   copy ---

3           **THE COURT:**  Yes.

4           **MR. CAUTHEN:**   --- Your Honor? She has the wrong

5   copy.

6           Let me go back to my spare copy just a moment, Judge.

7           **THE COURT:**  Okay.

8   **BY MR. CAUTHEN:**

9   **Q**   Page 2, underneath the text messages, you see where it

10  starts "as depicted"?

11  **A**   Yes, sir.

12  **Q**   And who was is text message reportedly coming from?

13  **A**   Mr. Norwood or a.k.a. Robbie, which is William Robert

14  Norwood III, a.k.a. Robbie.

15  **Q**   And what's the date and approximate time?

16  **A**   January 7, 2021 at 9:08 a.m.

17  **Q**   And what does it indicate with respect to message thread

18  and then a quote?

19  **A**   Robbie tells a group text message thread in quotes, It

20  worked. I got away with things that others were shot or

21  arrested for.

22  **Q**   After that, does he then text approximately four minutes

23  later?

24  **A**   He does.

25  **Q**   What did he say in that text?

1    **A**     "The cop shot a female Trump supporter, period. Then

2    allowed ANTIFA Trump supporters to assault him. I was one of

3    them. I was there. I took his shit."

4            **MR. CAUTHEN:** Judge, I apologize for the language.

5    She's just reading as it's quoted from the text.

6            **THE COURT:**  Yes, sir.

7    **BY MR. CAUTHEN:**

8    **Q**     Did Mr. Norwood follow it up with a photograph?

9    **A**     He did.

10   **Q**     And what did that photograph purport to show?

11   **A**     It shows Mr. Norwood depicted in a picture wearing a

12   police vest underneath a zipped up camouflage jacket.

13   **Q**     Okay.

14           Would that be a Capitol police vest?

15   **A**     A Capitol police tactical vest.

16   **Q**     Does he then continue on with four other messages of that

17   nature?

18   **A**     He does.

19   **Q**     What did he say with respect to telling the group that

20   he's texting to?

21   **A**     I fought four cops. They did nothing. When I put my red

22   hat on, they pepper-balled me.

23   **Q**     There's a follow-up message to that. I believe he

24   indicates what he stole?

25   **A**     He did. He said, "I got a nice helmet and body armor off a

1  cop, for God's sake, and I disarmed him. Tell me how that

2  works."

3  **Q**    Shortly after that, does he respond about one

4  individual -- one individual officer who was assaulted, in the

5  middle of the page?

6  **A**    Yes. He said, "The one cop who deserved it, got it. And

7  the cops who acted shitty got exactly what they deserved. The

8  ones who were cool got help."

9  **Q**    And based on your conversations in your interview with the

10 affiant, is the vest that he referred to as him stealing, is

11 that consistent with a vest worn by the Capitol police?

12 **A**    Yes, sir.

13 **Q**    Did you have or did your office have the opportunity to

14 subsequently interview Mr. Norwood in a noncustodial setting?

15 **A**    Yes, sir.

16 **Q**    Was that on approximately January 22 of this year?

17 **A**    It was.

18 **Q**    What did he indicate to you, if anything, about his

19 participation in the riot or disturbance at the Capitol?

20 **A**    So Mr. Norwood advised he traveled up to DC with his wife.

21 Got there during -- just right before the rally at The Ellipse.

22 He attended that. At the conclusion of Mr. -- of President

23 Trump's speech, he and his wife walked towards the Capitol

24 Building. As they were doing so, they inadvertently crossed

25 police barriers that appeared to be knocked down. They

1    continued to walk towards the Capitol itself, hearing

2    explosions in the area. When they reached a close proximity to

3    the door on the west side of the building, he and his wife were

4    separated by the crowd.

5         He continued to go into the Capitol. He proceeded to go

6    towards the Capitol and stated he was actually pushed into the

7    Capitol with a group of people. He said he tried to turn

8    around, but the crowd of people -- the force of the people

9    forced him into the building.

10   **Q**   Uh-huh.

11   **A**   While inside the building, he went through different areas

12   inside the US Capitol Building --

13   **Q**   Let me stop you at that point. While inside the building

14   going through different areas of the Capitol Building, did he

15   in any way indicate that he was being forced along with the

16   crowd or walking of his own at that point?

17   **A**   At first, it was he was forced along with the crowd. But

18   then once inside the Capitol Building, he was by himself --

19   walking by himself and, in his words, trying to find a way out.

20   **Q**   Uh-huh.

21        And are you aware that there were several photographs

22   taken from inside the Capitol complex that appear to show

23   Mr. Norwood?

24   **A**   Yes, sir.

25   **Q**   And in those, does he appear to be moving or standing

1    still looking around? You've seen them. How would you describe

2    them?

3    **A**    He seems to be walking around. One in particular that we

4    observed, he's up on an upper floor -- I believe it's an upper

5    floor. It's near the office of the Speaker of the House. He's

6    walking very freely by himself holding up a -- his telephone

7    videoing. And in one point, it appeared that he was actually

8    leading the crowd. He walked down a hallway, an L-hallway. When

9    he got to the end of the hallway, looked around, pointed down

10   the hallway, continued to walk and the crowd followed him.

11              **THE COURT:**  I'm sorry. This was a video?

12              **THE WITNESS:**  Yes. Yes, sir. There were videos

13   obtained from inside the Capitol.

14              **THE COURT:**  All right.

15   **BY MR. CAUTHEN:**

16   **Q**    Now, with respect to what else he told you, let's go back

17   to your January 22 interview. I interrupted you, so go ahead

18   and continue.

19   **A**    All right.

20        So he finally made his way out of the Capitol Building.

21   And when he walked out, he was on a different side of the

22   building, maybe the east side is what he thought. And as he

23   exited the building, he saw a bin, a big gray bin or gray tote

24   full of police equipment. And he saw a gentleman standing there

25   with a clipboard.

1      Mr. Norwood walked up to that area. He may have walked --

2  he was waved over to that area. And at that time, he said

3  someone put a police tactical vest on him.

4  **Q**    Someone just put it on him?

5  **A**    That's what he said. Yes, sir.

6  **Q**    Okay.

7      Go ahead.

8  **A**    Shortly after that, he removed the vest, put it back on,

9  and put his coat over the vest to conceal it a little bit. But

10  you could still see on the front a police patch.

11  **Q**    And that's the photograph you were referring to earlier, I

12  believe?

13  **A**    Yes, sir.

14  **Q**    Is that correct?

15  **A**    Yes, sir.

16  **Q**    Did he indicate you what he did with the stolen items?

17  **A**    Yes. After he met with his wife, they begin to walk out of

18  the area, met up with some people who offered them a place to

19  stay for the night at a hotel. Once they arrived at the hotel,

20  they started to watch news media. He saw how serious the

21  incident was and he decided to leave the vest behind at the

22  hotel the next day. So basically, he stated they left the

23  hotel, leaving the vest and the police helmet behind.

24  **Q**    Okay.

25      And now, let's stop there for a moment and move forward to

1    when he was arrested, I believe it was last week, here in South

2    Carolina. Are you aware of whether or not your colleagues had

3    set up surveillance on locations where he might've been in

4    order to prepare to arrest him?

5    A    They did. There was three different locations.

6    Q    And during the time, was he under surveillance?

7    A    He was under surveillance at that time.

8    Q    Did he ever -- did they ever lose surveillance on

9    Mr. Norwood?

10   A    They did.

11   Q    How, and why?

12   A    So approximately -- I would say at approximately 6:30,

13   Mr. Norwood arrived to --

14           **THE COURT:**  I'm sorry. 6:30 when?

15           **THE WITNESS:**  P.M., yes, sir.

16           **THE COURT:**  All right.

17           **THE WITNESS:**   P.M. He arrived to the area of his

18   residence on Locust Hill Road. He parked his vehicle in a local

19   business and walked approximately a quarter of a mile to his

20   residence.

21   **BY MR. CAUTHEN:**

22   Q    Was that business his business?

23   A    No. I believe it was a Family Dollar or Dollar General.

24   Q    So he parked at a store and then walked to his house?

25   A    Yes.

1   **Q**    Okay.

2        Continue please, ma'am.

3   **A**    When he arrived home, surveillance was actually sitting

4   across the street and was able to see. Shortly after that, all

5   the lights go off in the house. And they appeared to witness

6   somebody looking out, peering out of the windows at several

7   different times.

8   **Q**    Okay.

9   **A**    Shortly after that, they observed a Jeep Cherokee -- I

10  think it was a Jeep Cherokee, leave the property at -- I

11  wouldn't say a high rate of speed, but it was going over the

12  speed limit going towards Wade Hampton Avenue -- Wade Hampton

13  Boulevard. And at some point on Wade Hampton, they observed the

14  vehicle make a U-turn in the middle of the street and then pull

15  into a storage facility.

16  **Q**    And did they lose him at that point in time or try to

17  maintain surveillance?

18  **A**    They tried to maintain surveillance but actually they lost

19  him.

20  **Q**    When did they pick him up again?

21  **A**    They picked him up again as -- I think it was after

22  11 o'clock p.m., as he was traveling down Locust Hill Road to

23  his residence.

24  **Q**    And did they observe him -- did he go to his residence at

25  that point in time?

1   **A**    He did. He -- after leaving, I think, around the Dollar

2   General, he blacked his lights off -- he turned his lights out

3   and continued to drive down Locust Hill and made a sharp right

4   turn into his property.

5   **Q**    Without the lights on at 11 p.m.?

6   **A**    Yes, sir.

7   **Q**    Was anyone with him? Do you know?

8   **A**    It appears there was one other individual in the vehicle

9   with him.

10  **Q**    In the same vehicle?

11  **A**    Yes.

12  **Q**    Okay.

13       When he went into the residence that night at that time,

14  did they turn the lights on?

15  **A**    No. The lights remained off.

16  **Q**    Is that -- after that, is that when he was arrested?

17  **A**    Shortly after, yes, sir.

18  **Q**    How did the arrest take place? What occurred?

19  **A**    I would say at approximately 11:15 p.m., units that --

20  units of the -- our squad, the SWAT team and local police,

21  surrounded the house and activated the blue lights to let them

22  know of police presence. Prior to getting on the PA system to

23  call an announcement and have Mr. Norwood come out, they had to

24  wait for two other tactical teams to arrive because they were

25  at the two other addresses. So it took almost 25 to 30 minutes

1    for them to arrive.

2    **Q**    Okay.

3         And did he come out of the house voluntarily?

4    **A**    He did.

5    **Q**    Okay.

6         With respect to searches in this case, was there a search

7    executed on his -- on his other vehicle, a truck, I believe?

8    **A**    Yes. Mr. Norwood gave -- actually gave us consent to

9    search his truck that was located at the Dollar General.

10   **Q**    So he had left the truck at the Dollar General still?

11   **A**    Yes.

12   **Q**    And was that truck searched?

13   **A**    It was searched. Yes, sir.

14   **Q**    What, if anything of relevance to the activities we're

15   talking about today with respect to the Capitol riots -- did

16   they find anything in the vehicle related to that?

17   **A**    They did. They found a coaster that you would put -- like

18   you would put your drink on. It was a coaster that's -- had

19   United States Congress on it.

20   **Q**    Okay.

21        And have you seen anything relating to that in your view

22   or in the affiant's review of video from inside the Capitol?

23   **A**    Yes. So in a hallway or a corridor just outside the

24   Speaker of the House's office --

25   **Q**    And we're talking about Ms. Pelosi when you say Speaker;

1    correct?

2    **A**    Yes, sir.

3    **Q**    Okay.

4    **A**    There was a desk and there was a gentleman, an unknown

5    gentleman, rummaging through the -- through the desk. And as

6    he's doing that, he comes across a pile of coasters and he

7    starts flinging them down the hallway. He flings the first one

8    down the hallway. And seconds later, you can see Mr. Norwood

9    appear on the camera walking past that desk.

10   **Q**    And does the coaster that was recovered from his vehicle

11   appear to be the same type of coaster that they have at the

12   Capitol?

13   **A**    Yes, sir.

14   **Q**    Okay.

15        And you may have said this and if you have, please correct

16   me -- I just lost my spot momentarily -- did he enter Pelosi --

17   Speaker Pelosi's office?

18   **A**    We saw him go past that door and make a left. We are

19   assuming it's Speaker Pelosi's office. However, in the -- in

20   the post-interview -- post-arrest interview of Mr. Norwood

21   under Miranda, he did admit to going into Speaker Pelosi's

22   office.

23   **Q**    Okay.

24        Now, I believe you indicated -- I'm going to jump back a

25   little bit -- that when he and his -- his -- his wife left the

1  hotel in Washington or Virginia where they stayed after the

2  riot that he left -- he told you he left the stolen police gear

3  in the hotel room; is that correct?

4  **A**    That's correct.

5  **Q**    Did you have executed a search warrant or did the agency

6  execute a search warrant on a camper that he has?

7  **A**    Yes. It was a box trailer that belonged to him.

8  **Q**    And was that located here in South Carolina?

9  **A**    Yes, sir.

10 **Q**    Okay.

11     And did y'all find anything of relevance related to the

12 protest?

13 **A**    We did. So we located two tactical vests. One is black in

14 color with the word "police" on it that we could attribute to

15 the United States Capitol police.

16     And the second vest was a green tactical vest that

17 Mr. Norwood admitted belonged to him from the South Carolina

18 militia organization he belonged to maybe three years ago. We

19 found two police helmets: one is black in color; one is green

20 in color. We found an AR-15. We found ammunition consistent

21 with that AR-15. We found two tactical belts: one was like a

22 pistol belt; the other one was just like a tactical nylon belt.

23 **Q**    And --

24 **A**    We found face coverings.

25 **Q**    And did you find -- I forgot to ask. Did you find any

1   other weapons anywhere besides in the camper with the

2   AR-15-style weapon?

3   **A**   We did. Subsequent to the consent search on his vehicle,

4   that was a Glock 40 located on the driver's side floorboard, I

5   believe.

6   **Q**   And to be fair to Mr. Norwood, he is not prohibited from

7   possessing firearms or ammunition; correct?

8   **A**   That's correct.

9   **Q**   Okay.

10      I'm going to show you two photographs which I've

11   previously shown to defense counsel.

12          **MR. CAUTHEN:**  Marked as Government's Exhibit No. 1

13   and 2, Your Honor.

14   **BY MR. CAUTHEN:**

15   **Q**   Do you recognize those? Can you tell us what they are and

16   hand them up to the Court?

17   **A**   I do recognize those -- these. Exhibit 1 is the police

18   tactical vest and helmet that belonged to the Capitol police

19   that was removed from the property of the US Capitol.

20   And the second is a photograph of the ammunition that was found

21   inside the box trailer.

22   **Q**   Okay.

23      Now, with respect to the vest -- the tactical vest and the

24   helmet, have you confirmed those were, in fact, from the

25   Capitol police?

1   **A**    No. We're in the process of doing so. I had sent the

2   identifications up to the case agent.

3   **Q**    Are they the same type and appearance as that worn by

4   Capitol police?

5   **A**    Oh, yes, sir.

6   **Q**    Okay.

7        If you'd hand those --

8             **THE COURT:**  Any objection to --

9             **MR. STEPP:**  No objection. I've seen them.

10            **THE COURT:**   Okay.

11            All right.

12            So admitted, Exhibits 1 and 2.

13            All right.

14            Yes, sir.

15       (Government Exhibit Nos. 1 and 2 are admitted into the

16   record.)

17            **MR. CAUTHEN:**   Thank you. One moment please,

18   Your Honor.

19   **BY MR. CAUTHEN:**

20   **Q**    Did Mr. Norwood ever tell you that he had, in fact,

21   brought those items back from Washington after taking them?

22   **A**    He did. He admitted to taking them.

23   **Q**    When did he tell you that?

24   **A**    Subsequent to his arrest under Miranda in his post -- in

25   the interview post-arrest.

1   **Q**   And he was cooperative the whole time?

2   **A**   Very cooperative.

3   **Q**   Okay.

4        So that is different than what he told you in the first

5   interview; is that correct?

6   **A**   Yes, sir.

7   **Q**   Okay.

8        Thank you. Agent, at this time, if you would please answer

9   any questions that Mr. Stepp or defense counsel may have for

10   you.

11             **THE COURT:**  All right.

12             Mr. Stepp.

13                        **CROSS-EXAMINATION**

14   **BY MR. STEPP:**

15   **Q**   So, Agent, were you involved in the interview that the FBI

16   conducted with Mr. Norwood on January 22?

17   **A**   No, sir.

18   **Q**   Okay.

19        You were -- are aware that someone from the FBI contacted

20   Mr. Norwood and asked him to come and sit and talk to the FBI

21   in Greenville; correct?

22   **A**   That's correct, sir.

23   **Q**   Okay.

24        And he lived in Boiling Springs, right, or somewhere --

25   some distance away?

1   **A**    Yes.

2   **Q**    Okay.

3   **A**    Spartanburg County.

4   **Q**    So he drove or got from his home, wherever y'all searched

5   it, downtown to the FBI office, which is right -- a block away

6   from where we are, and sat for an interview with the FBI;

7   correct?

8   **A**    That's correct.

9   **Q**    And he didn't have to do that, did he?

10  **A**    No, sir.

11  **Q**    He wasn't under arrest, was he?

12  **A**    He was not under arrest.

13  **Q**    Okay.

14       And he told y'all that he had gone to Washington,

15  correct ---

16  **A**    Yes.

17  **Q**     --- on the 6th of January and he entered the Capitol

18  Building; correct?

19  **A**    That's correct.

20  **Q**    Okay.

21       And that this issue about these police vests came up and

22  he told you that he had taken police vests and the helmet but

23  that he left them in Washington and did not bring them back to

24  South Carolina; correct?

25  **A**    That's correct.

1    **Q**    All right.

2         Are you familiar with the affidavit that -- affidavit that

3    was submitted by FBI Special Agent Tyler Freeman in the

4    District of Columbia?

5    **A**    Yes.

6    **Q**    Okay.

7         So on this thing about the charge of stealing the police

8    vests, in these -- in these text messages that supposedly came

9    from Mr. Norwood's phone, he talks about disarming an officer

10   and taking the vest and helmet off of an officer; correct?

11   **A**    In the text, yes, sir.

12   **Q**    In the text message.

