UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Criminal Case No: 1:21-cr-00233 |
| ) | |
| **WILLIAM ROBERT NORWOOD, III,** ) | Status Hearing: May 5, 2023 |
| ) | |
| Defendant. ) | |
| ) | |

## MOTION TO MODIFY CONDITIONS OF PRETRIAL RELEASE

COMES NOW William Robert Norwood, III, ("Robbie"), through counsel, to request a modification of his pretrial release conditions pursuant to 8 U.S.C. § 3142(c)(3), to remove all conditions of pretrial release and to be released on a personal recognizance or an unsecured appearance bond, or, in the alternative, to have his release conditions modified by removal of the unduly restrictive conditions of home incarceration, location monitoring, and prohibition on the use of internet and phone— to allow for Mr. Norwood to enroll in educational classes, seek employment, and to work— a necessary and reasonable request consistent with the 18 U.S.C. § 3142(c)(1)(B) requirement of subjection to only "the least restrictive" pretrial conditions.

## CASE BACKGROUND

On February 25, 2021, Robbie Norwood of South Carolina was arrested and charged with misdemeanor and felony offenses related to his non-violent entry into the United States Capitol Building on January 6, 2021. On July 28, 2021, the Government obtained a Superseding



Indictment to correct for errors made in the first, clarifying that the only felony charge against Mr. Norwood is Obstruction of an Official Proceeding, Count One. The remaining charges are misdemeanors related to trespass and disruption in the Capitol Building and on restricted grounds, along with one charge of misdemeanor larceny related to the taking of two items belonging to Capitol Police, conduct that occurred after Mr. Norwood exited the Capitol Building.

Robbie Norwood is not charged with assaulting any officers. Instead, Mr. Norwood defended police officers from belligerent protesters, on two occasions, in different areas of the Capitol, forming a protective circle around officers along with others like Mr. Norwood, who had similar protective intentions.[1] Robbie is heard on video telling protesters to stop and not to touch an officer, physically moving back protesters who were putting their hands on the officer. See Defense Exhibit A. Robbie Norwood even offered a uniformed officer, who looked parched, a blue Gatorade from his pocket.

Robbie did not break anything or cause any damage inside the Capitol Building or any office thereof. Robbie put multiple fallen items back in place when he observed them out of place. He is seen on a publicly-available video putting a fallen item back in its place as he walks past it.[2] Robbie Norwood did not enter any Gallery or any space where a proceeding was taking place or would have been taking place.

---

[1] At least one incident of Mr. Norwood shielding a police officer is recorded on publicly available video at https://youtu.be/KjpNTN_TNfE?t=872, https://twitter.com/BGOnTheScene/status/1346931119363665923?s=20, and https://d2hxwnssq7ss7g.cloudfront.net/tXIzFNM5yp9f_cvt.mp4.

[2] The video depicting Mr. Norwood replacing a fallen object in the Capitol hallway is publicly available at https://youtu.be/DuSJ8oduGLM?t=87.

Mr. Norwood at one point approaches officers near the East Rotunda door asking to be let out of the building and is told that he cannot leave, that the doors must remain closed, at which point a crowd comes up behind Robbie and crushes him into the door, the force of the crowd eventually causing the doors to reopen — this is the most serious conduct in this case, according to the Government.[3]

### PRETRIAL DETENTION BACKGROUND

Robbie Norwood is 40 years old and a lifelong resident of South Carolina. He has no criminal history and is a United States citizen without an active passport to travel internationally. Robbie Norwood was employed and working up until he was incarcerated pre-trial for the underlying offense. He is the father to a 9-year-old child from a previous marriage and sees his daughter whenever he can. Mr. Norwood and his first wife maintain an amicable relationship.

---

[3] At the last hearing, the Government mischaracterized this incident, stating to this Court on November 2, 2022: "Mr. Norwood was *involved* with a pretty crucial breach of one of the doors." The statement was not challenged by Mr. Norwood's court-appointed counsel in court but requires elucidation.

