**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CR. NO. 21-cr-233 (CJN)** |
| | : | |
| **WILLIAM ROBERT NORWOOD, III,** | : | |
| | : | |
| **Defendant.** | : | |

_____

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS COUNT ONE**

_____

### I.      Introduction

Relying on the D.C. Circuit's recent decision in *United States v. Fischer*, No. 22-3038, __ F.4th __, 2023 WL 2817988 (D.C. Cir. Apr. 7, 2023), defendant William Robert Norwood III has moved to dismiss Count One of the superseding indictment charging him with obstructing an official proceeding under 18 U.S.C. § 1512(c)(2) (Motion to Dismiss Count One (ECF No. 56)). In *Fischer*, the D.C. Circuit reversed orders dismissing the Section 1512(c)(2) charges in several cases, holding that Section 1512(c)(2) "encompasses all forms of obstructive conduct, including . . . efforts to stop Congress from certifying the results of the 2020 presidential election." *Id.* at *3. It is hard to see how *Fischer*—a case in which the government successfully challenged the dismissal of Section 1512(c)(2) charges at the pleading stage—in any way suggests that dismissal of Court One is warranted here. For the reasons discussed below, Norwood's motion to dismiss should be denied.

## II.     Background

### a.     Relevant Factual Background

On July 28, 2021, Norwood was charged in a superseding indictment with various crimes arising from his participation in the January 6, 2021, attack on the United States Capitol (see Superseding Indictment (ECF No. 20)). As relevant here, Count One of the superseding indictment charged:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **WILLIAM ROBERT NORWOOD III**, also known as "Robbie Norwood," attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct.
>
> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

(*Id.* at 1-2).

On October 14, 2022, Norwood signed a written plea agreement in which he agreed to plead guilty to this charge (see Attachment A at 12). As part of that plea agreement, Norwood agreed that, were the case to proceed to trial, the United States could prove certain facts beyond a reasonable doubt (*id.*, Statement of Offense at 1). On January 6, 2021, Norwood entered the "entered the [U.S. Capitol] building through the northwest Senate Wing door at approximately 2:23 p.m." (*id.* at 3). Norwood entered an office across the hall from the Old Supreme Court Chamber, where he recorded a video of himself shouting, "'Well we in this bitch now. What now? This is our house,' upon entering the office, and 'Where you at Nancy?' upon leaving the office." (*Id.* at 3-4.) Norwood subsequently "led a pack of rioters through Speaker Nancy Pelosi's office suite. As Norwood was walking through the Speaker's wing, he stole a paper coaster with the words 'U.S. Congress' and the Congressional seal printed on it, which another rioter had thrown to him from a desk outside of one of Speaker Pelosi's offices." (*Id.* at 4.) Norwood "then walked to the balcony outside the Speaker's chamber.

There, he recorded two videos of the crowd gathered outside on the west front of the U.S. Capitol Building. In one of these videos, Norwood can be heard shouting, 'It's our house bitches.' In the second video, Norwood can be heard shouting 'The soldiers' house! Go home police! Bye, you bitches.'" (*Id.*)

From there, Norwood went to the East Rotunda doors, which "were being guarded from the inside by at least three U.S. Capitol Police officers, including one officer clad in black riot gear" (*id.*). Norwood "went to the front of the line of rioters gathered at the East Rotunda doors and began banging on the doors in an attempt to open them. Norwood, together with the rioters behind him, eventually pushed open the doors, which allowed hundreds of rioters to enter the U.S. Capitol Building from the outside." (*Id.* at 5.) After participating in the breach of the East Rotunda doors, Norwood "recorded a one-minute video inside the Rotunda that showed a line of Metropolitan Police Department officers wearing yellow jackets" (*id.*). In the video, "Norwood can be heard saying, 'Oh these assholes, trying to push us out. . . . Should we take our house back? Our house. Y'all are a bunch of pussies. It's about to go down bro.' Norwood then turn[ed] the camera on himself and sa[id], 'It's about to go down. Cause I'm gonna go [unintelligible] guns or their asps and attack these motherfuckers later. No fucking around, no no.'" (*Id.* at 5-6.)

Norwood exited the U.S. Capitol Building at approximately 2:59 p.m. (*id.* at 6). After doing so, "Norwood stole a U.S. Capitol Police helmet and plate carrier from a bin outside the building" (*id.*). In a subsequent interview with FBI agents, Norwood lied about the helmet's and the plate carrier's location (*id.* at 7). He also "corruptly attempted to persuade a government witness, Norwood's estranged wife with the initials D.O., not to speak to law enforcement and not to testify against him at trial while knowing that he was not permitted to have contact with D.O. under the conditions of his pretrial release" (*id.*).