13        However, in the affidavit, the officer who submitted this

14   to the Judge in DC, on Page 4, says Norwood alleged that after

15   leaving the Capitol Building, an unknown person took a police

16   vest from a pile of police equipment that was lying on the

17   ground outside the west side of the Capitol Building and put it

18   on Norwood. Norwood then admitted that he put on a police

19   helmet from a pile of equipment before walking away from the

20   Capitol and reuniting with his wife. Norwood's description of

21   how he acquired the vest and helmet is consistent with the

22   Capitol police officer's accounts of how their equipment was

23   stolen by rioters on January 6, 2021.

24        So what this agent put in his affidavit is that what

25   Norwood said about picking it up outside the building and

1   putting it on, he didn't take it from a police officer. There's

2   nothing here, other than his text message, that indicates that

3   he took the vest, disarmed a police officer and took that --

4   somebody's vest and helmet; correct?

5   **A**    That's correct.

6   **Q**    Okay.

7        And when you talk about these communications with others

8   in a group text message, the truth of the matter -- are you

9   aware that the group text message consists of Mr. Norwood, his

10  mother, his father, and his sister. Four people. Are you aware

11  of that?

12  **A**    On the top of the phone, it says three people. And I know

13  one of those people would be his sister.

14  **Q**    Okay.

15  **A**    I am aware of that.

16  **Q**    But what I'm saying is, are you aware that the text -- the

17  group text message is a very defined group of people. This is

18  not -- there's no indication that you have that he is posting

19  open text messages on Facebook or any other social media; is

20  that correct?

21  **A**    That's correct.

22  **Q**    Okay.

23       And as a result of the tip that was received by agents of

24  the FBI, they eventually interviewed the people who are listed

25  in here which led them to interview or request to interview

1   Mr. Norwood; is that correct?

2   **A**    Yes, sir.

3   **Q**    Okay.

4        And the photographs that are included in the affidavit to

5   the warrants -- to get the warrants or warrant, in Photograph

6   No. 10 of Mr. Norwood in what appears to be the Washington

7   Monument -- are you familiar with that? Do you see that?

8   **A**    Yes, sir.

9   **Q**    Okay.

10       Is that a -- a picture that you provided to the FBI?

11  **A**    I don't know that answer.

12  **Q**    Okay.

13       That picture is Mr. Norwood. Is that your understanding?

14  **A**    Yes, sir.

15  **Q**    And then that picture was used to compare to other

16  pictures, such as the one below Photo 10 which appears to be

17  taken in the Capitol rotunda. And someone has circled a person

18  in the middle of -- kind of in the middle of the room. Then

19  there is a zoom-in of that cropped photo down at the bottom of

20  Page 5 of the affidavit. Do you see that?

21  **A**    Yes.

22  **Q**    Okay.

23       And that appears to be -- it's in here because it appears

24  to be Mr. Norwood wearing the same hunter-type camo jacket that

25  he has in the picture outdoors and used to identify him as

Tanya Evanina - Cross-Examination by Mr. Stepp                    32

1   being in the rotunda; correct?

2   **A**   Correct.

3   **Q**   Okay.

4        And again, that -- on the next page, on Page 6 of the

5   affidavit, there's photo of people -- there's three pictures.

6   In top picture, someone has circled an individual kind of

7   looking like they are in a doorway, passageway, or something,

8   presumably inside of the Capitol Building. And then there's a

9   zoom-up that leads to one of those on the left-hand side of the

10  page right below it, which appears, again, to be Mr. Norwood

11  dressed in the same camo jacket in the red, I guess, MAGA hat;

12  correct?

13  **A**   Correct.

14  **Q**   And then, immediately to the right of that picture,

15  another one which also appears to be him dressed in a red MAGA

16  hat; correct?

17  **A**   Yes, sir.

18  **Q**   And -- but there's -- there's -- going back to this

19  photograph that appears in the text -- embedded in the text

20  message listed as Photo No. 3 on Page 2 of the affidavit, that

21  is, as your testimony was, believed to be him wearing a police

22  vest; correct?

23  **A**   Correct.

24  **Q**   And this texting that took place occurred the morning

25  after all of this activity at the Capitol Building; correct?

1  **A**    Yes. On the 7th of January.

2  **Q**    Right. In fact, the affidavit says as depicted in these

3  text messages on January 7, 2021, at 9:09 a.m., Norwood tells a

4  group message etc., etc. So these texts appear to have been

5  sent out the following day?

6  **A**    Correct.

7  **Q**    Okay.

8       So did you personally have interaction with Mr. Norwood?

9  **A**    I did on the day of the arrest.

10  **Q**    Okay.

11       And during the time that you had interaction with him, did

12  he give you any trouble?

13  **A**    No, sir.

14  **Q**    Did he make any threatening statements to law enforcement?

15  **A**    No, sir.

16  **Q**    Did he make any political statements regarding the

17  incident at the Capitol Building to you?

18  **A**    Define what you mean by "political statements."

19  **Q**    Well, such as, "We were up there to" -- and I'm just using

20  this as an example. "We were up there to protest the stolen

21  election," or something like that.

22  **A**    No.

23  **Q**    Okay.

24       Was there any indication that he had gone up there with

25  any plan to do anything illegal or nefarious in regard to the

1  government of the United States?

2  **A**    No.

3  **Q**    Okay.

4       And are you aware that thousands of people descended upon

5  the Capitol Building during this event on January 6?

6  **A**    Yes, sir.

7  **Q**    Okay.

8       And are you aware that the -- out of the people who had

9  been arrested and investigated and all of that, there appeared

10  to be some people who are more organizers than other people?

11  **A**    I don't know that answer to say yes or no.

12  **Q**    Okay.

13       And in regard to this investigation that you had, did you

14  communicate with the people in the District of Columbia who

15  were actually handling the investigation and the prosecution of

16  all these people?

17  **A**    I have communicated with them, yes.

18  **Q**    Okay.

19  **Q**    So going to the arrest, the circumstances surrounding the

20  arrest of Mr. Norwood on Friday, y'all had warrants in hand; is

21  that right? When I say -- I don't mean in hand. I guess you

22  were aware that there was a warrant for the arrest of

23  Mr. Norwood?

24  **A**    That's correct.

25  **Q**    Okay.

1    And y'all went over there for the purpose of arresting

2    him; is that correct?

3    **A**   Yes, sir.

4    **Q**   Okay.

5    And this warrant was issued on the 25th of February in the

6    District of Columbia, is that your understanding? I'm just

7    looking at the ---

8    **A**   Yes.

9    **Q**    --- front page of the --

10   **A**   Yes.

11   **Q**   Okay.

12   And it arrived down here the next day, the 26th; correct?

13   **A**   It was electronically provided to me that evening.

14   **Q**   Okay.

15   So y'all -- you had the -- all of the authority you needed

16   to arrest this man on the spot once you found him?

17   **A**   Correct.

18   **Q**   Okay.

19   But y'all went over there with a group of y'all and saw --

20   did you see him park that vehicle up from -- away from the

21   residence and walk a half a mile or a quarter of a mile?

22   **A**    I did not. That was relayed to me by surveillance

23   units ---

24   **Q**   Okay.

25   **A**    --- who were in place prior to the warrant being issued.

1    **Q**    Were these surveillance units members of the police?

2    **A**    They were members of the FBI.

3    **Q**    Were there regular police out there, the Spartanburg

4    County Sheriff or anybody that was a local cop?

5    **A**    There were members of the JTTF, the Joint Terrorism Task

6    Force, who have state authority, such as Spartanburg County

7    deputies, Greenville County deputies.

8    **Q**    Okay.

9          All right.

10         So the information that was out there was that he had

11   parked a truck at a Dollar General store and someone saw him

12   walking a quarter of a mile or some distance from the general

13   store to his residence; is that correct?

14   **A**    I don't know if they saw him walking, but they did -- do

15   know the truck was parked at the Dollar General and someone saw

16   him at the house.

17   **Q**    And you said there was a vehicle speeding away from the

18   house at some point?

19   **A**    Yes.

20   **Q**    Did you see that?

21   **A**    I did not. No, sir.

22   **Q**    So there's people surrounding the house, observing the

23   house, the house that they believed to contain a person that

24   they had a federal arrest warrant for; correct?

25   **A**    Well, surveillance started earlier than we actually

1  obtained the arrest warrant. There was a surveillance unit

2  sitting across the street. I wouldn't say the house was

3  surrounded by police. And I think Mr. Norwood spotted the car.

4  It's not -- it wasn't a marked unit. It was an unmarked vehicle

5  belonging to the FBI.

6  **Q**    Okay.

7      But there were a number of police officers near his -- or

8  at his -- or somewhere out there nearby; is that correct?

9  **A**    In the neighborhood, yes, sir.

10 **Q**    And someone saw a vehicle, your words, speeding away from

11 the house in excess of the speed limit; is that correct?

12 **A**    Driving a -- yes.

13 **Q**    Okay.

14     And was Mr. Norton believed to be the driver of that

15 vehicle?

16 **A**    It was believed that he was the driver, yes, sir.

17 **Q**    Okay.

18     And so this is, he apparently speeds away by himself in a

19 vehicle; is that right?

20 **A**    At the time, they didn't know if there was one or two

21 occupants in the vehicle.

22 **Q**    Okay.

23     Who was in charge of this arrest situation? You said there

24 was a SWAT team in the local police were there. Who was in

25 charge of all of these people?

1   **A**    Ultimately, the FBI.

2   **Q**    Okay.

3         Were you the FBI person in charge?

4   **A**    No, sir. It would be my supervisor.

5   **Q**    Okay.

6         So this vehicle driving away -- speeding away was believed

7   to contain him who y'all had an active warrant on; correct?

8   **A**    I don't believe we had the warrant at the time.

9   **Q**    Well, you were aware that there was a warrant?

10  **A**    I don't believe it was signed at that time. I don't

11  believe it was signed until after 8 o'clock. I'm not sure of

12  the exact time. We knew we were working on getting the

13  affidavit for the warrant ---

14  **Q**    Well --

15  **A**     --- and we were conducting surveillance.

16  **Q**    But the warrant for him had been issued the day before in

17  DC. I'm talking about the warrant to pick him up and arrest

18  him.

19  **A**    On Thursday evening.

20  **Q**    Okay.

21         **THE COURT:**  Let's get our dates straight. February --

22  I understood from what I'd written down earlier the warrant was

23  issued on February 25.

24         **THE WITNESS:**  Correct.

25         **THE COURT:**  And you received it later that same day

1    electronically, is that -- I believe you testified to that?

2              **THE WITNESS:**  Correct.

3              **THE COURT:**  Mr. Stepp's asking you about the

4    chronology of the surveillance as related to the warrant. Is it

5    a conduct that you described, the Jeep speeding away -- I don't

6    want to mischaracterize your testimony -- did that occur prior

7    to the warrant being issued on the 25th?

8              **THE WITNESS:**  I'd have to look at the notes. But --

9    to answer that correctly. Surveillance was set up on the house

10   prior to the warrant being issued.

11             **THE COURT:**  Do you need to follow up on my question?

12   I know you have a question or two but you may want to ask that

13   question.

14   **BY MR. STEPP:**

15   **Q**    When you say "being issued," do you mean --

16   **A**    The affidavit was being written.

17   **Q**    Okay.

18        For what? The arrest warrant?

19   **A**    Yes, sir.

20   **Q**    So this would have been the 25th, Thursday?

21   **A**    Correct.

22   **Q**    Okay.

23        But at some point, you attempt -- you went down -- at some

24   point, you said y'all went to the house, announced yourselves

25   and at that point, do you have the warrant to arrest him?

1   **A**    Yes. That was shortly before midnight when the house was

2   surrounded.

3   **Q**    Okay.

4        But you knew there was a warrant coming?

5   **A**    We believed so. Yes, sir.

6   **Q**    You wouldn't have been down there if you didn't, just

7   hanging out?

8   **A**    Correct.

9   **Q**    So -- but someone, if they wanted to detain Mr. Norwood,

10  could have stopped a vehicle that they believe he was driving

11  that they observed in violation of South Carolina law. They

12  could have stopped that vehicle; correct? If he's committing a

13  violation --

14  **A**    For speeding? For speeding?

15  **Q**    For speeding.

16  **A**    Yes, sir.

17  **Q**    Okay.

18       So when you said other people were at two other addresses,

19  I'm assuming you mean two other addresses beyond the place

20  where Mr. Norwood was arrested; is that correct?

21  **A**    Yes, sir.

22  **Q**    Okay.

23       And were those addresses relevant to this investigation?

24  **A**    One, in particular, was. On East Carolina Avenue. That's

25  where the trailer was located.

1    Q    Okay.

2         You got search warrant for that; right?

3    A    Correct.

4    Q    Okay.

5    A    The second address was the address of the family member

6    that we believed he may be sleeping -- staying with, as well.

7    Q    Okay.

8         Would that be his mother's house?

9    A    Yes.

10   Q    Okay.

11        So his mother's house, the place where the little trailer

12   was and the place where he was arrested with -- where his wife

13   and him were living, those were the three places of interest;

14   is that correct?

15   A    Yes, sir.

16   Q    Okay.

17        So -- and I think Mr. Cauthen asked you this or pointed

18   out. The pistol that was found in the truck which Mr. Norwood

19   gave y'all permission to search, that's a legal pistol as far

20   as things go with him; right?

21   A    Yes, sir.

22   Q    Okay.

23        And the picture that is in Exhibit 2 of a bunch of ammo,

24   is that -- is that illegal?

25   A    No.

Tanya Evanina - Cross-Examination by Mr. Stepp                    42

1    Q    Okay.

2         But you just found a lot of ammo in this trailer; correct?

3    A    The ammo was in the same bag as the AR-15.

4    Q    Okay.

5         But the AR-15 is not illegal; correct?

6    A    Correct.

7    Q    The ammo is not illegal?

8    A    Correct.

9    Q    So in your investigation, do you have any information that

10   Mr. Norwood has ever made social media statements or political

11   statements or anything that would be considered anti-police or

12   antigovernment?

13   A    No, sir.

14   Q    Okay.

15        In your interaction with him and your conversations with

16   your colleagues, has anyone ever noted Mr. Norwood to be

17   disrespectful or rude to either you or to the police?

18   A    No, sir.

19   Q    Okay.

20        Did you talk to his mother? This lady right out there. The

21   white-haired lady.

22   A    I did on Friday.

23   Q    Okay.

24        And so are you aware that his lived in this community,

25   Boiling Springs, Spartanburg County, Upstate of South Carolina

1   for basically his entire life?

2   **A**    Yes.

3   **Q**    That he has roots in the community?

4   **A**    Yes, sir.

5   **Q**    He has a place to live?

6   **A**    He can either live with his mom or wife, but yes, sir.

7   **Q**    Okay.

8        And that -- thank you.

9        That's all the questions I have.

10           **THE COURT:** Do you have follow-up questions?

11           **MR. CAUTHEN:**  Just briefly, Judge.

12           **THE COURT:**  Sure.

13           **MR. CAUTHEN:**  I want to make sure we all understand

14   something.

15                       **REDIRECT EXAMINATION**

16   **BY MR. CAUTHEN:**

17   **Q**    By the time that they executed the arrest -- what I mean

18   is  by the time that he came out of the house and turned

19   himself in, do you know -- do you recall approximately what

20   time that was?

21   **A**    I would say maybe 11:45, 11:50.

22   **Q**    P.M.

23   **A**    P.M., yes, sir.

24   **Q**    The arrest warrant, was it in hand at that time?

25   **A**    It was.

1  **Q**    Okay.

2      Was it in hand previously, at 6 o'clock when he left the

3  residence?

4  **A**    No.

5  **Q**    Okay.

6      Thank you.

7          **MR. CAUTHEN:**  No further questions, Your Honor.

8          **THE COURT:**  I have some questions for you.

9          **THE WITNESS:**  Yes, sir.

10         **THE COURT:**  It's alleged that the affidavit, you

11  testified to it, that was that Mr. Norwood sent text messages

12  regarding -- well, specifically stating, "It worked. I got away

13  with things that others were shot or arrested for. The cop shot

14  a female Trump supporter. Then allowed ANTIFA Trump supporters

15  to assault him. I was one of them. I was there. I took his

16  shit."

17         Were you able to follow up on who -- can you comment

18  on victims, law enforcement officers at the Capitol? Do you

19  have information as to Capitol police officers who were injured

20  or assaulted by individuals in the crowd?

21         **THE WITNESS:** So obviously, there were officers

22  injured or killed. But none -- no information that Mr. Norwood

23  participated in that. However, in his interview, post

24  interview, he actually told us that he had assisted law

25  enforcement that he witnessed being assaulted. "Assisted"

1    meaning pulling other people off policemen who were being

2    assaulted.

3             THE COURT:  Can you tell me anything more about that?

4             THE WITNESS:  This -- he provided this information

5    during both interviews.

6             THE COURT:  There were two interviews?

7             THE WITNESS:  Yes. There was one on the 22nd of

8    January, I believe. That's when he voluntarily came in for the

9    first interview. And then the post-arrest interview.

10            THE COURT:  And he gave that information that you

11   just described, assisting law enforcement officers who were

12   under assault.

13            THE WITNESS:  Yes. He said there was two different

14   areas. I can't remember exactly where they were. He said one

15   time he -- there was one officer who appeared in his eyes to be

16   under distress, breathing heavily, sweating. And he advised us,

17   me and my co-case, that he pulled off of the police and said,

18   "We do not -- we're not here to assault police." That was one

19   incident.

20            And another may have been in the great rotunda area

21   where he had seen a lot of police fighting with individuals in

22   the Capitol Building. At that time, he saw specifically, I

23   think, three officers being assaulted. In his words, he formed

24   a human chain with other individuals to try to protect those

25   policemen.

1          **THE COURT:** And that was described to you in the

2    January 22 interview or the post-arrest interview?

3          **THE WITNESS:**  Both.

4          **THE COURT:**  Both. The January 22 interview, did

5    you -- you or your office agents have copies of the text

6    messages at that point as to what Mr. Norwood purportedly --

7          **THE WITNESS:**  I believe they did, Your Honor. Because

8    I believe they showed him a picture of him in the vest, and he

9    acknowledged that it was him. But I know those texts were

10   submitted in the online tip prior -- that was conducted prior

11   to that in -- prior to January 22.