The East Rotunda doors were "breached," as per the government's verbiage, at 2:24 PM by George Tenney, who pleaded guilty to doing so. The doors were closed at 2:28 PM.

CCTV video then shows Mr. Norwood, along with other protesters, appearing by those doors around 2:37 PM. He is seen speaking to the officers. Then Mr. Norwood is then seen forcefully pushed into the East Rotunda doors by the crowd, the force of the crowd causing the doors to reopen at 2:38 PM. Mr. Norwood is seen pressed against the door before he begins crawling along the door back inside and away from the crush of the crowd. Robbie is then seen bending over in pain and coughing. As he moves behind the crowd to wait in the back of the group to exit from the open doors, he sees members of the crowd attacking a police officer in front, who is guarding the doors. Robbie Norwood rushes to the front of the crowd and puts himself in harm's way once again, even after being injured, to defend the officer, along with the help of other protesters, together using their bodies to form a circle to shield the officer and holding back protesters from hurting the officer.

Accordingly, Mr. Norwood's involvement in the reopening of the East Rotunda doors was not one of voluntary control, and therefore the Government's claim that "Mr. Norwood was involved with a pretty crucial breach of one of the doors" is a mischaracterization.

The video of all events described here is public and available at: https://youtu.be/KjpNTN_TNfE?t=224, https://twitter.com/BGOnTheScene/status/1346931119363665923?s=20, and https://d2hxwnssq7ss7g.cloudfront.net/tXIzFNM5yp9f_cvt.mp4.



After being arrested on February 25, 2021, for nonviolent offenses related to entry into the Capitol Building on January 6, 2021, Mr. Norwood was detained for a period of 55 days. He was then incarcerated again on March 11, 2022, for violating the terms of his pretrial release by contacting his current wife, "Dana". *Why was there a condition against Mr. Norwood contacting his wife in the first place?* Mr. Norwood's new counsel does not see a satisfactory answer for this. The Government claimed that Mr. Norwood's wife was a "potential witness" to his case and asked for a no-contact provision in his pretrial release. But Mr. Norwood's wife was not present with him inside the Capitol Building and did not witness any of Mr. Norwood's alleged criminal conduct on that day.

In text message communications, Dana wrote to her husband on October 23, 2021:

- "I was going alone to the rally and you thought it would be unsafe so you finally said you were going with me."
- "And you did not whatsoever harm any officers. You even gave my Gatorade to an officer that I bought you"
- "Pertaining to the details of what I actually know that went on in the capital. I was not in their so I do not no what happened inside. All I know is the footage that citizens leaked on social media"

And, Mr. Norwood's interaction with the person who is not a true witness to any alleged offenses, while in violation of the no-contact provision, was not in any way threatening physical harm. Instead, Mr. Norwood sent many love notes to Dana and warnings that her criminal past can embarrass her in court.[4] The messages were exchanges, back-and-forth conversations between the parties, not single-party spamming.

---

[4] Dana has a felony criminal conviction for making a false report to police against Robbie Norwood. She pleaded guilty in 2019 in Greenville, South Carolina, Case No. 2019A2320601358.

Mr. Norwood was detained in jail until January 13, 2023, for 308 days, as a result of exchanging text messages with his own wife, a person who is not an eyewitness to his conduct on January 6, 2021, the most serious of which is a non-violent allegation of obstruction of a Congressional proceeding. He was not a physical threat on January 6, nor after, nor was he ever violent. **Robbie Norwood defended and protected multiple police officers on January 6, even offering a Gatorade to an officer who looked parched. Combined with the time he was detained upon arrest, Mr. Norwood served 363 days in jail without a trial and without being convicted of a criminal offense.**[5]

Robbie Norwood was then ordered into home incarceration on January 13, 2023. He has been compliant with the terms of this release. By May 5, 2023, the date of Mr. Norwood's next hearing, he will have served 112 days of home incarceration in addition to the 363 days in jail.