### b. Procedural History

Norwood was initially arrested on February 25, 2021, and detained pending trial (ECF No. 5). The court appointed Peter Cooper, Esq., to represent Norwood (ECF No. 7). On April 20, 2021, the Honorable Emmet G. Sullivan, to whom this case was initially assigned, released Norwood into the High Intensity Surveillance Program (HISP) and placed him on home detention (ECF No. 16). One condition of Norwood's release was that he avoid all contact with his estranged wife (*id.* at 2). In March 2022, Judge Sullivan revoked Norwood's release based on his repeated violations of that condition of release (3/15/2022 Minute Order).

As noted above, on October 14, 2022, Norwood signed a plea agreement in which he agreed to plead guilty to obstruction of an official proceeding under Section 1512(c)(2) (Attachment A). On October 18, the case was reassigned to this Court. On October 25, the government filed an unopposed motion to stay the case pending the D.C. Circuit's decision in *Fischer*, noting that the parties had agreed to resolve the case via Norwood's guilty plea to Count One and that *Fischer* "will likely provide clarity to the elements required to sustain a conviction to obstruction of justice under 18 U.S.C. § 1512(c)(2)" (ECF No. 49). The Court denied the motion in part and held it in abeyance in part (10/26/2022 Minute Order).

In December 2022, Norwood moved the Court to be released back into HISP and on home detention pending trial (ECF No. 50). The Court granted Norwood's motion on January 13, 2023 (ECF No. 52). On April 7, 2023, the D.C. Circuit issued its decision in *Fischer*. That day, Maria Medvin, Esq., noticed her appearance as Norwood's retained counsel (ECF No. 54). Mr. Cooper withdrew on April 10 (ECF No. 55). On April 14, Norwood filed the instant motion to dismiss count one (ECF No. 56).

### III.   Argument

#### a.   Section 1512(c)(2) does not require assaultive conduct.

Norwood's motion to dismiss count one should be denied because the superseding indictment in this case sufficiently alleges a violation of Section 1512(c)(2), as the D.C. Circuit's recent opinion in *Fischer* confirms.

An indictment's "main purpose is 'to inform the defendant of the nature of the accusation against him.'" *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting *Russell v. United States*, 369 U.S. 749, 767 (1962)). Thus, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Given these limited requirements, it is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).

The grand jury charged Norwood in Count One with violating Section 1512(c)(2), which makes it a crime to "corruptly . . . obstruct[ ], influence[ ], or impede[ ] any official proceeding, or attempt[ ] to do so[.]" The term "official proceeding" means, among other things, "a proceeding before the Congress[.]" 18 U.S.C. § 1515(a)(1)(B). Tracking this statutory language, the superseding indictment alleged:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **WILLIAM ROBERT NORWOOD III**, also known as "Robbie Norwood," attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and committing an act of civil disorder and engaging in disorderly and disruptive conduct.

(ECF No. 20 at 1-2). This charge properly (1) contained the elements of the offense, (2) fairly informed Norwood of the charge against which he was required to defend, and (3) provided sufficient information to protect him from future prosecutions for the same offense. Nothing more was required. *See, e.g., United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.' . . . Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.") (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).

Rather than helping Norwood, the D.C. Circuit's recent decision in *Fischer* confirms the sufficiency of the indictment in this case. In *Fischer*, the D.C. Circuit addressed a pretrial ruling that Section 1512(c)(2) "'requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding.'" 2023 WL 2817988, at *3 (quoting *United States v. Miller*, 589 F. Supp. 3d 60, 78 (D.D.C. 2022)). Because the indictments in the cases on appeal did not allege that the defendants "violated § 1512(c)(2) by committing obstructive acts related to 'a document, record, or other object,' the district court dismissed the § 1512(c)(2) counts." *Id.* The government appealed and the D.C. Circuit reversed, holding Section 1512(c)(2) "encompasses all forms of obstructive conduct, including . . . efforts to stop Congress from certifying the results of the 2020 presidential election." *Id.* at *3. The court concluded that, "[u]nder the most natural reading of the statute, § 1512(c)(2) applies to all forms of corrupt obstruction of an official proceeding, other than the conduct that is already covered by § 1512(c)(1)." *Id.* at *4. The D.C. Circuit's opinion in *Fischer* thus confirms that the indictment in this case is sufficient notwithstanding the fact that it does not allege obstructive acts related to a document, record, or other object.