12         **THE COURT:**  Okay.

13         So just to make clear, you had the information that

14   he indicated that he assaulted a law enforcement officer

15   according to his own texts on the 22nd, but your office, or

16   someone, decided that he could be allowed to come in and be

17   interviewed and then leave?

18         **THE WITNESS:**  Correct.

19         **THE COURT:**  Okay.

20         All right.

21         Any follow-up on my questions?

22         **MR. CAUTHEN:**  None from the government.

23         **THE COURT:**  Mr. Stepp?

24         **MR. STEPP:**  Just one or two.

25                         **RECROSS EXAMINATION**

1    **BY MR. STEPP:**

2    **Q**    Agent, are you the person who delivered Mr. Norwood to the

3    Spartanburg jail when he was arrested on these charges?

4    **A**    Yes.

5    **Q**    Okay.

6          So I have the jail list which indicates that he was

7    brought into the jail, booked in at 3:18 a.m. on the 26th. Does

8    that sound about right to you?

9    **A**    It does.

10   **Q**    So between the time, midnight-ish, when y'all were out at

11   his place on -- where you arrested at 3:18 in the morning, what

12   went on for that three hours?

13   **A**    We obtained consent. He signed -- gave us -- provided us

14   consent to search the truck. That was done at the Dollar

15   General. He gave us consent. At that time -- when that was

16   completed, when we drove from Locust Hill Drive to the

17   Spartanburg County Sheriff's Office, where we used an interview

18   room and conducted an interview ---

19   **Q**    Okay.

20   **A**     --- of Mr. Norwood.

21   **Q**    And that's -- among other things, he told you that he had

22   lied about the -- leaving the vest in DC; is that correct?

23   **A**    Yes.

24   **Q**    Okay.

25         All right.

1          Thank you.

2                    **MR. STEPP:**  That's all I have.

3                    **THE COURT:**  I have a couple of more questions for

4     you.

5                    **THE WITNESS:**  Uh-huh.

6                    **THE COURT:**  You described, after the

7     January 22 interview, conduct by Mr. Norwood that I would

8     consider to be evasive in that he -- according to your

9     testimony, he parked away from his house. He didn't park in his

10    own driveway, I take it. When he entered the house, he didn't

11    turn on the lights. Then he left in another vehicle. And then

12    he -- that all occurred on the morning of the 25th, is that

13    right, the same day that he was later arrested?

14                   **THE WITNESS:**  Around 6:30 p.m. on Thursday the 25th.

15                   **THE COURT:**  The conduct that I just described

16    happened that way?

17                   **THE WITNESS:**  Yes. Start -- starting around 6:30-ish

18    is when surveillance spotted him leaving in that vehicle.

19                   **THE COURT:**  Okay.

20                   So again -- and I apologize if I'm not following the

21    chronology correctly, but I just want to make clear in my mind.

22                   On the January -- on January 22, an interview took

23    place and your office was aware of the text messages indicating

24    where he appeared to be boasting about harming a

25    law-enforcement officer and taking Capitol police gear?

1          **THE WITNESS:**  Correct.

2          **THE COURT:**  Okay.

3          He was brought in, interviewed, and was allowed to

4     leave?

5          **THE WITNESS:**  That's correct.

6          **THE COURT:**  Okay.

7          And then, approximately one month later -- that was

8     January 22 -- on the 25th of February, you received -- sometime

9     before that, your office received advanced notice, I suppose,

10    that a warrant was being sought for Mr. Norwood's involvement

11    in the Capitol riots.

12         **THE WITNESS:**  Correct.

13         **THE COURT:**  You indicated that you became aware that

14    an affidavit was being put together and was going to be

15    presented to the Judge in DC.

16         **THE WITNESS:**  Yes, sir.

17         **THE COURT:**  Okay.

18         And so with that surveillance, you understood that

19    you would be -- your office would be receiving the warrant and

20    surveillance was established for Mr. Norwood on the 25th?

21         **THE WITNESS:**  Correct.

22         **THE COURT:**  Okay.

23         And then, the warrant came in after surveillance was

24    established and there was some evasive conduct that took place.

25         **THE WITNESS:**  Correct.

1          THE COURT:  That's my term, evasive-appearing

2     conduct, what appeared to be evasive conduct. And while that

3     activity was taking place, the warrant was obtained

4     electronically by your office.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Such as, that when he did return to his

7     house later that evening at approximately 11 o'clock p.m.,

8     other agents were summoned to the scene to prepare for his

9     arrest?

10         THE WITNESS:  That's correct. Maybe 11:15-ish, 11:00,

11    11:15.

12         THE COURT:  Is there any reason why -- I'm just

13    curious. Was there any reason why your office made the decision

14    to do that rather than call him and let him know that a warrant

15    had been issued since your office had already made contact with

16    him previously and he had come to your office before?

17         THE WITNESS:  There was.

18         THE COURT:  Okay.

19         THE WITNESS:  We received another online tip on the

20    16th, I believe, of February that prompted our actions.

21         THE COURT:  Okay.

22         Is that something that -- can you explain that? You

23    received a tip that -- can I just ask this? -- a tip that he

24    indicated that he presented some sort of a risk that required

25    an arrest rather than a summons or phone call?

1              **THE WITNESS:**  Yes. So we received the second online

2    tip. I believe it was on the 16th. I would have to look at my

3    notes for the exact day stating -- and that tipster provided

4    information that Mr. Norwood was not truthful in the interview

5    and was still in possession of the bulletproof vest and the

6    helmet.

7              **THE COURT:**  Okay.

8         And so based on information that you just indicated

9    that your office received, based on that alleged

10   untruthfulness, it was decided by your office that he should be

11   arrested rather than summoned in?

12             **THE WITNESS:**  Correct.

13             **THE COURT:**  Is that fair?

14             **THE WITNESS:**  That's fair.

15             **THE COURT:**  Okay.

16        Any follow-up to my questions?

17             **MR. CAUTHEN:**  No, sir.

18             **THE COURT:**  Mr. Stepp?

19             **MR. STEPP:**  A couple of questions.

20   BY MR. STEPP:

21   **Q**    So at 11 o'clock at night on the 25th, where was

22   Mr. Norwood? Was he in the house? Was he out on the road?

23   **A**    I'm not sure of the exact times. But between 6 o'clock,

24   the 06:30 hour and to the point where we saw him again, I want

25   to say 11:00 or 11:15, he and his wife were on the other side

1   of town. This is what we found out from the interview of

2   Mr. Norwood. They were on the other side of town conducting

3   some type of rehab on a condominium that her father owned. They

4   were painting and such. So -- and between that amount of time,

5   they were at that condo.

6   **Q**   But you had people surveilling him or surveilling whatever

7   vehicle you believed him to be in; is that correct?

8   **A**   So when they left the house --

9          **THE COURT:**  This was in the Jeep?

10         **THE WITNESS:**  -- in the Jeep, he was able to lose the

11  one car that was following him. So they didn't know where he

12  went that time.

13  **BY MR. STEPP:**

14  **Q**   Okay.

15      So what information did you have that they were across

16  town fixing up a condo or something?

17  **A**   It was information provided by Mr. Norwood ---

18  **Q**   Okay.

19  **A**    --- after the arrest.

20  **Q**   All right.

21      So it appears -- do you have a copy of the complaint that

22  was issued in the District of Columbia in front of you?

23  **A**   I just have the affidavit.

24  **Q**   Just the affidavit?

25  **A**   Yes, sir.

Tanya Evanina - Recross Examination by Mr. Stepp                                    53

1  **Q**    Okay.

2            **THE COURT:**  I have a copy.

3            **MR. STEPP:**  Is that the front page of the complaint?

4            **THE COURT:**  Yes, sir.

5            **MR. STEPP:**  Okay.

6            Can she have that?

7            **THE WITNESS:**   Thank you.

8  **BY MR. STEPP:**

9  **Q**    Okay.

10     So you've got the complaint that was signed by the

11  Magistrate and the special agent; is that correct?

12  **A**    Correct, sir.

13  **Q**    All right.

14     So down in the corner -- you see the Magistrate's name? G.

15  Harvey -- G. Michael Harvey, US Magistrate?

16  **A**    Yes.

17  **Q**   You see right above that where it says digitally signed by

18  G. Michael Harvey?

19  **A**    Yes.

20  **Q**   You see that date 2021.02.25, 20:48 and then some other

21  numbers? Do you see that?

22  **A**    Yes, sir.

23  **Q**    Okay.

24     Now, I don't know what that means, but it looks to me like

25  it was digitally signed on the 25th at 10:48 p.m. -- 12:48 --

1   20:48 hours?

2   **A**   I think that's 8 -- it might be 8:48 p.m.

3   **Q**   Okay.

4      You're right.  That's why I'm a lawyer and not a

5   mathematician, I guess.

6      But this document appears to indicate that the Magistrate

7   signed this thing at 20:48 hours, 8:48 in the evening?

8   **A**   Yes, sir.

9   **Q**   So somebody had -- if this is correct, it would've been

10   filed and somebody would have had access to this. And if y'all

11   had had this, y'all could have arrested him because this

12   document gives y'all the power to arrest him; is that correct?

13   **A**   Correct.

14   **Q**   Pick him up wherever you find him?

15   **A**   Correct.

16   **Q**   Okay.

17      All right.

18      Thank you. That's all the questions I have.

19          **THE COURT:**  All right.

20          Anything further?

21          **MR. CAUTHEN:**  Very briefly, Judge.

22          **THE COURT:**  Sure.

23                  **REDIRECT EXAMINATION**

24   **BY MR. CAUTHEN:**

25   **Q**   8:48 is the timestamp we just talked about, is that

Tanya Evanina - Redirect Examination by Mr. Cauthen                    55

1    correct, 8:48 p.m?

2    **A**    Yes.

3    **Q**    Did y'all know where he was at 8:48 p.m. on that date?

4    **A**    No.

5    **Q**    Is that because he evaded the officer that was conducting

6    surveillance?

7    **A**    Yes.

8    **Q**    When was the next time y'all knew where he was

9    approximately?

10   **A**    Between 11:00 and 11:15, when he drove by that Dollar

11   General on Locust Hill.

12   **Q**    Is that when he went home?

13   **A**    Yes.

14   **Q**    Is that where y'all arrested him?

15   **A**    Yes.

16   **Q**    Thank you. No further questions.

17            **THE COURT:**  All right.

18            Okay. All right.

19            Thank you very much.

20            All right.

21            Government can call its next witness.

22            **MR. CAUTHEN:**  Judge, that would be the government's

23   showing in this case.

24            **THE COURT:**  Okay.

25            Is the -- does the defense wish to put up any

1    witnesses on the issue of detention?

2              **MR. STEPP:**  We do.

3              **THE COURT:**  Okay.

4              **MR. STEPP:**  The first witness, I would like to call

5    Tracy Dubois.

6              **THE COURT:**  Ms. Dubois, if you'd come forward.

7              Ms. Dubois, if you'd come right here. If you wouldn't

8    mind removing your mask so that we can hear you and see you. If

9    you would, state your name for the record and spell your name.

10             **THE WITNESS:**  Tracy Dubois. T-r-a-c-y, D-u-b-o-i-s.

11             **THE COURT:** Okay.

12             And if you'd be sworn by the clerk.

13             **THE CLERK:**  Please place your left hand on the Bible

14   raise your right hand.

15                              **TRACY DUBOIS**

16       having first being duly sworn, testified as follows:

17             **THE COURT:**  Ms. Dubois, if you'd have a seat. Ma'am,

18   I can tell you're soft-spoken. If you keep your voice up and

19   speak into the microphone so that everyone in the room can hear

20   you.

21             **THE WITNESS:**  Okay.

22             **THE COURT:**  Okay.

23             Yes, sir.

24                          **DIRECT EXAMINATION**

25   BY MR. STEPP:

Tracy Dubois - Direct Examination by Mr. Stepp                    57

1    **Q**    Ms. Dubois, where do you live?

2    **A**    Columbia, South Carolina.

3    **Q**    And do you know this man right here sitting beside me?

4    **A**    Yes.

5    **Q**    How do you know him?

6    **A**    He's my brother.

7    **Q**    He's your brother.

8         Okay.

9         He is William Robert Norwood, III ---

10   **A**    Yes.

11   **Q**    --- correct? And you live in Columbia and he lives -- or

12   had been living in Boiling Springs; is that correct?

13   **A**    I believe his current address was Greer.

14   **Q**    Greer.

15        Okay.

16        And do you have a family chat group with Mr. Norwood?

17   **A**    Yes. I created a group Facebook message at the beginning

18   of quarantine in 2019 to bring a sense of peace and cohesion to

19   my family, make sure of everyone's safety.

20   **Q**    Okay.

21        And so you created the group. Was Mr. Norwood part of that

22   group?

23   **A**    Yes.

24   **Q**    Who else is?

25   **A**    My mother and father.

1   **Q**   And that's your mother and father out there?

2   **A**   Yes.

3   **Q**   Okay.

4        So it's a four-person group; is that correct?

5   **A**   That's correct.

6   **Q**   All right.

7        And did you receive text messages from your brother on

8   January 7, 2021?

9   **A**   Yes.

10  **Q**   Did he send you some things that you considered to be

11  controversial or disturbing?

12  **A**   Yes.

13  **Q**   Okay.

14       And at some point, were you interviewed by the FBI?

15  **A**   Yes.

16  **Q**   All right.

17       And did you share with the FBI the text messages that your

18  brother had sent to you in this family group that you referred

19  to?

20  **A**   Yes.

21  **Q**   Okay.

22  **A**   They asked me what I know, so I told them what I know.

23  **Q**   And you showed them what you had received?

24  **A**   That's right.

25  **Q**   Correct?

1    A    That's right.

2    Q    And how often did you communicate with your brother?

3    A    Through that particular group?

4    Q    Well, let's start there. Through the group, how often

5    would y'all get messages back and forth involving your brother?

6    A    Probably maybe every day, every couple of days.

7    Q    Okay.

8         And how often did you communicate in any other fashion,

9    such as phone calls or, you know, anything like the?

10   A    My last text message to him was on December 9. So that's

11   an actual text message through phone service, not a Facebook

12   message, which is separate from what we've been discussing.

13   Q    Okay.

14        So the text message in December was just you to him; is

15   that correct?

16   A    That's right.

17   Q    Anything that went up on the group text went to all four

18   people?

19   A    That's right.

20   Q    Or at least they had access to it?

21   A    Yes.

22   Q    Okay.

23        And would you describe your brother and your relationship

24   in a political sense to be people who are of like mind or

25   people who hold different political opinions?

Tracy Dubois - Direct Examination by Mr. Stepp                60

1   **A**    We differ greatly in our ideologies and politics, yes.

2   **Q**    Okay.

3        And so from time to time, would you and your brother

4   either through texting or through the group text message go

5   back and forth about political things?

6   **A**    Yes. The arguments are deep and vast.

7   **Q**    I'm sorry. The what?

8   **A**    The arguments are deep and vast.

9   **Q**    Okay.

10       So did it surprise you that you received a text message

11  from your brother -- excuse me, not a text message, but a group

12  message from your brother on the 7th of January that he was in

13  Washington or had been in Washington?

14  **A**    Not surprised he was there, no.

15  **Q**    Okay.

16       Did you have any information ahead of time, like the 6th

17  or the 5th or any time prior to that that he was contemplating

18  or going to go to Washington?

19  **A**    Yes.

20  **Q**    Okay.

21       And how did that come about? Through the message thing?

22  **A**    Yes. I believe a day or so before, he said he was going to

23  go. Yes.

24  **Q**    Okay.

25       So you get these messages, and they are in the paperwork

1    that the FBI has; is that correct?

2    **A**    Yes.

3    **Q**    And they interviewed; correct?

4    **A**    Yes, sir.

5    **Q**    And were you truthful with the FBI?

6    **A**    Yes.

7    **Q**    All right.

8         And as far as the question of your brother, have you ever

9    heard him make -- either heard or seen him or become aware of

10   him making antigovernment statements that would relate to

11   violence or interfering with the governmental process?

12   **A**    I don't think he's violent, no.

13   **Q**    Okay.

14            **THE COURT:**  The question was: Have you ever heard him

15   make statements like that?

16            **THE WITNESS:**  I don't want to answer that because I

17   don't know --

18            **THE COURT:**  If you don't know, you don't know.

19            **THE WITNESS:**  Yeah. I wouldn't say I would know the

20   answer to that.

21   **BY MR. STEPP:**

22   **Q**    Okay.

23        What did the FBI ask you in the interview with you whether

24   he had ever made antigovernment statements, whatever that might

25   be?

Tracy Dubois - Direct Examination by Mr. Stepp                    62

1    **A**    I believe they asked me. I'm not sure I would know if he

2    has ever made those statements and I don't know -- I don't

3    remember how I answered with them.

4    **Q**    Okay.

5         But if they asked you, you responded in some fashion.

6    Would that be correct?

7    **A**    That's right, yeah.

8    **Q**    Okay.

9         So have you -- do you have any reason to believe that he

10   would flee or not appear if he were released on a bond and told

11   to report to court in the District of Columbia or anywhere

12   else?

13   **A**    Absolutely not. He's -- all of his family is here. He has

14   a daughter, as well. So he would not.

15   **Q**    Does he have any history of being arrested or charged or

16   convicted of any violent offenses?

17   **A**    He has no convictions or any violent history.

18   **Q**    Okay.

19        Thank you. That's all I have. Answer any questions the

20   prosecutor or the Court may have for you.

21             **THE COURT:**  Yes, sir.

22             **MR. CAUTHEN:**  Thank you for being here, ma'am. No

23   questions.

24             **THE WITNESS:**  Okay.

25             **MR. STEPP:**  Thank you.

1          **THE COURT:** Okay.

2          No questions?

3          **MR. CAUTHEN:**  No questions, Your Honor. I'm sorry.

4          **THE COURT:** Okay.

5          Ms. Dubois, I don't believe I have any questions for

6   you. Thank you very much.

7          **THE WITNESS:**  Thank you.

8          **MR. STEPP:**  Angela Norwood please.

9          **THE COURT:**  Mr. Norwood, if you'd come forward.

10         Ma'am, if you will, state your name and then spell it

11  for us.