**363 days in jail + 112 days of home incarceration = 475 days of unemployment.**

While on home confinement, Mr. Norwood resides with his mother, Angela H. Norwood, who is 65 years old, who agreed to supervise his home incarceration. Mr. Norwood's mother resides in a mobile home situated in a mobile home park. See ECF No. 14-1, p. 65. Mrs. Norwood began working small jobs six days a week after Robbie was arrested in order to assist in paying some of his outstanding bills. She has since lost these jobs and is now living solely on her social security check. Mr. Norwood, as a result of the jail and home incarceration restrictions, has been rendered unable to work and unable to earn an income. Robbie Norwood was working three jobs to make ends meet prior to his detention.

---

[5] This is extraordinary. Undersigned counsel, newly appearing on this case, has never seen anything like this — it shocked her conscience to learn about the length of pretrial detention in Mr. Norwood's non-violent Obstruction case. Had it not been for the court's *sua sponte* release of Mr. Norwood on home confinement, this length of time would have been significantly higher.

According to witness testimony at his detention hearing in South Carolina — where each witness who knew him testified that Mr. Norwood was not a danger to the community and had no prior criminal history nor history for violence— Robbie Norwood was working three jobs and paying "a couple of hundred dollars a month" in child support prior to his arrest. See ECF No 14-1. p. 70. Mr. Norwood was initially detained because he made facetious statements to his sister and his mother about assaulting police in the Capitol, like Antifa; this was in response to a year-long political debate the family was having— but these statements were the opposite of the truth. Mr. Norwood actually defended and protected police officers inside the Capitol from angry protesters — this is corroborated by clear video evidence.

## LEGAL STANDARD

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). Accordingly, a court has very limited authority to order pretrial incarceration or conditions of pretrial release— a judge "is not given unbridled discretion in making the detention determination." *Id.* at 742. The Court must follow the considerations relevant to this decision as specified by Congress. *Id*. The Court must consider "the nature and seriousness of the charges, the substantiality of the Government's evidence against the arrestee, the arrestee's background and characteristics, and the nature and seriousness of the danger posed by the suspect's release." *Id*. at 742-43; 18 U.S.C. § 3142(g).

This Court must order the pretrial release of an accused on personal recognizance or an unsecured appearance bond *unless* the Court determines that release "will not reasonably assure

the *appearance* of the person as required or will endanger the *safety* of any other person or the community." 18 U.S.C. § 3142(b), (c) (emphasis added). Only if the Court finds that personal recognizance or an unsecured appearance bond "will not reasonably assure the *appearance* of the person as required or will endanger the *safety* of any other person or the community," can pretrial release conditions be imposed. 18 U.S.C. § 3142(c)(1) (emphasis added). But the imposition of pretrial release conditions is also highly limited. The court can *only* impose those conditions that the court finds will "*reasonably* assure the *appearance* of the person as required and the *safety* of any other person and the community," and the imposition of these conditions is strictly limited to "the **least restrictive** further condition, or combination of conditions" available to the court. 18 U.S.C. § 3142(c)(1)(B) (emphasis added). Only after a hearing, and only after a finding at the standard of *clear and convincing* evidence, that "no condition or combination of conditions will *reasonably* assure the *safety* of any other person and the community," can a defendant be detained pretrial. 18 U.S.C. § 3142(f)(2)(B) (emphasis added). Pretrial detention is an "exceptional treatment," even in January 6 cases. *United States v. Munchel*, 991 F.3d 1273, 1285 (D.C. Cir. 2021).

The court *must* consider (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. See 18 U.S.C. § 3142(g); *Salerno,* 481 U.S. 742-43.

A defendant is entitled to Due Process of law under the Fifth Amendment and cannot be held pending trial if there are conditions of release that will reasonably assure the safety of the community and attendance of his future Court appearance. See U.S. CONST. amend. V ("No

person shall ... be deprived of life, liberty, or property, without due process of law …."); 18 U.S.C. § 3142(c) (pretrial release is "subject to the least restrictive" available condition).