Although it is somewhat convoluted and difficult to follow, Norwood appears to argue that *Fischer* only applies "when an assault on law enforcement is alleged to have been committed in furtherance of an Obstruction of an Official Proceeding" (Motion to Dismiss at 9). According to Norwood, "[t]he *Fischer* opinion provides no comprehensive guidance to trial courts on what to do in a case like that of Mr. Norwood's, a case in which an assault was not committed in furtherance of an allegation of Obstruction of an Official Proceeding" (*id.* at 10). This is not so.

Contrary to Norwood's argument, *Fischer*'s holding is not limited to cases involving assaultive conduct. Although the defendants in *Fischer* were alleged to have engaged in assaults on law enforcement officers, the D.C. Circuit held that Section 1512(c)(2) applies more broadly to "*all* forms of obstructive conduct[.]" 2023 WL 2817988, at *3 (emphasis added). The court explained that "the meaning of the statute is unambiguous. . . . Under the most natural reading of the statute, § 1512(c)(2) applies *to all forms of corrupt obstruction of an official proceeding*, other than the conduct that is already covered by § 1512(c)(1)." *Id.* at *4 (emphasis added). The court concluded that "[this] broad interpretation of the statute — encompassing all forms of obstructive acts — is unambiguous and natural, as confirmed by the 'ordinary, contemporary, common meaning' of the provision's text and structure." *Id.* at *5 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). It is impossible to read the D.C. Circuit's repeated references to Section 1512(c)(2)'s prohibition on "all forms" of obstructive acts as somehow limiting the statute's scope to obstructive acts involving assault. Norwood's argument that "[t]here is no majority opinion from the Court of Appeals on a scenario in which a defendant is not accused of committing a violent crime in furtherance of the alleged Obstruction" (Motion to Dismiss at 10) is meritless. His motion to dismiss count one based on its failure to allege an assaultive act should thus be denied.

### b.  Norwood's other arguments are meritless.

Norwood appears to advance two additional arguments in support of his motion to dismiss. First, Norwood seems to argue that Section 1512(c)(2) is unconstitutionally vague, and he invokes the rule of lenity (Motion to Dismiss at 14-16). Second, Norwood argues that "there is no evidence of corrupt intent in this case" (*id.* at 16). These arguments are meritless.

### i.  Section 1512(c)(2) is not unconstitutionally vague.

An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of

vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Norwood cannot not overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

Indeed, the D.C. Circuit in *Fischer* repeatedly found that, rather than being vague, Section 1512(c)(2) *actus reus* requirement is "unambiguous[.]" *See Fischer*, 2023 WL 2817988, at *3 ("In our view, the meaning of the statute is unambiguous."); *id.* at *5 ("the broad interpretation of the statute — encompassing all forms of obstructive acts — is unambiguous and natural"); *id.* at *10 ("we find the language of the statute unambiguous"); *id.* at *15 ("the language of § 1512(c)(2) is clear and unambiguous"). The court thus rejected the defendants' reliance on the rule of lenity. *Id.* at *15. Consistent with *Fischer*, every judge in this District to have addressed the issue has concluded

that Section 1512(c)(2) is not unconstitutionally vague. *See United States v. Gossjankowski*, No. 21-0123 (PLF), 2023 WL 130817, at *9 (D.D.C. Jan. 9, 2023) ("Finally, as this Court and other judges in this district have concluded, Section 1512(c)(2) is not unconstitutionally vague on its face."); *United States v. Bingert*, 605 F. Supp. 3d 111, 123 (D.D.C. 2022) ("The district courts have uniformly held that the certification of the Electoral College was an official proceeding and that the term 'corruptly' is not unconstitutionally vague.").

Fischer's vagueness argument appears to boil down to an assertion that "judges — legal scholars — have so far come to four distinct opinions on the meaning and applicability of the law" (Motion to Dismiss at 14). But that is not the test. As the Supreme Court explained in *Skilling*, a law is not unconstitutionally vague simply because "the Courts of Appeals have divided on how best to interpret the statute." 561 U.S. at 403. Indeed, a statute "is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). The concern is not "vagueness in the sense that the [statute] 'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary depending upon whom you ask." *Id.* (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" *Id.* (quoting *Coates*, 402 U.S. at 614). As previously discussed, by its plain terms, Section 1512(c)(2) requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. As every court to have addressed the issue has concluded, this is not an unconstitutionally vague requirement, and thus Norwood's vagueness challenge should be rejected.