12         **THE WITNESS:**  It is Angela Norwood. A-n-g-e-l-a,

13  N-o-r-w-o-o-d.

14         **THE COURT:** Okay.

15         If you'd be sworn by the clerk.

16                       **ANGELA NORWOOD**

17     having first being duly sworn, testified as follows:

18         **THE WITNESS:**  So help me God.

19         **THE COURT:**  All right.

20         Ms. Norwood, if you would have a seat there. Please

21  keep your voice up as you answer any questions from counsel.

22         **THE WITNESS:**  All right.

23         **THE COURT:**  Yes, sir.

24                     **DIRECT EXAMINATION**

25  **BY MR. STEPP:**

Angela Norwood - Direct Examination by Mr. Stepp                    64

1    **Q**    Your name is Angela Norwood; is that correct?

2    **A**    Yes, sir.

3    **Q**    Ma'am, where do you live?

4    **A**    Boiling Springs, South Carolina.

5    **Q**    How long have you lived there?

6    **A**    Going on 30 years.

7    **Q**    And is the place where you live an apartment or is it a

8    residence? How would you describe it?

9    **A**    It's actually a mobile home.

10   **Q**    And do you own the property that the mobile home sits on?

11   **A**    No, sir.

12   **Q**    Okay.

13         Do you rent the mobile home?

14   **A**    No. I own my own mobile home.

15   **Q**    You own the mobile home. Who owns the property that it

16   sits on?

17   **A**    His name is R.E. Gray. He owns the mobile home park.

18   **Q**    Okay.

19         So it's not a family member?

20   **A**    Oh, no.

21   **Q**    All right.

22         And this man sitting right here beside me, do you know

23   him?

24   **A**    Yes.

25   **Q**    He's your son, isn't he?

Angela Norwood - Direct Examination by Mr. Stepp                    65

1   **A**    Yes, sir.

2   **Q**    Okay.

3       And the lady that just testified, Tracy Dubois, she's your

4   daughter; is that correct?

5   **A**    Yes, sir.

6   **Q**    All right.

7       You and -- you heard her talk about that she created a

8   Facebook group message, Facebook group?

9   **A**    Uh-huh.

10  **Q**    And you're part of that group?

11  **A**    Yes, sir.

12  **Q**    Okay.

13      And your husband -- your ex-husband is; is that correct?

14  **A**    Yes, sir.

15  **Q**    And your son and your daughter. That's the four people;

16  correct?

17  **A**    Yes.

18  **Q**    All right.

19      Did the FBI ever come talk to you?

20  **A**    Yes, they did.

21  **Q**    Was it this agent right here who just testified?

22  **A**    No, ma'am -- no sir. The night of Rob's arrest, they came

23  to my house also. I don't know if they thought he would be

24  there but --

25  **Q**    Well, okay.

Angela Norwood - Direct Examination by Mr. Stepp                    66

1      You've heard -- you were in the courtroom and heard her

2  testify; is that correct? The lady.

3  **A**    Yeah.

4  **Q**    The FBI person.

5  **A**    Yes.

6  **Q**    Okay.

7  **A**    But it was a Jason Green and some other man that came to

8  my house.

9  **Q**    Okay.

10      There's been discussion about timing and all of the stuff.

11  Was there -- come into your place before or after, say,

12  midnight?

13  **A**    It was before midnight between, I would say, 10:30 and

14  11:00.

15  **Q**    Okay.

16      And their purpose in being there, by their statement to

17  you, was what?

18  **A**    They really didn't tell me why. I just assumed they

19  thought that Robbie was there.

20  **Q**    And why would you assume that?

21  **A**    Because he had already been questioned by the FBI.

22  **Q**    Okay.

23      So you were aware that he had been questioned by the

24  FBI ---

25  **A**    Yes.

Angela Norwood - Direct Examination by Mr. Stepp                    67

1   **Q**     --- in January?

2   **A**     Yes.

3   **Q**     Okay.

4           Were you aware because he told you that, or what?

5   **A**     Yes. He told me.

6   **Q**     Okay.

7           Did he tell you what the questioning was in connection

8   with?

9   **A**     Not really.

10  **Q**     What -- did he tell you that it was in connection with his

11  trip to Washington?

12  **A**     I mean -- I'm sorry. Yeah. He did tell me that it was

13  involving the trip to Washington.

14  **Q**     Okay.

15  **A**     Sorry.

16  **Q**     Okay.

17          So after he came back from this interview with the FBI in

18  January and told you that they had an interest in him, did he

19  ever make you believe that he was packing up and going to run

20  and get out of town?

21  **A**     No.

22  **Q**     Do you believe that he would have run and got out of the

23  town?

24  **A**     No, sir.

25  **Q**     Do you believe that if he were to be given a bond that he

1    would jump bond to avoid his obligation to go to court in the

2    District of Columbia?

3    **A**     No, sir.

4    **Q**     Could he live with you if he was on bond?

5    **A**     Yes, sir.

6    **Q**     Okay.

7          Are you aware -- does he have a -- he has a wife, the lady

8    out there; is that correct?

9    **A**     Yes.

10   **Q**     Okay.

11         And from a previous marriage, are you aware that he has

12   any children from that marriage?

13   **A**    He has a beautiful seven-year-old daughter. Yes, he does.

14   **Q**    And does -- are you aware as to whether he -- does the

15   child live with him, or the mother?

16   **A**    She stays with her mom. The mom, yes.

17   **Q**    All right.

18         And does he have any contact with a child to your

19   knowledge?

20   **A**    Yes, he has visitation rights.

21   **Q**    What does that mean? How often, and what?

22   **A**    Well, he sees her at least once a week. He gets her at

23   least one weekend a month, maybe two.

24   **Q**    Okay.

25         So are you aware if he's employed?

1    **A**    Yes, sir. He has three jobs.

2    **Q**    Up until the time he got locked up on last Thursday night

3    or Friday morning, was he working?

4    **A**    Yes, sir.

5    **Q**    Are you aware if he provides any money for support to the

6    mother of his child?

7    **A**    Yes, sir. He does.

8    **Q**    Do you know how much and how often?

9    **A**    I don't know exactly the payment schedule, but I'm -- it's

10   a couple of hundred dollars a month in child support.

11   **Q**    Okay.

12        And your knowledge about that comes from what? Him telling

13   you?

14   **A**    Yeah.

15   **Q**    Okay.

16        That's all the questions I have. Thank you, ma'am.

17        Answer any questions the prosecutor or Court has.

18                          **CROSS-EXAMINATION**

19   **BY MR. CAUTHEN:**

20   **Q**    Ms. Norwood, thank you for being here.

21   **A**    Yes, sir.

22   **Q**    Can you hear me okay?

23   **A**    Yes, sir.

24   **Q**    Sometimes with this plastic, it's hard.

25   **A**    Right.

1   **Q**    You indicated that in your home, it's you, your son and --

2   who lives in your home?

3   **A**    Just me and two fur babies.

4   **Q**    Okay.

5   **A**    Okay.

6   **Q**    Where does your son live?

7   **A**    His address is Locust Hill Road in Greer. He is married

8   for the moment and that is their home they rent together.

9   **Q**    I thought -- maybe I misunderstood you, ma'am. I thought

10  when Mr. Stepp asked you who lived in your home, it was you,

11  your son, and somebody else?

12  **A**    Huh-uh. No. It's just me and two critters.

13  **Q**    Okay.

14  **A**    Okay.

15  **Q**    All right.

16  **A**    Now, Robbie goes in and out, but he doesn't live there.

17  **Q**    Does he stay there sometimes?

18  **A**    The night it was icy, he stayed.

19  **Q**    Right.

20  **A**    Yeah.

21  **Q**    But you said he's married? You said something that led me

22  to believe momentarily he may be right now, for lack of a

23  better term?

24  **A**    Right. I'm not sure the marriage will last. I'll put it

25  that way. There are some marital issues, but this is not

1    divorce court.

2            **THE COURT:** What I'm interested in, and I think what

3    everyone concerned with this issue is interested in, is where

4    does Mr. Norwood live. Where does he reside?

5            **THE WITNESS:**  Locust Hill Road.

6            And if I could speak, the reason his truck was parked

7    at the Dollar Store is they rent from her dad. He didn't want

8    Robbie to be in his home anymore because of this FBI thing. And

9    so to spend the night with his wife, he would hide his truck

10   and walk to their house.

11   **BY MR. CAUTHEN:**

12   **Q**    With respect to -- Mr. Stepp asked you if your son would

13   leave and I believe you pretty much indicated he wouldn't ---

14   **A**    No.

15   **Q**    --- go anywhere?

16   **A**    No.

17   **Q**    Let me ask you this: Were you aware that he was in

18   Washington when the protest were going on?

19   **A**    I knew he was going, yes.

20   **Q**    Did he tell you that he assaulted police officers while he

21   was up there?

22   **A**    He did not tell me that. I read the same little Facebook

23   messenger thing that he sent out.

24   **Q**    Did he tell you that he had stolen the equipment or you

25   read that?

1    **A**    I read that also.

2    **Q**    Thank you, ma'am. I appreciate you --

3    **A**    Okay.

4          Thank you.

5          **THE COURT:**  Any --

6          **MR. CAUTHEN:**  No further questions. I'm sorry, Judge.

7          **THE WITNESS:**  Right.

8          **THE COURT:**  Maybe this is not something this witness

9    can answer, but if he were to be released on a bond, I would

10   like to know where he -- he would reside. If he's not welcome

11   at his father-in-law's ---

12         **THE WITNESS:**  He will live with me. We've already --

13   I've already made that decision pretty much.

14         **THE COURT:**  Where is he living -- I mean, you

15   indicated that -- we heard testimony from a previous witness

16   that I considered, there was some sort of evasive activity. And

17   you've indicated that, if anything, it was invasive to fool his

18   father-in-law that he was coming to visit his wife because his

19   father-in-law didn't want him in the house. If I -- I don't

20   want to mischaracterize your testimony. Is that fair?

21         **THE WITNESS:** Right. I think the father-in-law was mad

22   at him. I'm not trying to get him in any trouble or anything

23   like that.

24         **THE COURT:**  Again, I am interested in where he was

25   living at the time. Was -- was he -- are you testifying to your

Angela Norwood - Examination by the Court                                    73

1    knowledge that he stays at the Locust Hill Road address every

2    day ever since all of this has happened?

3              **THE WITNESS:**  Yes. Yes.

4              **THE COURT:**  Okay.

5              Okay.

6              Anything further?

7         **MR. CAUTHEN:**  No, sir, Judge.

8              **THE COURT:**  Mr. Stepp, anything further?

9         **MR. STEPP:**  Nothing.

10             **THE COURT:**  I'm sorry to get off ---

11             **THE WITNESS:**  Right.

12             **THE COURT:**  --- issue, but I -- I just wasn't clear.

13             **THE WITNESS:**  Right.

14             **THE COURT:**  And I appreciate that.

15             **THE WITNESS:**  There will be an address change done

16   and things will be taken care of.

17             **THE COURT:** Okay.

18             **THE WITNESS:**  Okay.

19             **THE COURT:**  All right.

20             Thank you, ma'am.

21             **THE WITNESS:**  I appreciate you. Thank you.

22        **MR. STEPP:**  Judge, we'll wrap it up with calling the

23   defendant, William Robert Norwood.

24             **THE COURT:**  All right.

25             Mr. Norwood.

1           All right.

2           Sir, I do have the spelling of your name correctly,

3  so if you would just be sworn by the clerk.

4           THE CLERK:  Please raise your right hand.

5                         WILLIAM NORWOOD

6     having first being duly sworn, testified as follows:

7           THE WITNESS:  Yes, ma'am.

8           THE CLERK:  Thank you.

9           THE COURT:  All right.

10          Sir, if you would have a seat right there.

11          All right.

12          Sir, and if you would keep your voice up so that

13 everyone in the courtroom can hear you and you can answer

14 questions from counsel.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Yes, sir.

17                        DIRECT EXAMINATION

18 BY MR. STEPP:

19 Q    Mr. Norwood, how old are you?

20 A    37.

21 Q    And on the 25th of February, you were arrested; is that

22 correct?

23 A    Yes, sir.

24 Q    You've been in jail ever since?

25 A    Yes, sir.

1  **Q**    Going backwards from that date, where were you living?

2  **A**    My primary residence was Locust Hill Road.

3              **THE COURT:**  I'm sorry?

4              **THE WITNESS:**  My primary residence was Locust Hill

5  Road.

6  **BY MR. STEPP:**

7  **Q**    All right.

8        So when you say primary residence ---

9  **A**    That's where I lived.

10  **Q**     --- that implies a secondary residence.

11  **A**    I have a work-from-home job where I would go to my

12  mother's to work from her home. It wasn't my place of residence

13  where I slept or received mail or bills. I just worked from

14  there so my wife could do her job at -- work-for-home job also.

15  She does a shop, an Etsy shop. I didn't want to disturb her or

16  vice versa, so I would work from my mother's residence and then

17  go home to sleep at night.

18  **Q**    You heard your mother testify a minute ago; is that

19  correct?

20  **A**    Yes, I did.

21  **Q**    So she indicated she'd been living at that location for an

22  extended period of time?

23  **A**    A long time, yes.

24  **Q**    From time to time, did you spend the night at your

25  mother's house?

1 **A**    I did the one night it was icy. She didn't want me to

2 drive through the conditions, so I stayed there.

3 **Q**    All right.

4      So would it be fair to say that your regular address was

5 the Locust Hill address?

6 **A**    Yes, sir.

7 **Q**    That's where you were arrested; is that right?

8 **A**    Yes, sir. Yes, sir.

9 **Q**    Who owns that Locust Hill address?

10 **A**    My wife's father.

11 **Q**    Your wife's father?

12 **A**    Uh-huh.

13 **Q**    Okay.

14      And how would you describe your relationship with your

15 father-in-law?

16 **A**    Well, this will clear some things up here. In December, my

17 wife and I had an issue -- marital issue. And me and her father

18 got into it verbally. He told me that he did not want me

19 staying at his property anymore, which we rented from him. That

20 was, it sounded like to me -- I'm not sure what the legal term

21 is -- but a landlord that will kick you out just from having a

22 disagreement with him, not nothing you've done. You didn't, you

23 know, whatever.

24      But I -- the wife and I wanted to work things out and

25 continue living together. But if I were to be caught there by

1   her father, she would get kicked out, as well. He -- that was

2   an ultimatum he basically gave her. And so I began parking down

3   the street at the Dollar General long before Washington -- long

4   before January 6, just to not to give it away.

5        He contracted the neighbor who he let's live there for

6   free to do some lawn work. He's an older gentleman,

7   80-something years old. But he has free rent basically to do

8   lawn work and yard work and keep up the area. He asked him to

9   tell -- asked the neighbor to tell her father if my truck was

10  there to let him know.

11       And I do not want to get my wife in trouble with her

12  father, so I parked down the street and would walk to the house

13  so he wouldn't see me there. And that's another reason I turned

14  my lights off when I pull in, so he doesn't notice us coming to

15  and fro so he doesn't say, "Yes, I saw him get out of her

16  Jeep."

17       No. It's just -- I'm trying to make that clear as to why I

18  parked down the street. It wasn't to elude or evade the FBI or

19  anyone else. It was to elude and evade her father so he

20  wouldn't -- and the neighbor who wouldn't see us coming and

21  going. So it was not evasive action for the FBI?

22  **Q**   Well, how long had -- this subterfuge thing about parking

23  up the road, how long had that been going on?

24  **A**   December, early December, mid-December.

25  **Q**   Of 2020?

William Norwood - Direct Examination by Mr. Stepp                    78

1    **A**    Yeah.

2    **Q**    Okay.

3         So about two months by the time you got arrested; is that

4    right?

5    **A**    Yes.

6    **Q**    Okay.

7         And how long have you been married to this -- your present

8    wife?

9    **A**    Since August 15, 2020.

10   **Q**    Okay.

11        And testimony has been mentioned about you having a

12   seven-year-old daughter?

13   **A**    Yes.

14   **Q**    And she lives with her mother; is that correct?

15   **A**    Primarily, yes. She's got primary custody.

16   **Q**    Okay.

17   **A**    She's got primary custody. I have secondary. But I --

18   **Q**    What does secondary mean?

19   **A**    It's what was listed in the divorce decree. I mean, it

20   means I don't have supervised or anything like that. I can get

21   her and take her.

22   **Q**    How often do you have visitation or time with your

23   seven-year-old daughter?

24   **A**    Every week. I get her at least one weekend a month, if not

25   more. But I -- I -- she can come and go freely, you know,

William Norwood - Direct Examination by Mr. Stepp                    79

```
1    whenever I -- you know, whenever she's not busy with other
2    church, school, other family things. There's no limit.
3    Q    Okay.
4         So this is an arrangement that's gone on how long?
5    A    Since my divorce was final in early -- either late '19 or
6    '20 -- early '20 or late '19.
7    Q    So the daughter is with you for, like, an overnight?
8    A    At least once a month.
9    Q    At least once a month for like a weekend, or what?
10   A    Yes.
11   Q    Okay.
12        And does she have any other visits that are not overnight
13   visits?
14   A    Yes. Every week, I pick her up and we go out and do
15   something for a day.
16   Q    All right.
17        And how far does the daughter live from where you were
18   living on Locust Hill Road?
19   A    Approximately 25 minutes away. She lives in Boiling
20   Springs.
21   Q    Okay.
22        And approximately how far does your mother live from --
23   A    Five minutes.
24   Q    What's that?
25   A    Five minutes.
```

1          **SPEAKER FROM THE AUDIENCE:**  From Locust Hill.

2          **THE WITNESS:**  Oh. Locust Hill? I'm sorry. I'm sorry.

3  Same distance. They live -- my daughter and my mother live

4  close to each other.

5  **BY MR. STEPP:**

6  **Q**    Now up until you got locked up on Thursday night, were you

7  employed?

8  **A**    I was.

9  **Q**    And tell us a little bit about where you had been working?

10 **A**    Well, since July, I worked for a company that was called

11 STS. It has since been brought up by another company called

12 CBSI. STS was Security Technology Solutions. And then, CBSI is

13 Consolidated Banking Systems, Inc.

14 **Q**    Okay.

15      And you began working -- you begin working with them when

16 did you say? July?

17 **A**    July 2020.

18 **Q**    July 2020?

19 **A**    Yes, sir.