## ARGUMENT

I. <u>Defendant is not a flight risk, nor a threat to any person or community.</u>

Robbie Norwood is not at risk of fleeing. He is 40 years old and has resided in South Carolina his entire life. His charges are non-violent and include only a single felony, which Mr. Norwood has moved to dismiss. His family, including his daughter, all reside nearby. He has no intention of leaving his family— to the contrary, he wants to be released so that he can work to support his family, as he has always done prior to the January 6-related incarceration. Even his sister, who turned Mr. Norwood in to the FBI, testified at his detention hearing that he would not flee— "Absolutely not. He's -- all of his family is here. He has a daughter, as well. So he would not." See ECF No. 14-1, p. 63. Even the prosecutor stated, "I have no indication that he's a flight risk. Obviously, his family is here. His child is here. So I have no indications of flight risk." *Id*. at pp. 129-130. While he was on pretrial release for these charges, he never made any attempt to flee and continued to make all of his court appearances. Having already served 475 days of confinement while these charges have been pending, fleeing would be worthless for any defendant, quite honestly.

Mr. Norwood's interactions with his wife Dana, the subject of the Government's 2022 request to jail Mr. Norwood pretrial, were *conversational*. The statements were natural, and any cautionary statements made by Mr. Norwood to Dana were not ones of physical threats. Mr. Norwood notified Dana that he can seek criminal extortion charges for her requests for money

from him. Attempting to prosecute perceived extortion is not the type of threat that the court can consider as *dangerous*.

*Examples of messages exchanged between Dana and Robbie. "Outgoing" designation denotes messages sent by Dana and "Incoming" denotes messages sent by Robbie Norwood.*

Robbie Norwood has not threatened, intimidated, or hurt anyone. Even his sister, who turned Mr. Norwood in to the FBI, testified at his detention hearing that he is not a danger to anyone — "He has no convictions or any violent history." See ECF No. 14-1, p. 63.

II. Discussion of 18 U.S.C. § 3142(g) Factors

*(1) The offense and (2) the weight of the evidence.*

Robbie Norwood is facing three misdemeanor charges and three petty offense charges related to his entry into the Capitol building on January 6, 2021, in addition to one felony charge

for Obstruction of a Congressional Proceeding under 18 U.S.C. § 1512(c)(2). On April 14, 2023, Robbie Norwood moved to dismiss the only felony count pending against him. Prior to that, on November 2, 2022, the Court addressed Mr. Norwood directly and notified him that, "I have held that that count is generally not applicable to most people whose conduct, it sounds like, you had engaged in." As argued in his motion, and incorporated herein by reference, Defendant believes that *United States v. Fischer* supports his request for dismissal, that the accusation is lacking supportive evidence, and is insufficient as a matter of law. See ECF No. 56. To summarize the defendant's claim, the evidence against Robbie Norwood does not support a felony obstruction charge as the available evidence in this case does not support the requisite *mens rea* and *actus rea* required for conviction under 18 U.S.C. § 1512(c)(2). *Id*.

      The remaining misdemeanor charges amount to a guidelines sentence of 0-6 months, or 182 days. (All but one of the six misdemeanor counts *group* under U.S.S.G. §3D1.2.) The *maximum* penalty for half of these charges is 6 months, or 182 days. But Mr. Norwood has already served 475 days of confinement. (The guideline sentence for the felony count that Mr. Norwood has moved to dismiss, 18 U.S.C. § 1512(c), without any adjustments, is 15-21 months, or 456 to 639 days. Mr. Norwood has already served more than the low-point guidelines sentence on a felony Obstruction charge).

      **Considering his charges and the time he has spent in pretrial confinement, his pretrial time served amounts to serving out the sentence without ever being convicted of the crime.** There is no justification, nor known authority, to continue the defendant subjected to pretrial conditions under such circumstances— certainly not when he poses no threat nor is a flight risk.