### ii.  The government's evidence of Norwood's corrupt intent is immaterial at the motion to dismiss stage

Finally, Norwood argues that Count One should be dismissed because "there is no evidence of a corrupt intent in this case, or the intent to interfere with any proceeding of Congress" (Motion to Dismiss at 16). This sufficiency-of-the-evidence argument is irrelevant at this stage of the proceedings.

As previously discussed, an indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling*, 418 U.S. at 117, which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *Verrusio*, 762 F.3d at 13 (quoting *Debrow*, 346 U.S. at 378). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Federal Rule of Criminal Procedure 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added). Indeed, "[i]f contested facts surrounding the commission of the offense would be of any assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.).

Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.3d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). "In deciding a motion to dismiss an indictment, the question before the Court is a narrow one, and the court will neither review the sufficiency of the evidence against the defendant nor craft jury instructions on the elements of the crimes charged." *United States v. McHugh*, 583 F. Supp. 3d 1, 10 (D.D.C. 2022) (cleaned up).

Norwood's argument runs afoul of these basic precepts. He repeatedly makes arguments about the facts he believes the government can prove, asserting that Count One should be dismissed because "there is no evidence of a corrupt intent in this case, or the intent to interfere with any proceeding of Congress" and because "[t]here is no evidence of Mr. Norwood's comprehension of the electoral vote count, let alone an intent to interfere with it" (Motion to Dismiss at 16-17). Norwood further makes arguments about the meaning of certain facts, claiming, for example, that "his words indicate that he was searching for Nancy Pelosi in her office, a place she would not be if Mr. Norwood was aware of the Speaker's duties for that day" (*id.* at 16), and that, when he went to the East Rotunda doors, he "ask[ed] to be let out of the building and [wa]s told that he cannot leave, that the doors must remain closed, at which point a crowd c[ame] up behind Robbie and crushe[d] him into the door, the force of the crowd eventually causing the doors to reopen" (*id.* at 3). To this

latter statement, Norwood appends a lengthy footnote disputing the government's interpretation of those same facts (*id.* at 3 n.3). Thus, even under Norwood's own approach, "Rule 12 doesn't authorize [his motion's] disposition before trial" because "contested facts surrounding the commission of the offense would be of . . . assistance in determining the validity of the motion[.]" *Pope*, 613 F.3d at 1259 (Gorsuch, J.).

This case is, of course, in an unusual posture:  the defendant has agreed to plead guilty and has agreed as part of a plea agreement that the government can prove certain facts beyond a reasonable doubt (see Appendix A). But that posture does not somehow permit the Court to consider the sufficiency of the evidence at the pleading stage. As Norwood's argumentative motion to dismiss makes clear, this is not a case "where the material facts are undisputed[.]" *Yakou*, 428 F.3d at 247. Nor has the government "made a full proffer of evidence" or agreed to "a stipulated record." *Id.* And the government would object to the Court treating the plea agreement's statement of facts in that fashion. *See id.* (noting that circuits have upheld pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds "in the absence of a government objection"). Nowhere in the parties' plea agreement or the statement of offense does the government assert that it contains "a full proffer of [the government's] evidence" against Norwood. And even publicly available information proves that it does not (*see, e.g.*, Statement of Facts in support of Sealed Complaint (ECF No. 1-1) (discussing Norwood's text messages about assaulting police officers on January 6 and false statements to the FBI during a January 22, 2021, interview); Text Messages sent from Norwood to D.O. (ECF No. 51-2)).

Thus, the "narrow" question before the Court remains whether the indictment sufficiently alleges a violation of Section 1512(c)(2), and it should "neither review the sufficiency of the evidence against the defendant nor craft jury instructions on the elements of the crimes charged." *McHugh*, 583 F. Supp. 3d at 10. "The indictment here uses language tracking the statute and alleges that

[Norwood] 'attempted to, and did, corruptly obstruct, influence, and impede an official proceeding.' . . . That is sufficient." *United States v. Munchel*, No. 1:21-CR-118-RCL, 2023 U.S. Dist. LEXIS 67141, at *15 (D.D.C. April 18, 2023).