20 **Q**    Okay.

21      And what -- were you working until you got arrested?

22 **A**    Yes.

23 **Q**    And does your job with these people -- what do you do for

24 these people?

25 **A**    Basically, I -- I'm on call. It's an on-call job. And when

William Norwood - Direct Examination by Mr. Stepp                    81

1    and if an ATM that we service in the Upstate area breaks or has

2    a fault, I go fix it. That includes opening the safe, making

3    sure the money is all there or not there, clearing jams with

4    the bills or fixing computer issues with an ATM. Anything --

5    any number of reasons an ATM could crash, I go and fix it.

6    **Q**    Okay.

7         Since you started working there in July, how many times

8    would you estimate that you had to go to an ATM and correct a

9    problem?

10   **A**    A lot.

11   **Q**    Well **--**

12   **A**    There's hundreds of times.

13   **Q**    And do you go by yourself or do you have someone go with

14   you?

15   **A**    I go by myself.

16   **Q**    And so they trust you enough to go to an ATM that may be

17   loaded up with cash money?

18   **A**    Yes.

19   **Q**    And the firearm that was found in your truck that you gave

20   the FBI permission to search, does that have -- do you have

21   that firearm for personal protection when you go out to these

22   ATMs?

23   **A**    Yes. Usually some ATMs have a quarter of a million dollars

24   in them. And I have to take all of the cassettes out at some

25   point. Sometimes I have to set them on the back of my tailgate.

William Norwood - Direct Examination by Mr. Stepp                    82

1    There's just a lot of money sitting right there that could

2    potentially be stolen or, you know, robbed. So I carry that gun

3    for protection just in case, you know, someone is trying to rob

4    me or hurt me.

5    **Q**    You ever had a problem come up where you needed a firearm?

6    **A**    I've been scared a few times. In certain bad neighborhoods

7    where an ATM might be, I've been walked up on by a homeless

8    person and it would scare me. And I didn't -- you know, the gun

9    was there, but I never used it. It was just for my protection,

10   just in case anything bad were to happen. But I've had people

11   come up to me just inquiring about my job and then there's a

12   lot of money sitting there. I don't want to risk that being

13   stolen.

14   **Q**    Okay.

15        And this is a part-time job or full-time?

16   **A**    This is part-time.

17   **Q**    Okay.

18        And you -- All right.

19        You have any other jobs?

20   **A**    Yes. I work for full-time job through Sitel. Sitel is

21   basically a call center or firm that is contracted out by other

22   companies -- many other companies that use their call center

23   employees to answer the phones for these companies. My -- the

24   campaign I work for is USAA Insurance. So anyone in the

25   military, law enforcement, government that has USAA, they call

1   in. Basically, my job is take their money if they want to pay

2   their bill. So --

3   **Q**    What do you mean "take their money"?

4   **A**    Pay their bill. I take their information and pay their

5   USAA insurance bill.

6   **Q**    So they give you personal information, like a credit card

7   number or Social Security numbers?

8   **A**    All of the above.

9   **Q**    Okay.

10       And so you do that for this Sitel company?

11   **A**    Yes, sir.

12   **Q**    Which is kind of like an answering service; is that right?

13   **A**    Yes, sir.

14   **Q**    And when did you start working with them?

15   **A**    I was hired in December. But due to scheduling issues

16   with, I guess, COVID, they started me January 4.

17   **Q**    Okay.

18       So up until you got arrested and put in jail ---

19   **A**    Uh-huh.

20   **Q**     --- were you working for these people on a regular basis?

21   **A**    I was.

22   **Q**    Every day?

23   **A**    Full-time.

24   **Q**    Okay.

25       Ever have any problems with somebody accusing you of

1   mishandling money or mishandling personal information or

2   anything like that?

3   **A**    No, sir. In fact, my first -- my test scores came back for

4   that job. I was 100 percent ---

5   **Q**    All right.

6   **A**    --- across the board.

7   **Q**    Okay.

8   **A**    I followed the rules and passed my test -- my audits.

9   **Q**    And this is the USAA Insurance people?

10  **A**    Yes.

11  **Q**    Okay.

12          **THE COURT:**  Mr. Stepp, may I interrupt you?

13          **MR. STEPP:**  Yes.

14          **THE COURT:**  Would this be a good time to take a short

15  break?

16          **MR. STEPP:**  If you suggest it, I think it is.

17          **THE COURT:**  I would like -- I think we should take a

18  short break. I want to make sure that our court reporter and

19  court staff are able to take a break.

20          **MR. CAUTHEN:**  Judge, can I put one thing on the

21  record?

22          **THE COURT:**  Yes, sir.

23          **MR. CAUTHEN:**  Just in case anybody was wondering,

24  while Mr. Stepp was questioning the witness, I handed up a note

25  to the clerk. That note was simply asking her to notify the

1  Judge in another court that I have to go to this afternoon that

2  I'll be there as close to the time as I can be. I wanted --

3  since I handed a note up, I wanted everybody to know what it

4  was.

5          **THE COURT:**  Absolutely. I'll be glad to make that

6  call myself if need be. Let's take a break.

7          Mr. Norwood, you're under oath and you can't discuss

8  your testimony while you're still in this testifying position.

9          So let's take a break. And we'll be back in 10

10 minutes.

11         Yes, sir.

12         **MR. STEPP:**  You want him just to stay up there?

13         **THE COURT:**  Yes, sir. Would you like to stay -- are

14 you comfortable? Would you like a glass of water or something?

15         **THE WITNESS:**  I would love something to drink.

16         **THE COURT:** Yes, sir. We'll make sure you have some

17 water.

18         **THE WITNESS:**  Thank you.

19         **THE COURT:**  All right.

20         Let's take a short break. I'll be back in just a

21 little bit.

22     (The Court goes off the record at 11:42 a.m.)

23     (The Court goes on the record at 11:55 a.m.)

24         **THE COURT:**  Please be seated.

25         All right.

1          Mr. Norwood, you're still under oath.

2          I will recognize Mr. Stepp.

3    **BY MR. STEPP:**

4    **Q**    Okay.

5          So Mr. Norwood, you said you had the firearm, which was in

6    your truck, because that was in connection with your fixing ATM

7    things; right?

8    **A**    Yes, sir.

9    **Q**    And you're not prohibited from possession of a firearm or

10   ammunition?

11   **A**    No, sir.

12   **Q**    So you grew up in Boiling Springs; is that right?

13   **A**    Yes, sir.

14   **Q**    Where did you go to high school?

15   **A**    Boiling Springs High School.

16   **Q**    Okay.

17         Did you go to church in Boiling Springs?

18   **A**    I went to church in Springfield, which is near Boiling

19   Springs. First Baptist North Spartanburg.

20   **Q**    Okay.

21         And were you a regular church member?

22   **A**    I was.

23   **Q**    Attendee, I guess I should say?

24   **A**    Yes, sir.

25   **Q**    And did you -- were you are a part of a gospel quartet?

1   **A**    I did sing in my 20s for Southern Gospel Quartet. We

2   traveled the world and sang.

3   **Q**    Okay.

4        So I'm going to shift gears a little bit. Your sister who

5   testified before talked about this Facebook ---

6   **A**    Uh-huh.

7   **Q**    --- message group ---

8   **A**    Yes.

9   **Q**    --- that you were a part of; is that right? What's the age

10  difference between you and your sister?

11  **A**    Two and a half.

12  **Q**    Who's ---

13  **A**    Two and a half years?

14  **Q**    --- the oldest?

15  **A**    I'm older.

16  **Q**    You're older?

17  **A**    Yes, sir.

18  **Q**    Okay.

19       And she lives in Columbia; is that right?

20  **A**    Yes, sir.

21  **Q**    Okay.

22       And over time -- well, just recently, let's say in the

23  last couple of years or so, have you and her communicated back

24  and forth about things beyond the family world, like politics

25  and stuff like that?

1  **A**    Yes, sir.

2  **Q**    Okay.

3       And you heard me ask her whether y'all had divergent views

4  on political issues?

5  **A**    Yes, sir. We do.

6  **Q**    All right.

7       And did you hear her answer?

8  **A**    I did.

9  **Q**    And so is it fair to say that you and her are on opposite

10 ends of the political spectrum or close to it?

11 **A**    Complete opposite.

12 **Q**    Okay.

13 **A**    Yeah.

14 **Q**    And as far as this -- some communications you had with

15 your sister, do you all go back and forth regarding political

16 issues?

17 **A**    We do. And I do -- I tend to poke at her some and

18 exaggerate things and -- just to upset her. It's my sister.

19 Just being a brother and picking on her. That's basically what

20 I did.

21 **Q**    So when you were interviewed by the FBI in January, they

22 talked to you about this text message that was in this group

23 message; is that right?

24 **A**    They did not.

25 **Q**    They did not?

William Norwood - Direct Examination by Mr. Stepp                    89

1   **A**     Not the first interview. And not -- I didn't know about

2   that until the initial hearing in here on that, I guess, Friday

3   last week. I didn't know that they had seen that. That was

4   beyond my knowledge.

5   **Q**     So the things that are in the affidavit that you've seen

6   now ---

7   **A**     Uh-huh.

8   **Q**     --- those text messages ---

9   **A**     Uh-huh.

10  **Q**     --- you were unaware that the FBI had those ---

11  **A**     Yes.

12  **Q**     --- until you saw them?

13  **A**     I was unaware until the -- it was unsealed, I guess, for

14  my viewing, or until I saw it that Friday.

15  **Q**     Okay.

16         So did -- in your interview with the FBI in January, did

17  you tell them that you had been sending out text messages?

18  **A**     I did tell them. I told someone that I had obtained the

19  vest and helmet by way of taking it from a police officer which

20  was not true. But that's what I told them, yes. I mean, I did

21  not do -- I did not commit that act, but I did say that. I did

22  tell someone that, yes.

23  **Q**     You told -- All right.

24         Wait a minute. I'm --

25  **A**     I just confused myself.

1   Q    You told --

2   A    I'm sorry. I did admit that I told someone that I did

3   that.

4   Q    And you admitted that to the FBI?

5   A    Yes.

6   Q    In January?

7   A    Yes.

8   Q    Okay.

9        And did you tell them who you had admitted doing these

10  various acts to?

11  A    I don't recall that I told them who, but I did tell them

12  that I did say that, yes.

13  Q    And did they seem to have any interest in who you might

14  have told it to?

15  A    One of the agents perked up and said, "You told someone

16  that?" And I said yes. And they just kept writing.

17  Q    Okay.

18  A    Yeah.

19  Q    So when you saw the affidavit that talked about the --

20  them getting -- the FBI getting a tip from somebody and it had

21  the initials there and then they talked to that tipster who

22  told the FBI that the tipster had information that somebody

23  else whose initials there who was the brother of you had

24  received a text messages and had been interviewed by the FBI,

25  was that the first time you saw that was in affidavit on

1   Friday?

2   **A**    Yes.

3   **Q**    Okay.

4        But you are the one. You sent those to your sister; is

5   that right?

6   **A**    I did.

7   **Q**    Into this group of four people; is that right?

8   **A**    Three others.

9   **Q**    Three others?

10  **A**    Yeah.

11  **Q**    Okay.

12           **THE COURT:**  Your sister, your mother, and your

13  father?

14           **THE WITNESS:**  Yeah. And me. Yes, sir.

15  **BY MR. STEPP:**

16  **Q**    Did you send anything out to anybody else?

17  **A**    Maybe, but not that I recall. I mean, it wasn't to the

18  degree that I did with my sister. I don't have any knowledge

19  now, no.

20  **Q**    Okay.

21       And are you familiar with the term to "gig" somebody?

22  **A**    I think so.

23  **Q**    Poke them?

24  **A**    Yeah.

25  **Q**    Okay.

1     And from -- based on your divergent political views, did

2     you poke your sister or gig her from time to time?

3     **A**    I did, just to rouse her up. I know how she's a little

4     more sensitive to me, so I would just gig her.

5     **Q**    What was your -- when you sent the text messages out that

6     you now acknowledge are yours, what was your intention or

7     purpose by sending them out to the group?

8     **A**     Just to get at my sister. Make her, you know, just --

9     there's an overarching context to our entire thread that is

10    missing from just what you see in the affidavit, the way that

11    we had been arguing about certain things over the course of a

12    year. And she just -- one of our disagreements pertained to the

13    group supposedly called ANTIFA. And I was -- our argument was

14    that what I'd seen on YouTube Live streams over the past year

15    out west in Seattle, Portland.

16         These people were committing crimes every single night and

17    the same people would come back the next night. They would

18    either get arrested and released immediately -- and I'm not

19    sure if it was -- what it was due to or why, but I saw with my

20    own eyes the same people committing crimes every night against

21    federal building and federal police. And it just blew my mind

22    that those people were able to do that on a nightly basis and

23    basically make a living as rioters. And that was our argument.

24         And she didn't -- apparently, my sister has neither seen

25    this footage or hasn't bothered to research other news

1    resources other than mainstream media. She would see nothing of

2    this or didn't believe it existed. And I would try to send her

3    a link and that these people would watch these videos. These

4    videos don't lie. And she just didn't believe any of it. Never

5    did. And I don't -- either she refused to watch the links that

6    I would send her or she just refused to believe what she saw.

7    That was my argument.

8         So my purpose for saying I was going to dress that way and

9    then do such a thing was to basically further prove to her that

10   certain people would get away with certain things if they were

11   in a particular group, even though I didn't do it. That was

12   just me getting at her from a previous argument we had been

13   having for months.

14   **Q**   So when you --

15   **A**   So it was not what happened.

16   **Q**   So when you sent her a text message that talked about

17   stealing a -- police equipment, police tactical vest from a

18   police officer ---

19   **A**   Uh-huh.

20   **Q**   You put that in your text message; correct?

21   **A**   I did.

22   **Q**   And did that happen?

23   **A**   No. No. I did not do that.

24   **Q**   And did you tell the FBI how you came to get the vest and

25   the helmet?

William Norwood - Direct Examination by Mr. Stepp                    94

1    **A**    I did.

2    **Q**    Okay.

3         But when you told the FBI that you had left those in DC

4    and returned to South Carolina, was that true?

5    **A**    No, it was not.

6    **Q**    Okay.

7         And why did you tell them something like that that was not

8    true?

9    **A**    Well, frankly, I was scared to death. I had heard on the

10   news what they were trying to do to people that were there. You

11   know, they were contemplating charging people with murder, you

12   know, who had nothing to do with killing anyone or other

13   charges that didn't pertain to what exactly took place. My

14   activity that day, I didn't involve no violence whatsoever. I

15   didn't -- I didn't attack anyone whatsoever. I was, you know,

16   in this crowd that got pushed into a building and got just lost

17   in this crowd.

18        And in my attempt to find my way out of this building,

19   which I had no foreknowledge of the floor plan, I didn't know

20   how to get back out of the doorway -- most of them were being

21   pushed inward by people coming from the outside, from guarded

22   from inside by police and trying to prevent others from coming

23   in so there's no way to get out -- no good way to get out until

24   later -- maybe 30 minutes after I entered the building, I saw a

25   way to get out. The door was open, but it wasn't flooded with

1  people. I just squeezed my way out.

2  **Q**    Okay.

3  **A**    And I believe there's photographs of me coming out of the

4  building.

5  **Q**    But you seen news footage or video footage of things that

6  went on at the Capitol?

7  **A**    There is.

8  **Q**    Is it fair to say that there were thousands of people

9  there?

10  **A**    Lots. Thousands upon thousands.

11  **Q**    Okay.

12       So when the FBI contacted you, you drove from Boiling

13  Springs to Downtown Greenville to be interviewed; is that

14  correct?

15  **A**    I think I was in Greer at the time, Locus Hill at the

16  time ---

17  **Q**    Okay.

18  **A**     --- but still --

19  **Q**    Okay.

20       But you came in Downtown Greenville to the FBI office?

21  **A**    I did.

22  **Q**    All right.

23       And were you -- were you aware that you didn't have to

24  come down here?

25  **A**    Yes.

1    **Q**    Were you aware that you didn't have to talk to these

2    people?

3    **A**    I was aware.

4    **Q**    But you did talk to them?

5    **A**    Yeah. I wanted to tell them the, you know, truth. And I

6    wanted to tell them about the vest and hat, but I was scared to

7    death the way they spoke to me initially that they would

8    immediately arrest me then. I was just scared. I should've told

9    the truth. I apologize I did not. But I should've told the

10   truth. I have, subsequently, told Ms. Evanina the truth.

11   **Q**    Did you contact a lawyer?

12   **A**    I did not.

13   **Q**    Did you think about leaving town?

14   **A**    No.

15   **Q**    If you were released on bond, would you show up at the

16   District of Columbia or wherever else they tell you to show up?

17   **A**    If that's where they tell me to go, yes, sir.

18   **Q**    All right.

19         And when you were -- let's fast-forward to last Thursday

20   night?

21   **A**    Uh-huh.

22   **Q**    You talked about parking your truck up the road a little

23   bit ---

24   **A**    Yeah. Just right up the street.

25   **Q**    --- because of the issues with your father-in-law?

William Norwood - Direct Examination by Mr. Stepp            97

1  **A**   Yes, sir.

2  **Q**   You heard the FBI agent talk about a vehicle leaving that

3  Locust Hill Road house?

4  **A**   Yeah. When I arrived at the Dollar General that night, I'd

5  been on the phone with my wife. She knew I was on the way over.

6  I'm parked. I went into Dollar General and got some apple

7  juice. I had a bag. I carried it down the street. Walked across

8  the road -- across Locust Hill because Dollar General was on

9  the opposite side. I walked across the street, walked down

10 about a block or 150 yards to a street just before our home and

11 made a right.

12      And I noticed two vehicles that I now know to be FBI. I

13 didn't know then. But they were running, sitting on the street.

14 And --

15 **Q**   Did they have any markings on them, like FBI, police,

16 sheriff, anything like that?

17 **A**   No. Just two vehicles I never seen before sitting on the

18 street in front of houses that don't normally have vehicles

19 sitting in front of them. I walked that -- you know, I walked

20 there for weeks. There never is -- never are any vehicles

21 sitting there. There were two.