At his pretrial detention hearing in South Carolina in 2021, Mr. Norwood took the stand to testify as to what he did inside the Capitol Building on January 6, 2021. ECF No. 14-1, pp. 116-123. He testified to protecting two groups of police officers while inside the building. In addition to the Government's CCTV video corroborating his account, clear audio and video evidence from independent reporter Brendan Gutenschwager shows Mr. Norwood, who is dressed in a camo-print jacket and is wearing a red baseball cap with a black underlay as well as glasses, repeatedly telling protestors to "stop touching him" and to "leave him alone," before physically moving back protesters who began attacking a police officer near the East Rotunda doors.⁶



A second incident of Mr. Norwood protecting police is corroborated by Capitol Police Sergeant Timberlake, who describes to the investigating FBI agent as being in a group of officers in front of the doors to the Senate Chamber when they were attacked by protesters. A protester in a red hat, Sgt. Timberlake explains (expectedly Robbie Norwood) attempts to interfere to stop the assault on the officers.⁷

Moreover, the second most serious charge against him, a misdemeanor count of theft of government property, also appears to lack the requisite evidence to substantiate the charge. Mr.

---

⁶ See Defense Exhibit A, available at https://medvinlaw.com/videosharingfinaloutput — See also https://twitter.com/BGOnTheScene/status/1346931119363665923 and https://d2hxwnssq7ss7g.cloudfront.net/tXIzFNM5yp9f_cvt.mp4.

⁷ From what can be derived from the FD-302, there are at least two videos depicting this event. Although exculpatory, the videos have not been provided to defense counsel. Counsel for the Government was also not in possession of these videos when newly retained undersigned counsel inquired as to the videos. A request for the videos has been placed to the FBI agents, according to Government counsel.



Norwood is accused of taking a helmet and body plate outside of the Capitol Building, which the Government alleged to the Grand Jury as belonging to Capitol Police. Mr. Norwood explained to the FBI that he took a vest and helmet from a bin outside the Capitol Building, as two people standing by the bin were telling people to grab one. The Government does not question this account, with the Government's Statement of Facts stating— "NORWOOD's description of how he acquired the vest and helmet is consistent with U.S. Capitol Police officers' accounts of how their equipment was stolen by rioters on January 6, 2021." See ECF 1-1. But after obtaining these items from Mr. Norwood, the Government was not able to confirm that the items Mr. Norwood took belonged to Capitol Police. At the detention hearing for Mr. Norwood in South Carolina, the prosecutor asked the lead FBI Agent, "Now, with respect to the vest -- the tactical vest and the helmet, have you confirmed those were, in fact, from the Capitol police?" The Agent responded, "No. We're in the process of doing so. I had sent the identifications up to the case agent." See ECF No. 14-1, pp 26-27. After a continued inquiry into the matter, the Government has not been able to substantiate the claim that Capitol Police was the owner of the items. As to the body armor, the serial number of the item does not match records of items owned or purchased by Capitol Police. The Government labeled the FD-302 discussing an investigation into the serial number discrepancy of the body armor as "Highly Sensitive." And, the helmet does not seem to match the helmets worn and owned by Capitol Police officers, which are newer model helmets and have identifying "U.S. Capitol Police" text on them in white lettering and a clear face shield with a clasp attachment — characteristics lacking from



U.S. Capitol Police helmet worn on January 6, 2021

vs.

Ballistic helmet seized from Mr. Norwood.



the entirely plain helmet obtained by Mr. Norwood. The helmet in Mr. Norwood's possession appears as an older model, a common ballistic helmet sold to the public, and appearing to be of the type worn by protesters on January 6, not by law enforcement. All the while, Count Two of the Superseding Indictment alleges that the "body armor vest and helmet belong[ed] to the United States Capitol Police." ECF No. 45-1.[8]



Thus, the multitple questionable charges against Mr. Norwood, along with the weak evidence against him and strong exculpatory evidence of his good conduct inside the Capitol, weigh in favor of the removal of pretrial supervisory conditions— together with the computation of his time served and the realistic limitation on the possible sentence this court could impose if the defendant is convicted of any or some of the offenses.