**IV.     Conclusion**

For the foregoing reasons, the Defendant's motion to dismiss should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Joseph S. Smith, Jr.*
JOSEPH S. SMITH, JR.
Assistant United States Attorney
CA Bar No. 200108
601 D Street, N.W.
Washington, D.C. 20001
(619)546-8299
Joseph.s.smith@usdoj.gov

ATTACHMENT A



U.S. Department of Justice

Matthew Graves
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C.  20530*

September 27, 2022

**<u>VIA E-MAIL</u>**
Peter Cooper, Esq.
400 Fifth Street, NW
Suite 350
Washington, D.C. 20001
pcooper@petercooperlaw.com

       Re:     <u>United States v. William Robert Norwood III</u>
               Criminal Case No. 21-cr-233-EGS

Dear Mr. Cooper:

       This letter sets forth the full and complete plea offer to your client, William Robert Norwood III (hereinafter referred to as "your client" or "defendant"), from the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office").  This plea offer expires on **October 17, 2022**.  If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below.  Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as "this Agreement").  The terms of the offer are as follows:

      1.      **<u>Charges and Statutory Penalties</u>**

       Your client agrees to plead guilty to Count One in the Superseding Indictment, charging your client with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.

       Your client understands that a violation of 18 U.S.C. § 1512(c)(2) carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3), (d); a ter]m of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

In addition, your client agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court for the District of Columbia. Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Commission, *Guidelines Manual* (2018) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation. Further, your client understands that, if your client has two or more convictions for a crime of violence or felony drug offense, your client may be subject to the substantially higher penalties provided for in the career-offender statutes and provisions of the Sentencing Guidelines.

### 2.    Cooperation with Additional Investigation

Your client agrees to allow law enforcement agents to review any social media accounts operated by your client for statements and postings in and around January 6, 2021 prior to sentencing.

### 3.    Factual Stipulations

Your client agrees that the attached "Statement of Offense" fairly and accurately describes your client's actions and involvement in the offense to which your client is pleading guilty. Please have your client sign and return the Statement of Offense as a written proffer of evidence, along with this Agreement.

### 4.    Additional Charges

In consideration of your client's guilty plea to the above offense, your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense. The Government will request that the Court dismiss the remaining counts of the Superseding Indictment in this case at the time of sentencing. Your client agrees and acknowledges that the charges to be dismissed at the time of sentencing were based in fact.

After the entry of your client's plea of guilty to the offense identified in paragraph 1 above, your client will not be charged with any non-violent criminal offense in violation of Federal or District of Columbia law which was committed within the District of Columbia by your client prior to the execution of this Agreement and about which this Office was made aware by your client prior to the execution of this Agreement. However, the United States expressly reserves its right to prosecute your client for any crime of violence, as defined in 18 U.S.C. § 16 and/or 22 D.C. Code § 4501, if in fact your client committed or commits such a crime of violence prior to or after the execution of this Agreement.

### 5.    Sentencing Guidelines Analysis

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties agree to the following:

### A.      Estimated Offense Level Under the Guidelines

The parties agree that the following Sentencing Guidelines sections apply:

| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference | 3 |
| U.S.S.G. § 3C1.1 | Obstructing the Administration of Justice | 2 |
| | Total | 19 |

The Government intends to seek an eight-level adjustment pursuant to U.S.S.G. § 2J1.2(b)(1)(B) because the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice. Your client reserves the right to oppose this eight-level adjustment. If the Court determines that the eight-level adjustment applies, the total offense level would be 27.

**Acceptance of Responsibility**

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. Furthermore, assuming your client has accepted responsibility as described in the previous sentence, the Government agrees that an additional 1-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1(b), because your client has assisted authorities by providing timely notice of your client's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

### B.      Estimated Criminal History Category

Based upon the information now available to this Office, your client has no criminal convictions.

Accordingly, your client is estimated to have 0 criminal history points and your client's Criminal History Category is estimated to be I (the "Estimated Criminal History Category"). Your client acknowledges that after the pre-sentence investigation by the United States Probation

Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease.

###    C.    Estimated Guidelines Ranges

Based upon the Estimated Criminal History Category set forth above, your client's Estimated Offense will be level 16 if the Court determines that the eight-level upward adjustment under § 2J1.2(b)(1)(B) does not apply.  If the Court determines that the eight-level adjustment does not apply under U.S.S.G. § 2J1.2(b)(1)(B), based upon the Estimated Offense Level of 16 and the Estimated Criminal History Category set forth above, your client's estimated Sentencing Guidelines range is 21 months to 27 months ("Estimated Guidelines Range").  Pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 16, the estimated applicable fine range is $10,000 to $95,000.