22      I commented to my wife. I said there were cars sitting

23 there with men in them just sitting in there running. I said

24 that's kind of weird. And then I looked across the street and

25 noticed this car parked across the street with lights on. I

1   said that's kind of weird too. I said look. We were just

2   commenting on the strangeness. I didn't realize at the time

3   that it was, in fact, the FBI. But I was like it's odd that

4   these cars are just sitting there.

5        So we had things to do. We were going to go paint one of

6   her father's other properties. Now, he didn't know I was there

7   either. He was in another -- he's got several properties he

8   rents. But we went to paint, do some -- he was selling the

9   condos. One of her jobs was to go paint --

10  **Q**   You hear the FBI agent say that vehicle left --

11  **A**   Yeah. We left. We got in the Jeep and was going to go to

12  the condo. When we pulled out, I may have been speeding, but it

13  wasn't to elude anyone at that point.

14       When we passed the Dollar General, I noticed this white

15  car that I had seen earlier. I told her, I said, "That same

16  car, I could have sworn, followed me from the store, you know,

17  earlier on my route to the home."

18       I said, "It looks like the same car."

19       I said, "It might be. I'm going to see if they're

20  following me."

21       I said, "I'm not sure if they are or not."

22       I said, "I'm going to see."

23       So when we got on the highway, the three lane road of 29,

24  Wade Hampton Boulevard, I -- they turned, made a right also at

25  the red light. I think there may have been a car between us.

1    I'm not -- I can't quite remember.

2        But as I pulled up to the top of a hill, I switched lanes.

3    When I switched lanes, they switched lanes. I said, "Do you see

4    their" -- I commented to her.

5        I said, "You see they're switching lanes with me. This is

6    weird. I don't know if they're following me or not, but I'm

7    going to rule this out real quick."

8        And I turned into a storage unit, which the company I work

9    for has a storage unit there. Nothing of mine is in it. It's

10   just company property, like extra -- for ATMs and anything that

11   an ATM would need is there. Because they're based out of

12   Cummings, Georgia. And they have another office in Columbia,

13   South Carolina --

14   **Q**    Okay.

15        So did you attempt to evade the vehicle, the white vehicle

16   that was --

17   **A**    I attempted to rule out whether or not I was being

18   followed.

19   **Q**    All right.

20   **A**    Yes.

21   **Q**    Did that vehicle continue to follow you or did it

22   eventually --

23   **A**    I did -- I lost them too.

24   **Q**    Okay.

25   **A**    When I pulled into the storage unit, it requires a code at

1  the gate. So I went through the gate. And I looked back and I

2  didn't see anyone pull in behind me. So I just turned around

3  and went back out through the gate.

4  **Q**     Okay.

5  **A**     And didn't see the car.

6  **Q**     Okay.

7         All right.

8         And you heard the FBI agent testify about ---

9  **A**     Yes.

10 **Q**     --- they had surveillance people out there?

11 **A**     I, now, know who that was. Yes.

12 **Q**     All right.

13        So now you put that together?

14 **A**     Yes.

15 **Q**     At the time, you thought it was who might have been

16 following you?

17 **A**     I don't know. I mean, it was just odd at the moment.

18 **Q**     Did you think that your father-in-law might have put

19 somebody out to follow you?

20 **A**     I didn't rule that out.

21 **Q**     Okay.

22 **A**     Cause he was already put -- he was cracking down on her

23 because he had -- I think the neighbor, the older gentleman who

24 we tried to hide from maybe had told him he had seen me there.

25 And he's got -- I think he's -- he's a man of means. He's got

1    some money. And I wouldn't rule out him having me followed. No.

2  **Q**    Okay.

3         So you ended up back at the house ---

4  **A**    Yeah.

5  **Q**    --- later on in the evening?

6  **A**    We did some painting and went back home.

7  **Q**    Okay.

8         And you -- at some time, they rousted y'all -- rousted

9  that you out and --

10  **A**    We drove past the Dollar General and I noticed there were

11  two, like, maybe Greenville County just sitting there to the

12  side of the building with their running lights on.

13         I said, "That's weird."

14         I said, "They might be here for me."

15         I commented -- I said, "This could be for me. I'm not

16  sure."

17         So we went ahead and went to the driveway. I could've kept

18  going, but I just said, "I'm not going anywhere. I'm not

19  running."

20         So I pulled in the driveway. And we went to the bedroom --

21  our bedroom, which is blacked-out curtains. You know, it's a

22  secluded room. You can't see in or out. We stayed in the

23  bedroom and apparently didn't notice that they all just flooded

24  the yard, apparently, right after I pulled in. I didn't really

25  realize that until several minutes later.

1     And we didn't really hear anything on the loud speaker

2   until -- I mean, at the very end, I heard a noise, like what

3   sounded like a speaker but couldn't tell what was being said.

4     So at that point, I give her all of my belongings, my

5   wallet and everything.

6     I said, "They must be here for me. I'm going to go out."

7     I said, "You can come out with me."

8     She tried to come out with me, but they told her to go

9   back inside.

10     So I opened the door and just stuck my hands out and then

11   that was that. They directed me back. I wasn't going to run or

12   flee. I removed all of the weapons from the home previously

13   just so there would not be anything there so they couldn't say

14   I had anything in anticipation of anything. So I just got rid

15   of everything and tried to do it the right way and walked out.

16   **Q**   Did you, based on your interview with the FBI in January,

17   do you suspect that you might be charged with criminal

18   violations?

19   **A**   Everyone that was there and entered the building, I saw

20   was being charged. So I knew something was coming. I just

21   didn't know what. I was just waiting on it. I didn't know what

22   would, you know, what they'd eventually charge me with.

23     But I told my family, I said, "I'm not out of the woods. I

24   said they're going to get me with something. I just don't know

25   what yet."  But yeah.

1    **Q**    Okay.

2         And so the firearms that you had in the truck and the

3    firearms at the utility trailer ---

4    **A**    Uh-huh.

5    **Q**    --- those are in the custody of the police now, is that

6    your understanding?

7    **A**    As far as I know.

8    **Q**    Okay.

9         And the ammo? Same thing?

10   **A**    As far as I know. I don't know where anything is.

11   **Q**    Okay.

12        All right.

13        That's all the questions I have. Thank you. Answer

14   anything the prosecutor or the judge has.

15            **THE COURT:**  Yes, sir.

16            **MR. CAUTHEN:**  May it please the Court.

17                    **CROSS-EXAMINATION**

18   BY MR. CAUTHEN:

19   **Q**    Mr. Norwood, you indicated that the pistol that was in

20   your truck was for your protection for safety reasons because

21   you handled a lot of money. And when you're dealing with it, do

22   you have to set the money and, I guess, your tools out on the

23   bed of your truck when you open it?

24   **A**    Open my tailgate ---

25   **Q**    Tailgate.

1   **A**    --- and I pull up past the ATM. And ATMs have cassettes

2   inside. Each cassette contains a denomination of money and a

3   lot of it. So I pull the cassettes out and check them for jams

4   because sometimes bills get stuck in the cassette ---

5   **Q**    All right.

6   **A**    --- and then I've got to check the entire dispenser.

7   **Q**    The gun stays just, I guess, over on the bed?

8   **A**    Near me.

9   **Q**    Okay.

10  **A**    Near me somewhere.

11  **Q**    So do you have a concealed weapons permit?

12  **A**    I do.

13  **Q**    You do?

14  **A**    I have one. I think it expired a year ago maybe. I don't

15  carry a concealed --

16  **Q**    You don't have one?

17  **A**    I mean, I had a --

18  **Q**    Okay.

19  **A**    Yes. I had a card.

20  **Q**    Okay.

21  **A**    I don't it's active, if that makes sense.

22  **Q**    Do you have an active CWP?

23  **A**    No, sir.

24  **Q**    Okay.

25       Thank you.

1   **A**   Sorry.

2   **Q**   Now, you talked about telling the truth then, and now. So

3   let's talk about that briefly.

4   **A**   Sure.

5   **Q**   On January 22 -- and if you can't hear me because of all

6   the glass, just ask me to speak up. On January 22 of this year

7   when the FBI interviewed you and you spoke with them, you were

8   cooperative. You told them that you left the stolen material in

9   the hotel room in Washington; is that correct?

10  **A**   That's what I said, yes, sir.

11  **Q**   And that wasn't true?

12  **A**   Not at all.

13  **Q**   Okay.

14       And then, you did not tell them that you also had a stolen

15  coaster from the Speaker's office, do you?

16  **A**   It wasn't from the Speaker's office.

17  **Q**   Did you tell them you had a stolen coaster from the

18  Capitol when you went into it?

19  **A**   Not the first interview. That one slipped my mind. It

20  wasn't for the Speaker's office. It was from the gentleman

21  sitting in the hallway who, apparently, found a sleeve of them.

22  **Q**   Was it stolen?

23  **A**   Yes.

24  **Q**   Okay.

25  **A**   Yes. Yes. Yes.

1   **Q**   Did you tell them about it in that interview?

2   **A**   No.

3   **Q**   Okay.

4       Thank you. Then you told them, I believe on the 22nd that

5   whatever -- referring to the texts that we were talking

6   about --

7   **A**   Uh-huh.

8   **Q**   -- that you had sent them to sound tough. Is that -- those

9   were your words?

10  **A**   Sure.

11  **Q**   You didn't tell them that you sent them to poke at your

12  sister or to provoke her or agitate her, did you?

13  **A**   No.

14  **Q**   So your testimony is you sent those texts to your mom,

15  your sister, and your dad -- because you were the fourth one in

16  the group ---

17  **A**   Yeah.

18  **Q**   --- to sound tough?

19  **A**   Well, when he asked me then, just send a quick second ---

20  **Q**   Right.

21  **A**   --- I didn't go into the entire deal with my sister and

22  the whole back story with that. I said yeah, to sound -- that

23  part, I didn't explain. I'm sorry.

24  **Q**   But there's no doubt that you sent those?

25  **A**   No doubt.

William Norwood - Cross-Examination by Mr. Cauthen

1   **Q**     I'm sorry?

2   **A**     No doubt.

3   **Q**     And you said that, "I got away with things that others

4   were shot or arrested for. This allowed ANTIFA -- then allowed

5   ANTIFA Trump supporters to assault him. I was one of them. I

6   was there. I took his shit. I fought four cops. They did

7   nothing. I got a nice helmet and body armor off of a cop, for

8   God's sake, and I disarmed him. Tell me how that works. The one

9   cop who got it -- who deserved it, got it. The cops who acted

10  shitty got exactly what they deserve, dot, dot, dot. The ones

11  who were cool got help." Is that correct?

12  **A**     That's what I said, yes.

13  **Q**     Yep. And you put the vest on at some point, didn't you?

14  **A**     Yes. But it didn't occur at any commission of a crime or

15  anything like that.

16  **Q**     I -- I --

17  **A**     I went out of the building.

18  **Q**     I'm just saying you put it on at some point?

19  **A**     At some point, yes.

20  **Q**     So it's your testimony that you admitted to stealing that

21  equipment off of a cop, assaulting four others and that the one

22  that got it, deserved it, was all trying to provoke your sister

23  or to sound tough; is that correct?

24  **A**     It's not my testimony that I admit that. I mean I admit to

25  saying that to my sister, but I don't admit to committing those

William Norwood - Cross-Examination by Mr. Cauthen                    108

1   actions.

2   **Q**    That's not what I'm asking you. I'm saying --

3   **A**    Well, I'm sorry. I'm confused.

4   **Q**    You said that?

5   **A**    I said those words, yes.

6   **Q**    Those were the texts. Your testimony now is you just said

7   that to provoke your sister?

8   **A**    Pretty much, yes.

9   **Q**    And as a matter of fact, the items that you stole from the

10  Capitol, the vest and the helmet ---

11  **A**    Uh-huh.

12  **Q**    --- they weren't found in your house, were they?

13  **A**    No.

14  **Q**    You had moved them off site to a storage trailer.

15  **A**    Just to my trailer, yeah. They were in there pretty much

16  basically when I got home. And I -- my trailer had been moved

17  prior to that date.

18  **Q**    Right. So it was off site. It wasn't in your house?

19  **A**    It was.

20  **Q**    Okay.

21       And I believe you told the FBI that -- you were testifying

22  earlier that you got into one lane and when you thought the

23  white car might be following you, you switched lanes and it

24  switched lanes. In fact, you told the FBI you made a U-turn, I

25  believe, on 29 in Greer to see if they were following you

1  before turning into the --

2  **A**   No. I did not make a -- I mean, I turned into the storage

3  unit. I might have had to turn back a little bit when I passed

4  it. But I didn't make a U-turn and travel any distance. I

5  turned and went into a storage building. I planned on going

6  into there to begin with. I wasn't planning on doing a U-turn.

7  And I didn't tell the FBI that. I just made a left. It might've

8  been a hard left, but not a U-turn.

9  **Q**   Is it fair to say that you were becoming very suspicious

10  when you saw two cars sitting outside the residence when you

11  arrived around six o'clock walking to your home with the bag of

12  apple juice that you talked about and then saw a white car

13  following you -- that you thought had been following you

14  earlier in the day. And then, when you arrived back that

15  evening at the home in the Jeep, that you saw -- I believe you

16  said -- two county cars sitting there. So you were very

17  suspicious that they --

18  **A**   At that point, things were coming together at that point.

19  I was like, this may be it. This may be. I don't know -- I

20  didn't know for sure, but it looked, to me, suspicious.

21  **Q**   And you said something earlier that I didn't quite follow.

22  You said that when went over to y'all -- I'm going to call you

23  and your wife's residence, okay?

24  **A**   Sure.

25  **Q**   You walked in -- to sneak in so that the father-in-law

1    wouldn't see you there. And you went in, parked the truck,

2    walked down there and went in, that didn't have anything to do

3    with not cutting lights on inside the house, did it?

4    **A**    We don't usually run the -- I cut -- you can ask my wife.

5    I am a stickler when it comes to the power bill. I turn the

6    lights off when I get home on purpose. She leaves like five of

7    them on. I go in there and like, "You don't need this on or

8    need this on."

9    **Q**    So you cut all the lights off?

10   **A**    Not all, but the ones in front of the house. There are

11   lights on the back of the house that you can't tell if they're

12   on or off from the front.

13   **Q**    So we're talking about 6 o'clock, so it would be getting

14   dark outside?

15   **A**    It was dusk. But I wasn't -- but the lights we didn't need

16   on, I turned off.

17   **Q**    Okay.

18   **A**    Like, the lights in front of house, the rooms we weren't

19   using, there was no point having a light on.

20   **Q**    Would it be your testimony that the agents couldn't tell

21   if you had lights on in certain parts of the house or not if

22   they were around it?

23   **A**    They couldn't if they were out front, no.

24   **Q**    Okay.

25        And then I believe y'all came back around 11:00, and

1  that's not an exact time, but around 11:00, that you went in

2  and you still didn't cut any lights on? Why was that?

3  **A**     Not in the front of the house, no. I mean, that's -- we

4  didn't need them. Our bedroom is in the back. It's hard to

5  explain but it's a split -- the house is like an older built in

6  the 60s ranch home. The back of house has bedrooms and the

7  front of the house is the living area. We just went straight to

8  the bedroom.

9  **Q**     So you cut no lights on your way there, didn't cut any

10  lights on when you went in. Nothing. Just open and shut the

11  door, go straight in the dark to the back bedroom?

12  **A**     It wasn't that dark. I mean, we had fluorescent lights.

13  There's like a stove light in the kitchen. You could see just

14  fine. I mean, it's not, like, pitch black dark in there. It

15  was -- there's lights. You just can't really tell -- there are

16  awnings over each window which make it hard to tell when lights

17  are on or off -- that are dimmer lights, for instance. It is

18  not -- it wasn't pitch dark in the house. It just was not

19  bright in front where people can see.

20  **Q**     Let me ask you this: How was your wife reacting to all of

21  this when you were slipping around, heading back to the -- you

22  cut the lights off of the Jeep before you got back to your

23  house?

24  **A**     We do that so the older gentleman that lives next door

25  doesn't see us arrive and leave. We try to avoid him seeing me.

William Norwood - Cross-Examination by Mr. Cauthen                112

1   **Q**    Why couldn't you pull in and cut the lights off in the

2   driveway?

3   **A**    That's what we -- I turned the lights off right as I

4   turned in. They didn't turn off at the Dollar General. I'm

5   sorry. You're incorrect. I apologize. I went down to the

6   driveway and turned my lights off as I turned in. You can -- I

7   promise you, as soon as I made that right and clicked the

8   lights off and turned into the driveway.

9   **Q**    So the agent's incorrect --

10  **A**    I didn't say she's lying or she's not being correct.

11  **Q**    I just said you're saying the agent's incorrect when they

12  say surveillance said you cut it off well before the house?

13  **A**    It was right there at the driveway. Maybe 10 feet prior,

14  maybe. Right before I turned in, I hit the lights. That's a

15  common thing I do just so the neighbor doesn't see us coming

16  and going so he doesn't get up and look out of the window and

17  see two people enter the home. I try to avoid any further

18  trouble with her father that I can.

19  **Q**    Now, you made a comment earlier that you had been watching

20  the news prior to this and that you -- and correct me if I

21  misunderstood you, but that you had said that you have seen

22  where they are charging people with all kinds of things and

23  attempted murder and stuff they didn't do.

24  **A**    I saw that, yeah. This was talked about amongst the media.

25  I'm not saying that anyone has been or is or what. I was scared

1   to death that all the people -- the pundits, that they're going

2   to charge you with this and that, this and that. And I'm like,

3   I'm freaking out because I didn't do any of that, you know, as

4   far as hurting anyone. I was just afraid they were going to pin

5   a murder on everybody.

6   **Q**   Why would you tell your family that you had gone through

7   the stuff that we did when instead you told the FBI that you

8   were actually forming a line around officers and helping

9   officers? Why not just tell them the truth?

10  **A**   That was the only -- what you see in that context there is

11  just a brief -- that's not all I've said to my family. I've

12  spoken to my mother and father outside of Facebook since then

13  and we've talked about it. But not -- just because I sent that

14  to my sister in that group doesn't mean that's all I've said to

15  anyone. What you see is the one time I said that to my sister.

16  **Q**   It wasn't one time. It was several different statements,

17  wasn't it?

18  **A**   One instance that consist of several statements, yes.

19  **Q**   One conversation?

20  **A**   Yes.

21  **Q**   Okay.