### (3) History and characteristics of the Defendant.

Robbie Norwood is 40 years old and has no criminal history. He was born and raised in the upstate of South Carolina, where he has deep roots and close ties to the community. He began

---

[8] Undersigned counsel has reviewed hundreds of images of law enforcement officers in helmets on January 6, 2021. Not a single officer appears in a ballistic helmet, certainly not one without police markings, nor in any helmet without a face shield attachment. A variety of evidentiary discrepancies are being investigated by defense counsel and a motion to dismiss may follow after the investigation.

at Lone Oak Elementary School in Spartanburg, went on to Boiling Springs Middle School, and graduated from Boiling Springs High School in 2001. He then went on to attend North Greenville College and Spartanburg Community College, both in South Carolina.

In his first semester of college, Robbie joined a local gospel quartet and sang with the group for five years before being asked to join a nationally known full-time gospel quartet. He sang with them for almost 2 years before deciding to "come off the road" and become more active in his church, First Baptist North Spartanburg— a church he regularly attended up until his arrest. Mr. Norwood was very active in the church choir for almost ten years, which is how he met his first wife and the mother of his 9-year-old daughter. Although the couple later divorced, they maintained a solid friendship and co-parenting relationship.

To earn a living, Mr. Norwood ran a mobile entertainment company. He worked for over twelve years serving local schools, restaurants, and private customers, providing DJ services and musical entertainment. The closures and panic associated with Covid-19 destroyed his music business. Life forced Mr. Norwood to seek additional means of employment. He began working a second job as an ATM repairman. He was entrusted with repairing ATM machines with access to very large sums of money. See ECF No. 14-1, p.81. But the income was insufficient, necessitating Mr. Norwood to take on more work. He took on a third job, now working for an insurance company taking inbound calls and making changes to clients' accounts— where he was also entrusted with safeguarding private financial information for clients of the company, including credit card numbers. Mr. Norwood lost all three sources of income upon incarceration.

A character reference letter written for Mr. Norwood indicates that he is a beloved and cherished member of the community. Trusted South Carolina State Representative Steven Wayne

Long, who has known Robbie for several years, writes that Robbie Norwood is "a very kind and generous man" who "never hesitates to help others." See Defense Exhibit B. Indeed, this character was on display on January 6 when Mr. Norwood protected multiple officers from assaults. See Defense Exhibit A.

Mr. Norwood now seeks to get his life back, to go back to work, to go back to church, to take care of his family, and to go back to being a responsible and productive member of his community. He is also looking forward to taking classes to obtain certifications to improve his job prospects.

The history and characteristics of the defendant weigh in favor of the removal of pretrial supervisory conditions.

<u>(4) The nature and seriousness of the danger to any person or the community.</u>

Robbie Norwood is not a danger to any person or community. Even amid his entry into the Capitol on January 6, he chose to do the right thing when it comes to preserving safety and property, from using his body to protect officers from angry protesters to replacing fallen items throughout the Capitol. He even offered his beverage to an officer who appeared thirsty.

In the text messages with his wife (counsel is in possession of a Cellebrite cell phone report that the Government compiled, totaling 1,148 pages, showing text messages between Mr. Norwood and his wife, dated from July 10, 2021 through January 6, 2022, which is oddly labeled as "Highly Sensitive" in what appears to be an abuse of the protective order), Mr. Norwood makes absolutely no threats to the safety of his wife. The most "threatening" messages are his precautions about her being cross-examined on her prior criminal record of making false

accusations against him, accusing her of engaging in potential criminal activity, and notifying her of his plans to pursue criminal charges for her actions.