If the Court determines that the eight-level upward adjustment under § 2J1.2(b)(1)(B) applies, the total offense level will be 24.  If the Court determines that the eight-level adjustment applies under U.S.S.G. § 2J1.2(b)(1)(B), based upon the Estimated Offense Level of 24 and the Estimated Criminal History Category set forth above, your client's estimated Sentencing Guidelines range is 51 months to 63 months ("Estimated Guidelines Range").  Pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 24, the estimated applicable fine range is $20,000 to $200,000.

Your client reserves the right to ask the Court not to impose any applicable fine.

The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range(s) set forth above is warranted, except the Government reserves the right to request an upward departure pursuant to U.S.S.G. § 3A1.4, n. 4.  Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A.  However, the parties are free to argue for a Criminal History Category different from that estimated above in subsection B.

Your client understands and acknowledges that the Estimated Guidelines Range(s) calculated above are not binding on the Probation Office or the Court.  Should the Court or Probation Office determine that a guidelines range different from the Estimated Guidelines Range(s) is applicable, that will not be a basis for withdrawal or recission of this Agreement by either party.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement.  Should your client commit any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the

Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

**6.        Agreement as to Sentencing Allocution**

The parties further agree that a sentence within the Estimated Guidelines Range(s) would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below. However, the parties agree that either party may seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

**7.        Reservation of Allocution**

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. The parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range(s) calculated herein. In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range(s) calculated herein.

In addition, if in this Agreement the parties have agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the parties reserve the right to full allocution in any post-sentence litigation. The parties retain the full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding(s) before the Bureau of Prisons. In addition, your client acknowledges that the Government is not obligated and does not intend to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

**8.        Court Not Bound by this Agreement or the Sentencing Guidelines**

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines. Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Your client acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing. Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Court.

Your client acknowledges that your client's entry of a guilty plea to the charged offense authorizes the Court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range.  The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence that is outside the Guidelines range or if the Court does not follow the Government's sentencing recommendation.  The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Court.  Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

9.  **Conditions of Release**

Your client acknowledges that, although the Government will not seek a change in your client's release conditions pending sentencing, the final decision regarding your client's bond status or detention will be made by the Court at the time of your client's plea of guilty.  The Government may move to change your client's conditions of release, including requesting that your client be detained pending sentencing, if your client engages in further criminal conduct prior to sentencing or if the Government obtains information that it did not possess at the time of your client's plea of guilty and that is relevant to whether your client is likely to flee or pose a danger to any person or the community.  Your client also agrees that any violation of your client's release conditions or any misconduct by your client may result in the Government filing an ex parte motion with the Court requesting that a bench warrant be issued for your client's arrest and that your client be detained without bond while pending sentencing in your client's case.

10.  **Waivers**

    A.  **Venue**

Your client waives any challenge to venue in the District of Columbia.

    B.  **Statute of Limitations**

Your client agrees that, should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, any prosecution, based on the conduct set forth in the attached Statement of Offense, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of Offense that is not time-barred on the date that this Agreement is signed.

### C.      Trial Rights

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule.  Your client agrees to forego the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea.  Your client also agrees to waive, among other rights, the right to plead not guilty and the right to a jury trial.  If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify.  If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client.  Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt.  If your client were found guilty after a trial, your client would have the right to appeal your client's conviction.  Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution.  By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn.  Your client knowingly and voluntarily waives the rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the plea of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court.  Your client understands that the date for sentencing will be set by the Court.

### D.      Appeal Rights

Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claims that (1) the statute to which your client is pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute.  Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances.  Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court.  In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the

Court.  Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

### E.     Collateral Attack

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel.  Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2), but agrees to waive the right to appeal the denial of such a motion.

### F.     Hearings by Video Teleconference and/or Teleconference

Your client agrees to consent, under the CARES Act, Section 15002(b)(4) and otherwise, to hold any proceedings in this matter – specifically including but not limited to presentment, initial appearance, plea hearing, and sentencing – by video teleconference and/or by teleconference and to waive any rights to demand an in-person/in-Court hearing.  Your client further agrees to not challenge or contest any findings by the Court that it may properly proceed by video teleconferencing and/or telephone conferencing in this case because, due to the COVID-19 pandemic, an in-person/in-Court hearing cannot be conducted in person without seriously jeopardizing public health and safety and that further there are specific reasons in this case that any such hearing, including a plea or sentencing hearing, cannot be further delayed without serious harm to the interests of justice.