22      Wouldn't you think if you read that coming from somebody

23  that that's very disturbing?

24  **A**   It's very disturbing. I agree. It is. I don't disagree. I

25  mean, I said it, but it wasn't true. Although I did say it,

1    yes.

2    **Q**    Thank you, sir.

3    **A**    No problem.

4    **Q**    I appreciate it.

5    **A**    Okay.

6            **MR. CAUTHEN:**  Judge, no further questions.

7            **THE COURT:**  All right.

8            Any follow-up?

9            **MR. STEPP:**  Yes.

10                          **REDIRECT EXAMINATION**

11   **BY MR. STEPP:**

12   **Q**    That address that you were living at is Locust Hill Road?

13   **A**    Yes, sir.

14   **Q**    Is it a dead-end?

15   **A**    No.

16   **Q**    So if --

17   **A**    It's a main highway.

18   **Q**    If, when you came to your home at 10:30, 11 o'clock

19   Thursday night and you wanted to keep going ---

20   **A**    Uh-huh.

21   **Q**     --- and just keep going ---

22   **A**    Could have, yes.

23   **Q**     --- could you have done that?

24   **A**    Yes.

25   **Q**    All right.

1         You didn't have to turn into your driveway?

2   **A**    Huh-uh.

3   **Q**    If you had wanted to avoid whoever was you thought might

4   be around there, you didn't have to go to a cul-de-sac, turn

5   around and come back and come right past that?

6   **A**    No.

7   **Q**    All right.

8         Thank you. That's all I have.

9              **MR. CAUTHEN:**  Judge, I have nothing further.

10             **THE COURT:**  All right.

11             I have a couple of questions. You indicated that

12  you -- your presence with Capitol was a result of you being

13  pushed into the building?

14             **THE WITNESS:** Yeah. The crowd -- I'm not sure what

15  went on at every entrance or every entrance of the left side of

16  the building. I'm not sure it's east or west, but I know it's

17  on the side of the monument, the Washington Monument. That side

18  of the Capitol was the side we approached from and the side

19  that I entered on. And the group, the crowd -- you can ask my

20  wife who was there. We got separated at one point. Before it

21  got too bad, I guess she peeled backward without my knowledge.

22  She went the other way and I didn't notice.

23             And I got further up in this melee of people just

24  pushing and yelling and pushing. And I looked back and she was

25  nowhere to be seen. I couldn't turn back. Because at this

1  point, men were just like, "Go. Push. Go. Go." You know, just

2  shoving people just left and right. Go. It was a huge crowd of

3  people just shoving.

4          So I turned back around, instead of fighting

5  everybody, and continued in that direction. On the way through

6  this entire melee, they were firing pepper balls or things into

7  the crowd to deter people. But it wasn't deterring anyone.

8  Everybody just kept going.

9          And I got hit in the face with something. It burned

10 my right eye. My face was on fire. I'm not sure what exactly it

11 was, but something got me. And then at that time, I tried to

12 turn around because I couldn't see. My glasses came off. I was

13 holding my glasses. I could -- I'm blind without my glasses on.

14 I can barely see.

15         So I looked down through the crowd and what looked

16 like water bottles -- plastic case of water was sitting there.

17 I so dove down and grabbed me one and poured it in my face. It

18 didn't help anything with the burn. People were like, "You'll

19 be okay. Get up. You know, you're fine. You'll be all right."

20 And then continued to push us up these steps.

21         This crowd just flowed onto the steps underneath this

22 white -- the white media -- I'm not sure what you call it --

23 media stand, underneath it through a white tarp that had been

24 ripped down previously. And the crowd just continued to flow.

25 Then pathway to this door got narrower. The steps got narrower.

1    Then it turned into this -- it looked like a temporary walkway

2    or semipermanent walkway. I'm not sure if it's a permanent or

3    temporary thing that's raised. It's got aluminum rails and it's

4    got, like, a black rubber mat that goes all the way across this

5    thing. And it's almost -- it may be three-foot wide. I'm not

6    sure how wide it would be, but the crowd was just there flowing

7    down that.

8         And that -- we flowed on that little temporary

9    walkway into this doorway. And there's where I entered the

10   building. And the you couldn't go back that way because that

11   single file temporary walkway was just one way basically. The

12   crowd coming that one way. People flowed in the entire time

13   through that door, so I had no choice but to go another way.

14        And then as -- upon entering the building that way,

15   the crowd continued to shuffle through -- through what I think

16   is called Statuary Hall where the -- a lot of statues are and

17   some models of DC that are 3-D models. And upon entering there,

18   I noticed there was a scuffle.

19        Now, this has been seen on -- I've seen it on YouTube

20   and on the news. This is -- I was at the back of this crowd,

21   not involved in the scuffle. But whoever was in front was

22   tangling with the police that were there, trying to stop them

23   from continuing on this path. And I didn't know at the time

24   that they were fighting police up there. So I had no idea what

25   was going on. I just knew there was a scuffle taking place.

1          I went around to the right of the crowd to avoid

2     whatever was going on with the scuffle and noticed that three

3     or four, five, or six men had backed up three or four police

4     officers to the wall. The cops -- you know, they had their

5     batons out and were backed up against the wall appeared to be

6     fighting.

7          At that point, I stood in front of them. I said, "I'm

8     sorry, guys. I mean, I'm -- I'm -- I'll help you. I'm here to

9     help." So me and this other -- a few other people that were in

10    the same mindset formed an armed, you know, a human chain and

11    just stood in front of them and told everybody that was passing

12    us that had been, you know, poking and prodding and assaulting

13    and mocking or whatever with the police, I said, "Leave them

14    alone. You know, leave them alone. Go on past us. You know,

15    we're not here for this."  That was one instance in the

16    situation I let the entire major part of the crowd flow through

17    before I walked away and ensured that they weren't going to be

18    further assaulted. Because they had just been in a fight,

19    apparently, with whoever was in the front of this crowd.

20         And then in the meantime, I meandered through the

21    building not knowing where I was because I don't know the

22    layout. I saw a doorway that looked like it was free and clear.

23    So I walked out this door. It ended up being a dead end and the

24    balcony. I was like, that's great. So nowhere to go from there.

25    It's a balcony.

1          So I turned right around, went back inside, saw

2    people flowing to another door and maybe it was a way out.

3    Walked in. It turns out it's Nancy's office. I went, oh, nope,

4    not here. I saw this -- there was a gentleman inside saying,

5    "I'm going to take her computer. I got this. I'm going to take

6    her computer."

7          I'm like, I'm out. I turned around and said, "I'm

8    going to leave. I'm out." Those were my words. I turned around

9    and left.

10          And then I think this was after this point where this

11    gentleman was in the hallway chucking coasters at people as

12    they -- he had a sleeve of coasters that he had picked up off

13    of some desk somewhere. And he's sitting in a rolling chair in

14    the hallway just flicking coasters at people. And that's one of

15    the coasters he hit me with. I just kind of grabbed it and

16    stuck it in my pocket. It was a cardboard coaster. And so I

17    took that and continued going until I saw where people -- it

18    looked like people were trying to get out of a door.

19          There were three officers standing in front of the

20    door. That was also a crowd on the other side of this door

21    fighting to get in. So I was, like -- I told one of the

22    officers, "Can I please go out this door? Can you please open

23    this door for me and let me out?

24          He said, "No. I'm not letting you out."

25          Before I could move and get out of the way, a crowd

1  behind me surged and just shoved me into this door as hard as

2  they could. At this point, I'm getting squished to the point  I

3  can't breathe. Every bit of oxygen, they smushed out. I mean,

4  I've got 50 to 100 people behind me shoving me against this

5  door.

6         At this time -- at this point, I'm in fear for my

7  life because I'm going to be crushed to death. Fortunately,

8  before I passed out from that, the door opened. And when it

9  opened, I grabbed a hold of the sides of the door. It's hard to

10  explain, but the back of the door and the front of the door. I

11  was holding on for dear life. As the crowd was going in and out

12  behind me, those people were just flooding in and out, in and

13  out. I didn't want to be trampled by whoever was coming in or

14  out. So I just held onto this door for life.

15         Thirty seconds to a minute goes by. I don't know how

16  long I was holding that door. Somebody on the inside reaches

17  out and grabs me, my left arm, and pulled me back into the

18  building. And I proceeded to walk over six feet from that door

19  and just bend over and catch my breath. Because I was out of

20  breath from the fight I just had from, you know, trying to hang

21  onto a door and getting squished.

22         And at that point, I see somebody else pull an

23  officer in. This officer was in full body armor, like head to

24  toe, had the shoulder pad, arm pads, whole, you know, outfit

25  on. And he was in distress obviously. His face was sweaty. He

1   had looked like he had tears coming out of his face. He was

2   just like -- [Demonstrating panting sound] -- eyes wide,

3   breathing heavy, had his hand on his pistol. It was on his

4   right leg.

5          At that point, I thought he was about to shoot

6   somebody. I was trying to calm him down. I said, "It's okay.

7   You know. You're going to be all right." I was trying to soothe

8   him.

9          At that point, before I could get any more words out

10  of my mouth, these two idiots come in and try to attack him,

11  sticking their hand under his mask and hitting him in the face.

12         I'm like, "What are y'all doing?"

13         And this is on video on YouTube somewhere. I've seen

14  it. To where I'm reaching out and grabbing all of these guys

15  and pulling them away from the cop and telling them to stop.

16         "Do not attack this officer. What are you doing?

17  Stop. You know, stop now."

18         I had a Gatorade in my pocket that I had not yet

19  opened that we bought on a food truck on our way toward the

20  Capitol. And I offered it -- I offered it to the police

21  officer. I said, "This is an unopened Gatorade. You might need

22  this. You're sweating profusely. Before you dehydrate or pass

23  out, drink it."

24         You know, he refused it. Which is fine. He refused

25  the Gatorade. And as I'm putting it back in my pocket, one of

William Norwood - Recross Examination by Mr. Cauthen                    122

1   those idiots grabbed it and tried to hit the cop with it. So I

2   reached over again and grabbed this guy. I was like give me --

3   I fought him for my Gatorade back. I put my Gatorade back in my

4   pocket and then grabbed him again a couple of times and shook

5   him by the chest and was trying to stand between him and the

6   police officer.

7              I was like, "Get away from the officer. You stop.

8   We're not here to assault anyone. Get out. Stop."  And then he

9   went on his way.

10             I wasn't there to hurt anyone. And I did what I could

11  to prevent people from being hurt. That is the truth.

12             **THE COURT:**  Have you seen the pictures that are

13  portrayed in the affidavit?

14             **THE WITNESS:**  I have.

15             **THE COURT:**  Okay.

16             Okay.

17             All right.

18             Any follow-up to my questions?

19             **MR. CAUTHEN:**  Just a couple.

20             **THE COURT:**  Yes, sir.

21                          **RECROSS EXAMINATION**

22  BY MR. CAUTHEN:

23  **Q**    When you got pushed in initially, if that's what happened,

24  you went in with the initial, let's just say, surge of people?

25  **A**    Yes.

1   **Q**    And you're rolling along in this river of people. Why

2   didn't you just step to the side, let them go by, and then go

3   right back out when it ended?

4   **A**    There was no end. There were hundreds -- there was

5   150-200,000 people at that door. There was no end to it.

6   **Q**    No end in sight?

7   **A**    No. I mean, I'm sure there was eventually.

8   **Q**    Right.

9   **A**    But I don't know when that was going to be and I wasn't

10  going to stand there and wait -- just stand there and wait and

11  see what happened at that door. Because I know that some people

12  were going -- some people that were coming in were, like, "Run

13  this way. SWAT's coming right behind us." And I don't know

14  what's going on. I'm, like, panicking at this point.

15  **Q**    But you knew that was a way out; right?

16  **A**    It could have been.

17  **Q**    Right.

18  **A**    But it was single file and no end in sight. So I mean,

19  there was -- I could stand there and wait for who knows how

20  long or try to find a way out somewhere else.

21  **Q**    And y'all stayed in DC or Virginia that night in a hotel

22  and then came back the next day?

23  **A**    Uh-huh.

24  **Q**    At no time you texted your group that you had helped all

25  of these people?

1  **A**    Not at that point.

2  **Q**    That maybe you saved someone's life instead of beating

3  someone up?

4  **A**    No. I did that -- that was a thing with -- my sister had

5  going on. That was not a private thing between my parents or

6  her individually. It was just something I was trying to poke at

7  her further that comes from a previous argument we've had.

8  **Q**    Wouldn't you think that it would -- after it was over and

9  after you got your poke in, if that's what happened, that your

10 family would think highly of you if you had helped not one, but

11 two or three different officers?

12 **A**    Sure.

13 **Q**    And you didn't tell them?

14 **A**    I mean, I -- I didn't put it in that conversation because

15 by this point, I believe it was --

16 **Q**    I'm talking about the next day.

17 **A**    Oh, no. Not the next day. No.

18 **Q**    Thank you, sir.

19        **MR. CAUTHEN:** Judge, I don't have any further

20 questions.

21        **THE COURT:** Yes, sir.

22        Mr. Stepp.

23        **MR. STEPP:**  A couple.

24                    **REDIRECT EXAMINATION**

25 **BY MR. STEPP:**

1   **Q**    So this coaster ---

2   **A**    Uh-huh.

3   **Q**    --- that the government says you stole from the Capitol

4   Building and you put it in your pocket; is that right?

5   **A**    Yes, sir.

6   **Q**    Where was it?

7   **A**    They have it.

8   **Q**    FBI?

9   **A**    Sure. Yeah.

10   **Q**    Describe it.

11   **A**    It's cardboard and it's a disposable coaster I'm not sure

12   if they're giving out as souvenirs or if that's what they hand

13   out to Congress or what.

14   **Q**    Let me ask you a question.

15   **A**    What?

16   **Q**    You ever been to a bar?

17   **A**    Yeah.

18   **Q**    You ever seen a coaster in a bar?

19   **A**    Yeah.

20   **Q**    Is it ---

21   **A**    Same.

22   **Q**    --- kind of sort of match that description?

23   **A**    Same thing. Except it's not a bar. It says U.S. Capitol on

24   it or something like that ---

25   **Q**    Okay.

1    **A**      --- or Congress.

2    **Q**    It's a piece of cardboard?

3    **A**    Paper, yeah.

4    **Q**    Okay.

5         Second question.

6    **A**    Uh-huh.

7    **Q**    You seen this pretrial bail report about an arrest in 2013

8    for possession of stolen pistol?

9    **A**    Yeah. I saw it.

10   **Q**    And the bail report indicates that you were arrested

11   November 1, '13 and the case was dismissed a month later,

12   February -- December 10, '13? It was dismissed?

13   **A**    It was dismissed, yeah.

14   **Q**    Okay.

15        And so you had a pistol; is that right?

16   **A**    I purchased a pistol at a gun show.

17   **Q**    And it turned out to be a stolen gun?

18   **A**    Ended up being stolen.

19   **Q**    All right. And that led to this charge?

20   **A**    It led to that charge.

21   **Q**    The prosecutor dismissed it; is that right?

22   **A**    Yes. Yes.

23   **Q**    Okay.

24        So when you were -- put in for this job with these ATM

25   people where you're dealing with money ---

1   **A**   Yeah.

2   **Q**   --- all the time?

3   **A**   Uh-huh.

4   **Q**   Did they see this?

5   **A**   They did.

6   **Q**   Did they query you or question you about that?

7   **A**   They did.

8   **Q**   Okay.

9       And did you tell them that it was --

10  **A**   I told them the truth.

11  **Q**   -- you didn't know it was a stolen gun and it was

12  dismissed?

13  **A**   Yeah.

14  **Q**   Okay.

15  **A**   I told them the truth.

16  **Q**   Okay. And so this was before they hired you?

17  **A**   Uh-huh.

18  **Q**   Okay. And did this come up at all on this Sitel answering

19  service? Do they see this?

20  **A**   They did. I did background with both because I handle

21  person -- sensitive information with both.

22  **Q**   Okay.

23      And so they asked you for an explanation about it?

24  **A**   I had to print out a copy of my background and basically

25  attach a letter, an explanation letter, to each charge that

1  they saw and send it in. Yeah.

2  **Q**    They knew about it and they hired you anyway?

3  **A**    Yes.

4  **Q**    Okay.

5       Thank you. That's all I have.

6            **THE COURT:**  All right.

7            One follow up, if I may. You testified about helping

8  officers while you were there, do you tell the FBI that on

9  January 22?

10            **THE WITNESS:**  I believe so, yes, sir.

11            **THE COURT:**  Okay.

12       Thank you, sir.

13            **THE WITNESS:**  Thank you, sir.

14            **MR. STEPP:**  You can step down. Thank you.

15       Judge, that's our presentation.

16            **THE COURT:**  All right.

17            Would counsel like to present a summary and argument

18  as to detention or bond?

19            Yes, sir.

20            **MR. CAUTHEN:**  May it please the Court. Judge, the

21  government is not concerned with Mr. Norwood's political

22  ideology or his going to Washington. Obviously, that's his

23  right to do so.

24            I have no indication that he's a flight risk.

25  Obviously, his family is here. His child is here. So I have no

1   indications of flight risk.

2          What I am concerned about is whether he poses a

3   danger to the community. Essentially, what we have, Your Honor,

4   are four instantaneous portions of conversation that's taking

5   place while he's doing this. And he appears to be, just from

6   the contents of the communications themselves, reveling in the

7   fact -- and I'm only going to go through this part once -- that

8   "it worked. I got away with it. Others were shot at or

9   arrested for;" that "one cop shot a female Trump supporter,

10  then allowed ANTIFA supporters to assault him. I was one of

11  them. I was there. I took his shit."

12         Then took a picture of himself at some point wearing

13  the law enforcement vest that he stole. "I fought four cops.

14  They did nothing. I got a nice helmet and body armor off of a

15  cop, for God's sake and I disarmed him. Tell me how that works.

16  The one cop who got it -- the one cop who deserved it, got it.

17  The cops who acted shitty, got exactly what they deserved." I

18  assume he means the ones that were doing their jobs. "The ones

19  who were cool got help."

20         Your Honor, he did not tell the FBI when they

21  interviewed him that -- he wasn't truthful in some ways. He

22  didn't tell them he still had the vest and the helmet. He says

23  he was scared. He didn't tell them that he went in other

24  portions of the Capitol, Pelosi's office where he went in and

25  backed right out. He didn't tell them about getting the

1    coaster, for what that's worth. So he gave false information to

2    them.