Mr. Norwood has not exhibited any traits that are perceived as *dangerous* in any criminal law context. Even his sister, who contacted the FBI about her brother's entry into the Capitol building, testified that Robbie is not a danger to anyone and has no violent history. The reason why Mr. Norwood's messages to his sister and his mother appeared like he was involved in something much more serious than his actual conduct in the Capitol — the messages that disoriented this investigation and caused detention in the first place— is because Robbie and his family were having a year-long political conversation about Antifa and the malicious actors damaging federal property and injuring federal officers throughout 2020; Robbie was mocking his sister for ignoring the fact that so many of the culprits were getting away with their crimes. See ECF No. 14-1, pp. 93-94, 114. Mr. Norwood facetiously told his sister in this family chat that he acted like Antifa too. *Id*. The evidence collected in this case corroborates that Mr. Norwood's statements to his sister were indeed banter and nothing more. In the video evidence collected for this case, Mr. Norwood is seen assisting officers, not assaulting them. Mr. Norwood's good sense to interfere in the assaults on law enforcement, using his own injured body to protect officers, shows his good character—proves peaceable character.

The text message exchanges with his wife Dana, as argued *supra*, also fail to indicate any articulable danger.

The lack of serious danger of the defendant also weighs in favor of the removal of pretrial supervisory conditions.

Summation:

Any additional restraints on the defendant's liberty amount to a violation of his Fifth Amendment rights. See U.S. CONST. amend. V ("No person shall ... be deprived of life, liberty, or property, without due process of law …."). There is no justification to hold Mr. Norwood on any conditions, let alone home incarceration. Mr. Norwood can only be "subject to ***the least restrictive*** further condition, or combination of conditions" that this Court "determines will reasonably assure the ***appearance*** of the person as required and the ***safety*** of any other person and the community." 18 U.S.C. § 3142(c) (Emphasis added). Since there is no legitimate concern for his appearance, nor a reasonably articulated concern for the safety of any person, Mr. Norwood should not be subjected to any restraint other than personal recognizance or an unsecured appearance bond.

In the alternative, if this court finds that at least some conditions should be imposed, the conditions should not include any home confinement, monitoring, or communications restrictions that would prevent Mr. Norwood from seeking an education, seeking employment, working, or using electronic and telephone devices. These restrictions are in no way the "***least restrictive***" conditions that the law permits to be imposed. These conditions are in no way tailored to Mr. Norwood's background, alleged offense conduct, the merits of the Government's case against him, or the concerns before the court. Mr. Norwood was gainfully employed prior to being incarcerated pretrial. He needs his job back and seeks to be treated as a man presumed innocent until he is found guilty; he seeks to be afforded the liberties that this great country offers — to be free from confinement, to be free to work. Robbie Norwood needs to take care of his family, especially his 65-year-old mother, who has been taking care of him for the past five

months and with whom he currently resides, in a trailer home, in a trailer park. His plan is to find work and take classes to increase his employability in additional fields. As it stands right now, following this court's orders, Mr. Norwood has no income and no ability to help his family.

There is nothing on the record justifying any restraints on his ability to work or to communicate with members of his community. Furthermore, there is nothing justifying any controls over Mr. Norwood, especially at this stage of the prosecution where Mr. Norwood's pretrial confinement has exceeded the sentence he is likely to serve. All of the 18 U.S.C. § 3142(g) factors weigh in favor of releasing the defendant without pretrial conditions. Based on the confines of the law, Mr. Norwood should be released on personal recognizance.

## CONCLUSION

For any of all of the reasons stated herein, the defendant seeks to remove all conditions of pretrial release and instead to be released on a personal recognizance or an unsecured appearance bond. In the alternative, the defendent seeks to have his pretrial release conditions modified by removing the unduly restrictive conditions of home incarceration, location monitoring, and the prohibition on the use of internet and phone— to allow for Mr. Norwood to enroll in educational classes, seek employment, and to work. Mr. Norwood's motion is consistent with the 18 U.S.C. § 3142(c)(1)(B) requirement of subjection to only "the least restrictive" pretrial conditions

Respectfully submitted,

By Counsel:



                                              /s/
                                 Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel: 888.886.4127
Email: contact@medvinlaw.com

## CERTIFICATE OF SERVICE FOR CM/ECF

      I hereby certify that on April 21, 2023, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

                                             /s/
                                 Marina Medvin, Esq.