### 11.     Use of Self-Incriminating Information

The Government and your client agree, in accordance with U.S.S.G. § 1B1.8, that the Government will be free to use against your client for any purpose at the sentencing in this case or in any related criminal or civil proceedings, any self-incriminating information provided by your client pursuant to this Agreement or during the course of debriefings conducted in anticipation of this Agreement, regardless of whether those debriefings were previously covered by an "off the record" agreement by the parties.

### 12.     Restitution

Your client acknowledges that the riot that occurred on January 6, 2021, caused as of April 5, 2022, approximately $2,734,783.15 damage to the United States Capitol. Your client agrees as part of the plea in this matter to pay restitution to the Architect of the Capitol in the amount of $2,000.

Payments of restitution shall be made to the Clerk of the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, your client agrees to disclose fully all assets in which your client has any interest or over which your client exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. Your client agrees to submit a completed financial statement on a standard financial disclosure form which has been provided to you with this Agreement to the Financial Litigation Unit of the United States Attorney's Office, as it directs. If you do not receive the disclosure form, your client agrees to request one from usadc.ecfflu@usa.doj.gov. Your client will complete and electronically provide the standard financial disclosure form to usadc.ecfflu@usa.doj.gov 30 days prior to your client's sentencing. Your client agrees to be contacted by the Financial Litigation Unit of the United States Attorney's Office, through defense counsel, to complete a financial statement. Upon review, if there are any follow-up questions, your client agrees to cooperate with the Financial Litigation Unit. Your client promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement could be prosecuted as a separate crime punishable under 18 U.S.C. § 1001, which carries an additional five years' incarceration and a fine.

Your client expressly authorizes the United States Attorney's Office to obtain a credit report on your client in order to evaluate your client's ability to satisfy any financial obligations imposed by the Court or agreed to herein.

Your client understands and agrees that the restitution or fines imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, your client understands that the schedule of payments is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset. If your client is sentenced to a term of imprisonment by the Court, your client agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically imposes a schedule of payments.

Your client certifies that your client has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this Agreement and/or that may be imposed by the Court. In addition, your client promises to make no such transfers in the future until your client has fulfilled the financial obligations under this Agreement.

### 13.   Breach of Agreement

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Agreement. In the event of such a breach: (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against

your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously characterized as "off-the-record" debriefings, and including your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by a preponderance of the evidence, except where such breach is based on a violation of federal, state, or local criminal law, which the Government need prove only by probable cause in order to establish a breach of this Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

### 14.   **Complete Agreement**

No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal and Superior Court Divisions of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by signing this Agreement and the Statement of Offense, and returning both to me no later than **October 17, 2022**.

Sincerely yours,

Matthew M. Graves
United States Attorney

By:   s/ Andrew J. Tessman
      Andrew J. Tessman
      Assistant United States Attorney

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorney, Peter Cooper. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.


Date: _14 Oct 2022_        _William Norwood III_
                          William Robert Norwood III
                          Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, William Robert Norwoood III, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.


Date: _14 Oct 2022_        _____
                          Peter Cooper, Esq.
                          Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No: 21-cr-233-EGS** |
|  | : |  |
|  | : |  |
| **v.** | : | **18 U.S.C. §§ 1512(c)(2), 2** |
|  | : | **(Obstruction of an Official Proceeding and** |
| **WILLIAM ROBERT NORWOOD III,** | : | **Aiding and Abetting)** |
| **also known as "Robbie Norwood,"** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, William Robert Norwood III, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

1

3.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.  The joint session began at approximately 1:00 p.m.  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5.      At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol;

however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.  Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *William Robert Norwood III's Participation in the January 6, 2021, Capitol Riot*

8.      William Robert Norwood III drove from South Carolina to Washington D.C. to attend the "Stop the Steal" rally on January 6, 2021.  After the rally, Norwood walked toward the U.S. Capitol Building.  Norwood ascended the partially covered stairs on the northwest side of the U.S. Capitol Building, and ultimately entered the building through the northwest Senate Wing door at approximately 2:23 p.m.