3           He, obviously, is someone that is concerned about the

4    political events. He is concerned about what media and social

5    media has to say because he indicated in his testimony that he

6    had seen where they were charging people, I think he said, with

7    attempted murder and other things they didn't do. He doesn't

8    know what they did. I don't know what they did.

9           On the day that they -- that they were able to arrest

10   him, maybe he did park his vehicle at the Dollar General so he

11   could walk to see his wife. And maybe there is some history

12   there that he's not supposed to be there. But it is awfully

13   coincidental when he parks the truck and walks there, doesn't

14   cut any lights on, leaves not long after getting there with her

15   apparently, is suspicious of vehicles that are around there,

16   and eludes one that is behind him and goes to hide out and then

17   leave.

18          Then comes back and sees other, this time, marked

19   cars nearby. Goes into the residence. And according to the

20   agent's testimony from surveillance, cuts the lights off in

21   advance of getting to the house. He says right at in the

22   driveway surveillance said in advance, some distance in advance

23   and then goes in the house and doesn't cut the light -- any

24   lights on until he says he gets back to the -- I believe he

25   said bedroom, where they have blackout curtains in there.

1          He didn't flee. He didn't know when they were coming

2     to arrest him or if they were coming to arrest him. I think he

3     had his suspicions. And they were certainly further aroused on

4     this date. And he came out voluntarily without any problem,

5     which speaks well of him, and for the safety of his wife and

6     son.

7          But what we have a concern about is a grown man of 43

8     years old -- I think he's 43 -- doesn't typically put stuff

9     like this of the context of these messages that I've just

10    relayed to the Court about this type of behavior with respect

11    to assaulting law enforcement officers, stealing stuff from law

12    enforcement officers, talking about how they got what they

13    deserved in a family context just to appear to be tough or even

14    just to gig someone, so to speak, to prompt a reaction.

15         If that were true, if it were just to prompt a

16    reaction, you would think that at some point later, he would

17    have replied to his group or at least his sister that it wasn't

18    none of that happened; that, in fact, the exact opposite was

19    true when he got in there; he turned into someone that tried to

20    help law enforcement as opposed to assaulting and stealing from

21    law enforcement.

22         I'm not concerned that he's a flight risk. I'm

23    concerned that he's a danger to law enforcement. He legally,

24    right now, possesses weapons, ammunition. And of course, that's

25    his right to do so. But when you look at his words along with

1   where he was when this was taking place and the activity that

2   occurred and how descriptive he is, instead of simply waiting

3   and going right back out or standing aside, if nothing else, in

4   a corner until it's subsided. The government does not believe

5   he's a good candidate for bond, but he presents a danger to law

6   enforcement, Your Honor. Thank you.

7           **THE COURT:** All right.

8           Thank you, sir.

9           Yes, sir, Mr. Stepp.

10          **MR. STEPP:**  Thank you, Judge.

11          May it please the Court. I wasn't here Friday, but I

12  was told that when they first bought Mr. Norwood in that the

13  United States attorney announced to the Court that the US

14  Attorneys Office in the District of Columbia was asking for an

15  unsecured bond with specified conditions and the US Attorneys

16  Office here did not feel that was appropriate, and so here we

17  are.

18          The charges that he's charged with, knowingly

19  entering or remaining in a restricted building or grounds

20  without lawful authority, in violation of 1752(a), the

21  punishment that's listed is 10 years if the person during and

22  in relation to the offense uses or carries a deadly or

23  dangerous firearm or the offense results in significant bodily

24  injury as defined by another code section. There's no evidence

25  that either one of those portions of the law applied. If they

1   don't, then someone convicted under this is liable for

2   punishment or imprisonment of not more than one year. The

3   government's had their time to research it. And I think we can

4   assume at this point that it's a misdemeanor in the first

5   charge.

6           The violent entry or disorderly conduct on Capitol

7   grounds, violation of 40 U.S.C., 1504. I couldn't find the

8   penalty section, but I believe that I was told at the hearing

9   that he was informed that it was a six-month misdemeanor.

10          **MR. CAUTHEN:**  That's correct, Your Honor.

11          **MR. STEPP:**  On obstruction of justice or Congress --

12          **THE COURT:**  I think under that -- I don't mean to

13   interrupt you. But I think if it -- if there is some sort of

14   violence, that it could be a five-year --

15          **MR. CAUTHEN:**  It could be, Your Honor -- I'm sorry. I

16   didn't mean to interrupt you -- if there is some evidence of

17   violence. And I think what they're looking for as far as the

18   investigation goes is any corroborating evidence regarding what

19   he has indicated about his assault. At this point, what they've

20   charged him with is under the six-month provision of that.

21          **THE COURT:** Well, to Mr. Stepp's point as to the first

22   charge, is the government seeking the heightened penalty or is

23   it a lesser penalty under the corresponding penalty section?

24          **MR. CAUTHEN:**  Your Honor, it looks like it's up to

25   one year as it is presently charged.

1          **THE COURT:**  One year.

2          **MR. CAUTHEN:**  Yes, sir.

3          **THE COURT:**  Okay.

4          All right.

5          I'm sorry, Mr. Stepp.

6          **MR. STEPP:**  Obstruction of justice or Congress,

7    violation 18 U.S.C. 1512(c)(2), is a charge that carries up to

8    a maximum of up to 20 years.

9          **THE COURT:**  Uh-huh.

10         **MR. STEPP:** And theft of government property, the body

11   armor and the helmet, this is more common that we see all the

12   time, which is it's a 10-year charge. But if the value of the

13   property does not exceed $1000, it's a one-year charge. Again,

14   nothing that they have produced that shows that it is anything

15   more than a one-year misdemeanor.

16         **MR. CAUTHEN:**  Judge, I'm sorry. Maybe I

17   misunderstood. For the purpose of preliminary hearing, I

18   thought we weren't going into that aspect. We're looking at the

19   detention hearing aspect of it, and it is more than $1000.

20         **MR. STEPP:**  Well, in a bond hearing, Judge, the Court

21   is allowed to consider the evidence against the defendant

22   because it's relevant for the Court to know, you know, how

23   strong the evidence is, what the charges are, etc., etc.

24         **THE COURT:** Well, I'm not -- I'm not going to advise

25   you not to say that. I do think it's fair to look at what is --

1   what the seriousness of the charges are and what the punishment

2   could be.

3           **MR. STEPP:**  It's either one year or 10 years. It is

4   probably easy to get over the thousand-dollar mark, but it's

5   not in the affidavit. People in DC didn't send it down here.

6   And they had a month from the time that they focused on this

7   man and got an FBI report back to make their case. So they send

8   it down here as a misdemeanor. And I understand that since we,

9   you know, waive the probable cause issue, the people up there

10  will take it to a grand jury and they may add charges and

11  clarify things and kinds of stuff.

12          But the government's chosen to rely on danger to the

13  community. And I would point out to the Court that in the bond

14  statute 1342 under (f), Section (f), when they're talking about

15  detention hearing and that type of stuff, they get down here

16  under (f)(2) and it says -- talking about -- (f) says "Judicial

17  officer shall set and hold a detention hearing to determine

18  whether any condition or combination of conditions set forth in

19  subsection (c) would reasonably ensure the appearance of such

20  person as required" -- which the government concedes he's not a

21  flight risk -- "and the safety of any other person in the

22  community" -- and the government is focused on law enforcement.

23          So (f)(2) -- I've got to read this right, (f)(2). It

24  says, "Upon motion of the attorney for the government or upon

25  judicial officer's own motion in a case, that involves a

Argument of Counsel                                                    136

1   serious risk that person will flee" -- which is off the table

2   -- "or serious risk that the person will obstruct or attempt to

3   obstruct justice, threaten, injure, or intimidate, or attempt

4   to threaten, injure, or intimidate, a prospective juror or

5   witness." That's a basis to have a detention hearing.

6          So the burden is on the government to convince the

7   Court that there is a serious risk that he will attempt to do

8   these things. And I will advise the Court that they have not

9   met that.

10          He has a past that does not indicate that he has any

11   criminal convictions, very few criminal arrests, none of which

12   have arisen to anything of any consequence. He has strong ties

13   to the community.

14          He was -- you know, they don't bring in anything

15   other than these text messages to say he's a danger to law

16   enforcement; he's out -- you know, he's a menace to these

17   people; he is waiting to spring on them or something like that.

18   This is a man that when they came to arrest him -- I presume

19   they searched his house. There's no testimony that they found

20   any weapons or dangerous items in his house or he could've used

21   them against law enforcement. There's nothing showing that he's

22   been running his mouth either before or after talking about

23   they got what they deserved and if they come get me, there's

24   going to be a fight to the finish and all of that stuff.

25          They asked him to come to Greenville to sit for an

1    interview. And he did that. He didn't have to, for a variety of

2    reasons. He could've talked to a lawyer. He could've said no

3    thanks. He could've decided to pack his bags and leave. But he

4    didn't. He came up here and he told him enough stuff to where

5    he's going to get convicted of most, if not all, of these

6    charges.

7              It really doesn't matter whether he brought the vest

8    back from DC or not. He took it away from the Capitol. He knew

9    it wasn't his. That meets, in my view, the statutory definition

10   of larceny or receiving stolen property, which is what the

11   statute says is that -- I've got to find this thing -- someone

12   who steals or receives, conceals, or retains the same with

13   intent to convert his own use, knowing it to have been stolen

14   or embezzled or whatever, is guilty of the crime. It doesn't

15   matter.

16             Now, he should've told them. Once you start talking

17   about telling the police, if you tell them the truth, you ought

18   to tell it all. But he didn't. And we don't have anything that

19   the government's brought in here today other than these text

20   messages that they have that he acknowledges he sent to say

21   that he is a menace to law enforcement. And because they think

22   he's a menace to law enforcement, he should be sent up to the

23   District of Columbia in shackles to face the Court up there

24   without any consideration of the fact that the Court could put

25   him on monitoring, home detention, things that would keep him

1    close by.

2              And I would also point, Judge, the bigger picture

3    about how these types of cases are dealt with. And I know every

4    Court is different, but they're all going back to one Court,

5    which is in the District of Columbia. And they, in the past,

6    have a track record of -- of -- of either putting people on

7    personal recognizance bonds, or when they come up to DC,

8    because I believe their procedure is that whatever happens here

9    can be reviewed up there. And that the Judge up there has the

10   authority to alter the bond.

11             And there's probably some people that the Court might

12   be familiar with on some things because we may remember the

13   fellow who was hanging off of the railing of the -- I guess

14   it's the Senate place, named Josiah Colt. Well, his case, this

15   fellow was hanging off the thing. You've seen a picture of him.

16   I'd ask the Court to take judicial notice of it. I can show you

17   this picture right here. I'll pass it to the government, then

18   I'll pass it up to the Court.

19             **THE COURT:**  Yes, sir. Thank you.

20             **MR. STEPP:**  Court records in the District of Columbia

21   indicate he's on a personal recognizance bond. He was not

22   detained.

23             Another person the Court may remember seeing in the

24   media was the fellow who wore the Camp Auschwitz shirt. His

25   name is Robert Packer. Here's a photograph that the Court may

1   have seen before. The Court records in the District of

2   Columbia, I think, also indicate he was released on a personal

3   recognizance bond.

4           The Court may remember the fellow who was seen

5   walking through the rotunda with Speaker Pelosi's lectern. His

6   name is Adam Johnson. The record in the District of Columbia

7   will reflect that he's on a personal recognizance bond.

8           Now, again, every case is different. And these cases,

9   they all show up in the district court. Most of them show up in

10  the District Court and end up going to DC, but that's where

11  they're heading. I just think, Judge, that Mr. Norwood is

12  entitled to a bond, that he ought to have a bond, the Court can

13  put conditions and restrictions on him, that he would get to

14  the District of Columbia on his own or he would. As they

15  apparently were prepared to tell the Judge before was that if

16  he got released, they were going to provide him with WebEx or

17  some kind of Internet connection things where he could do

18  connection with the District Court in Columbia because they

19  might not need him up there at certain times or all the time

20  and that type of stuff.

21          But I would suggest to the Court that he is a good

22  candidate for bond. He can live with his mother. He's got long

23  ties to the community. He's got -- he had a job. I don't know

24  if he'll still has it.

25          All of these firearms he had have been turned in. The

1    government said, well, he has firearms. No, he doesn't. He

2    hasn't had them. And obviously, if he gets out, he can't have

3    them because he can't have them while he's on bond.

4           But these are nonviolent crimes. They have had a

5    month or longer to come up with these crimes. If they thought

6    he was a danger or a menace, they could've taken him off the

7    street after they interviewed him. The FBI people down here,

8    they could've told their people in DC the guy is a menace, he

9    needs to be taken of the street. Don't wait a month to send us

10   a warrant down here to pick him up. Do it now.

11          Judge, I think he's a good candidate for bond. I will

12   ask you to set a bond. I'd ask you to set a personal

13   recognizance bond. Let him stay with his mother, put him on

14   whatever restrictions the Court deems appropriate. But I would

15   ask that he be released on bond. Thank you.

16          **THE COURT:**  All right.

17          Any follow-up on that?

18          **MR. CAUTHEN:**  Just briefly, Judge.

19          **THE COURT:**  Yes, sir.

20          **MR. CAUTHEN:**  Mr. Stepp, as he always does, did an

21   excellent job on behalf of his client. As far as what those

22   three individuals did, stole, or said they did in the pictures

23   they handed up, I have no idea what those people were charged

24   with ultimately and whether they stole anything or whether they

25   said they assaulted anybody up there.

1          And with respect to -- I know Mr. Stepp is coming

2    into this case after the appearance last week, which I think

3    was on Friday, if I'm not mistaken, the Department of Justice

4    in the District of Columbia has been made aware of the results

5    of the search warrant of the camper, in which the body armor

6    and the helmet were found. They were not aware of all of the

7    details of that in the FBI getting them that information.

8    They're in agreement since last week with moving for detention.

9    I just wanted to note that for the record.

10          **THE COURT:**  All right.

11          Thank you.

12          Well, I do think that there are some factors that

13   mitigate towards the defendant being a good candidate for bond.

14   But I'm concerned based on what I've heard here and looking at

15   three things in particular: his own texting; his own words to

16   his family, including his mother, that he had assaulted an

17   officer. I am concerned about that. I note Mr. Stepp's point

18   about other corroborating evidence not being presented. But

19   these are the defendant's own words in his group text. And I

20   think I can rely upon -- upon those.

21          I'm also concerned about his not being truthful

22   during the FBI interview by his own admission regarding the

23   vest and helmet telling him they were abandoned in a Virginia

24   hotel when, in fact, he had placed them in an off-site camper.

25   That information was not brought to the FBI's attention until

1    someone tipped the FBI that he was not truthful to the FBI.

2           So while he did go and -- on his own go to the FBI

3    office and was allowed to leave after providing that interview,

4    by his own admission, he wasn't truthful to them. And that

5    gives me concern.

6           Also, frankly, portions of his testimony here about

7    his presence in the Capitol, I don't find to be entirely

8    credible. I, like everyone else, am aware of what happened on

9    January 6 in the District of Columbia at the Capitol Building.

10   And I've heard the version that the defendant, Mr. Norwood,

11   supplied regarding how he ended up in the building. But I don't

12   find it entirely credible about his efforts to leave the

13   building, particularly looking at the pictures that provide --

14   are provided in the affidavit. And that gives me some concern,

15   as well, regarding what else he's not being truthful about,

16   particularly given the fact that he was not truthful to the FBI

17   in the January 22 interview.

18          And given that -- given that I -- that -- those three

19   points, that evidence that's been presented, I don't think I

20   can fashion a bond with conditions that would reasonably assure

21   the safety of the community, particularly the law enforcement

22   community, given -- especially going back to the very first of

23   the -- not only the admission and texting about hurting the law

24   enforcement officer, but boasting about it.

25          And so for that reason, I'm to enter an order of

1   detention. I understand the Court in the District of Columbia

2   may very well revisit this. And at that time, maybe additional

3   information may come out that suggests that an order of

4   detention should be revisited and a bond should be set. But

5   based on the record I have before me, I think that an order of

6   detention is appropriate, and that's what I'm going to enter.

7           All right.

8           Thank you very much.

9           **MR. CAUTHEN:**  Judge, that's all we have in this

10  matter. Thank you.

11      (The Court adjourns at 1:05 p.m.)

12

13                          * * * * * * * *

14                  **C E R T I F I C A T E**

15      I certify that the foregoing is a correct transcript from

16  the record of proceedings in the above-entitled matter.

17

18  _____                    March 22, 2021

19  Teresa B. Johnson, CVR-M-CM, RVR, RVR-M                  Date

20

21

22

23

24

25

**I N D E X**

| DESCRIPTION | PAGE NO. |
| --- | --- |
| **Witnesses for the Government:** | |
| S.A. Tanya Evanina | |
| Direct Examination by Mr. Cauthen | 11 |
| Cross Examination by Mr. Stepp | 27 |
| Redirect Examination by Mr. Cauthen | 43 |
| Recross Examination by Mr. Stepp | 47,51 |
| Examination by the Court | 44,48 |
| Redirect Examination by Mr. Cauthen | 54 |
| **Witnesses for the Defense:** | |
| Tracy Dubois | |
| Direct by Mr. Stepp | 56 |
| Angela Norwood | |
| Direct Examination by Mr. Stepp | 63 |
| Cross Examination by Mr. Cauthen | 69 |
| Examination by the Court | 72 |
| William Norwood | |
| Direct Examination by Mr. Stepp | 74 |
| Cross Examination by Mr. Cauthen | 103 |
| Redirect Examination by Mr. Stepp | 114 |
| Examination by the Court | 115 |
| Recross Examination by Mr. Cauthen | 122 |
| Redirect Examination by Mr. Cauthen | 124 |

## **E X H I B I T S**

| **NO**. | **DESCRIPTION** | **ID** | **EV** |
|---------|-----------------|--------|--------|

### GOVERNMENT

| | | |
|------|-------|----|
| G-1 | Photo | 26 |
| G-2 | Photo | 26 |

### DEFENDANT

No exhibits offered.

### COURT

No exhibits offered.