9.      After entering the Senate Wing door, Norwood walked south and briefly entered an office across the hall from the Old Supreme Court Chamber.  Norwood recorded a video of

himself entering this office.  In this video, Norwood can be heard shouting, "Well we in this bitch now. What now?  This is our house," upon entering the office, and "Where you at Nancy?" upon leaving the office.

10.     After leaving the office, Norwood walked through the Crypt and upstairs to the Rotunda.  From there, Norwood led a pack of rioters through Speaker Nancy Pelosi's office suite.  As Norwood was walking through the Speaker's wing, he stole a paper coaster with the words "U.S. Congress" and the Congressional seal printed on it, which another rioter had thrown to him from a desk outside of one of Speaker Pelosi's offices.

11.     Norwood then walked to the balcony outside the Speaker's chamber.  There, he recorded two videos of the crowd gathered outside on the west front of the U.S. Capitol Building.  In one of these videos, Norwood can be heard shouting, "It's our house bitches."  In the second video, Norwood can be heard shouting "The soldiers' house!  Go home police!  Bye, you bitches."

12.     After leaving the balcony, Norwood entered one of Speaker Pelosi's offices for approximately 25 seconds.  He then walked back through the Speaker's wing, where he witnessed another rioter destroying a wooden sign over the archway, which read "Speaker of the House Nancy Pelosi."

13.     After leaving the Speaker's wing, Norwood walked back through the Rotunda and to the East Rotunda doors.  The East Rotunda doors were being guarded from the inside by at least three U.S. Capitol Police officers, including one officer clad in black riot gear.  Norwood went to the front of the line of rioters gathered at the East Rotunda doors and began banging on the doors in an attempt to open them.  Norwood, together with the rioters behind him, eventually pushed open the doors, which allowed hundreds of rioters to enter the U.S. Capitol Building

from the outside.  A screenshot from the surveillance footage depicting the breach of the East

Rotunda door is provided below.



14.     Norwood was temporarily pinned between the East Rotunda door and the wave of

rioters entering the U.S. Capitol Building.  When he came back inside, Norwood joined several

other rioters in forming a circle around the officer clad in black riot gear.  Norwood offered the

officer clad in black riot gear a blue Gatorade from his pocket.

15.     After participating in the breach of the East Rotunda door, Norwood continued

wandering around the Capitol Building.  He recorded a one-minute video inside the Rotunda that

showed a line of Metropolitan Police Department officers wearing yellow jackets.  During the

video, Norwood can be heard saying, "Oh these assholes, trying to push us out. . . .  Should we

take our house back?  Our house.  Y'all are a bunch of pussies.  It's about to go down bro."

Norwood then turns the camera on himself and says, "It's about to go down.  Cause I'm gonna

go [unintelligible] guns or their asps and attack these motherfuckers later.  No fucking around,

no no." Screenshots from the one-minute video that Norwood recorded inside the Rotunda are provided below.



16.    Norwood eventually exited the U.S. Capitol Building through the East Rotunda door at approximately 2:59 p.m.

17.    After exiting the U.S. Capitol Building, Norwood stole a U.S. Capitol Police helmet and plate carrier from a bin outside the building.  The helmet and plate carrier are valued at approximately $578.83.

18.     During a non-custodial interview with FBI agents in January 2021, Norwood lied to agents by claiming to have left the helmet and plate carrier in a cabinet in a hotel room in Washington, D.C.  In fact, however, Norwood took the helmet and plate carrier back with him to South Carolina and hid them in a portable trailer that he parked on a friend's property.

19.     During his post-arrest interview, Norwood admitted that he and his then wife with the initials D.O. brought their own personal tactical vests, mace, and small knives with them to Washington D.C.

20.     For several months prior to his bond revocation on March 15, 2022, Norwood corruptly attempted to persuade a government witness, Norwood's estranged wife with the initials D.O., not to speak to law enforcement and not to testify against him at trial while knowing that he was not permitted to have contact with D.O. under the conditions of his pretrial release.

21.     Norwood knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building.  Norwood obstructed, influenced, and impeded an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

Respectfully submitted,

MATTHEW M. GRAVES
Acting United States Attorney
D.C. Bar No. 481052

By:     /s/ Andrew J. Tessman
Andrew J. Tessman
Assistant United States Attorney

DEFENDANT'S ACKNOWLEDGMENT

I, William Robert Norwood III, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 10-14-22

William Robert Norwood III
Defendant

ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 14 Oct 2022

Peter Cooper, Esq.
Attorney for Defendant